IN THE UNITED STATE DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| JACOB SAATHOFF, KATHY SAATHOFF, and KELSEY MARKOU,<br><br>    Plaintiffs,<br>v.<br><br>CITY OF CHAMPAIGN, ILLINOIS and OFFICER ANDRE DAVIS (officer # 7786),<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)   No.  13-cv-02253<br>)<br>)<br>)<br>)<br>)<br>) |

**MOTION FOR SUMMARY JUDGMENT**

NOW COME Defendants, City of Champaign and Officer Andre Davis (collectively "Defendants"), by one of their attorneys, Thomas Yu, and under Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7.1(d) of the U.S. District Court for the Central District of Illinois, move for summary judgment against Plaintiffs, Jacob Saathoff, Kathy Saathoff and Kelsey Markou, and in support state as follows:

### I.   INTRODUCTION

Plaintiffs have filed suit against Defendants alleging that on the evening of Nov. 17, 2012, Officer Andre Davis's ("Davis") actions in responding to a dogfight taking place at Centennial Park in Champaign, Illinois resulted in the untimely death of their dog, which was an unreasonable seizure of their property and a violation of their Fourth Amendment rights under the U.S. Constitution. Further, Plaintiffs allege that the unreasonable seizure was the result of policy and practice of the Champaign Police Department ("CPD") and its failure to train its officers regarding "Use of Force" against animals and the use of firearms.

Defendants deny the allegations and state that under the totality of the circumstances presented to Davis, his actions were reasonable and he is afforded the protections of qualified

1

immunity. Moreover, Davis affirms that he has received extensive training in "Use of Force" and use of firearms during his tenure with CPD. In addition, Chief of CPD, Anthony Cobb ("Chief Cobb") affirms that he is unaware of any custom or practice at CPD, which violates CPD policies and procedures, Illinois Law Enforcement Accreditation Program (ILEAP) standards or state law.

## II.  UNDISPUTED MATERIAL FACTS

### A. November 17, 2012

1. Davis was traveling westbound on John Street around Mattis in his squad car en route to responding to a residential alarm call. (Exhibit A, Davis Deposition Transcript, p.78, l.11-18)

2. Davis heard a dispatch call for someone who was walking their dog and their dog was being attacked by a pit bull. (Ex. A, p.78, l.11-18; p.84, l.9-17)

3. While still en route to the alarm call, Davis continued westbound on John Street approaching the intersection at Crescent. (Ex. A, p.81, l.16 to p.82, l.2)

4. At around 5:30 PM, Saturday, November 17, 2012, a group of people were frantically waiving Davis down. (Exhibit B, Complaint, ¶ 14; Ex. A, p.82, l.6-7)

5. The sun had already gone down. (Ex. B., ¶ 11; Exhibit C, Jones Deposition Transcript, p.35, l.7-10)

6. Davis pulled alongside the curb and exited the vehicle. (Ex. A, p. 83, l.1-6)

7. Davis activated his vehicle spotlight and turned it towards 2 dogs engaged in a dogfight. (Ex. A, p.83, l.7-24)

8. Because the dogs are engaged in fighting, sometimes the dogs were illuminated by the spotlight and sometimes they were not. (Exhibit D, Markou Deposition Transcript, p.44, l.9-20)

9. Davis positioned himself between the spotlight and the dog and there appeared to be a shadow being cast down upon the dogs. (Ex. A, p.121, l.2-19)

10. To Davis, both dogs appeared dark, but one dog was larger and the other appeared smaller and had a white stomach. (Ex. A, p.85, l.10-16)

11. Kelsey Markou ("Markou") identified herself to Davis as the owner of one of the dogs engaged in the dogfight and she identified her dog alternately as: the one being attacked; the brown dog; the dog with the leash; and the chocolate lab. (Ex. A, p.86, l.13-17)

12. The bystanders, Tyrone Jones ("Jones") and 3 male, black juveniles, were echoing some of what Markou was saying to Davis. (Ex. D, p.45, l.17-24; Ex. C, p.47, l.7-12)

13. Jones observed the entire dogfight and tried to calm down Markou at the scene because she was hysterical and it "might have been" hard to understand her. (Ex. C, p.71, l.19 to p.72, l.11).

14. Jones does not remember seeing Markou's dog wearing a metal collar, but does remember seeing it wearing a cloth-like collar. (Ex. C, p.39, l.8-17)

15. Jones does not remember if the collar was black or brown. (Ex. C, p.38, l.2 to p.39, l.17)

16. Jones does not remember Markou identifying her dog as wearing a collar to Davis because everything was happening so fast. (Ex. C, p.68, l.10-12)

17. Jones states that when the dogs were fighting, you really could not tell which dog had a leash because their bodies were in the way. (Ex. C, p.45, l.7-11)

18. The most important information Markou provided to identify her dog to Davis was the color of her dog. (Ex. D, p.101, l.12-22; Ex. C, p.45, l.12-14)

19. Markou hears the bystander juveniles saying and echoing to Davis, "Shoot it." (Ex. D, p.49, l.12-22)

20. Davis is colorblind and has difficulty distinguishing between greens, reds, browns and grays, especially at night depending on the lighting conditions. (Ex. A, p.25, l.17 to p.27, l 20)

21. Davis drew closer to the dogs and one dog appeared to be a pit bull, the other dog he could not clearly identify because he could only see from the midsection to the hind legs. (Ex. A, p.87, l.6-11; p.88, l.11-18)

22. Davis observed the smaller dog positioned underneath the bigger dog. (Ex. A, p.88, l.23 to p.89, l.10)

23. Markou states that there may have been some rolling around when there were exchanges in leverage and the dogs were moving back and forth and that no dog ever really got on their back for the most part. (Ex. D, p.55, l.4 to p.56, l.8)

24. By this time, Davis was within 5 to 7 feet of the dogfight. (Ex. A, p.89, l.17-19)

25. Davis observed the bigger dog dominating and mauling the smaller dog. (Ex. A, p.89, l.15-16)

26. To Davis, the dominating dog was dark and the dog being mauled was darker. (Ex. A, p.122, l.10-16)

27. To bystander Jones, during the dogfight "the Lab was giving the pit [bull] a run for its money." (Ex. C, p.51, l.16)

28. Davis could not determine which dog the leash was attached to because it was tangled up between the two dogs. (Ex. A, p.89, l.20-24)

29. At the same time, there were other bystanders providing Davis with confusing information regarding which dog was the aggressor. (Ex. A, p.90, l.1-16)

30. Jones observed that Davis appeared confused as to what was going on at the scene. (Ex. C, p.73, l.4-6)

31. To Davis the larger dog appeared to be aggressive and mauling the other dog. This dog had a muscular build with a large head and it resembled a pit bull to Davis. (Ex. A, p.91, l.12 to p.92, l.2)

32. Davis unholstered his gun and aimed at the larger dog certain it was the aggressor dog. (Ex. A, p.90, l.17-21)

33. Davis discharged his firearm, but misses. (Ex. D, p.61, l.9-16)

34. Davis discharged his firearm a second time and hit his target. (Ex. D, p.62, l.13)

35. From her reaction Davis learns that he has mis-identified which of the two dogs was owned by Markou. (Ex. D, p.69, l.10-11; Ex. A, p.93, l.2-5)

36. Jones observed that after he shot the dog, Davis looked confused. (Ex. C, p.54, l.23 to p.55, l.7)

37. The two dogs separated and now Davis observes that the other dog is indeed a pit bull. This dog's ears are pinned back; teeth are glaring; eyes are widened; and it is indicating a heightened state of aggressiveness. (Ex. A, p.94, l.12-20)

38. Davis is concerned that someone may get bit, attacked or mauled by this dog. (Ex. A, p.94, l.21-23)

39. Davis shoots at and chases after the pit bull as it flees the scene. (Ex. A, p.95, l.7-10)

### B.  Champaign Police Dept.

40. A CPD investigation of Davis's conduct of Nov. 17, 2012 revealed that his decision to discharge his weapon was within CPD policy. (Exhibit F, Cobb Deposition Transcript, p.35, l.6-12)

41. "Use of Force" Policy No. 1.3.2.C. was in effect on Nov. 17, 2012 provided that, "Deadly force may be used to kill a dangerous animal or an animal that is so severely injured that humanity requires its disposal to prevent further suffering." (Ex. F, p.47, l.9 to p.48, l.7)

42. CPD determined that Davis's use of force was within policy because he used deadly force to kill a dangerous animal. (Ex. F, p.48, l.8-14)

43. Chief Cobb also concluded that there was confusion at the scene as to which dog was responsible for the attack and that Davis was concerned about the safety of bystanders in the immediate area (Exhibit F, p.39, l.19 to p.40, l.1)

44. Davis has been employed as a CPD Officer since 2004. (Ex. A, p.12, l.18-21)

45. In February 2013, Davis was promoted to the position of Detective. (Ex. A, p.114, l.2-4)

46. From Sept. 2004 through June 2014, Davis received over 1,300 police training hours, which includes training in "Use of Force" and use of firearms. (Exhibit E, Davis Affidavit, ¶ 3-4)

47. Chief Cobb is the final policymaking authority for CPD. (Exhibit G, Cobb Affidavit, ¶ 2)

48. At no time during Chief Cobb's tenure at CPD did he have knowledge of any custom or practice at CPD, which violates CPD policies or procedures, Illinois Law Enforcement Accreditation Program (ILEAP) standards, or state law. (Ex. G, ¶ 5)

49. The Director of Champaign County Animal Control since 2005, Stephanie Joos, states that there is no specific training available to respond to dog fights because every situation is so different. (Exhibit H, Joos Transcript, p. 8, l. 17-18; p. 26, l. 7-22)

50. Moreover, in her almost 18 years in Animal Control services, she is aware of dog fights happening maybe once or twice a year. (Ex. H, p. 27, l. 2-4)

### C. Plaintiffs

51. Plaintiffs received the subject dog as a free gift in 2008. (Exhibit I, Plaintiffs' Answer to Interrogatories, ¶ 5)

52. This dog was a chocolate-colored Labrador Retriever that Plaintiffs were training as a hunting and retrieving dog. (Ex. I, ¶ 7)

53. Plaintiffs purchased a companion female chocolate-colored Labrador Retriever for $400 in 2011. (Ex. I, ¶ 5)

54. The actual out-of pocket cost for a replacement dog (new male chocolate-colored Labrador Retriever with comparable bloodlines) is $3,000.00 (Ex. I, ¶ 14)

55. In January 2013, Markou went to one free counseling session at Parkland College, but has sought no other counseling or treatment for emotional distress. (Ex. D, p. 96, l.12 to p. 97, l.5)

### III.    ARGUMENT

#### A. Legal Standard:  Summary Judgment

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The evidence in the record shows that there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law accordingly.

#### B. Unreasonable Seizure

To state a claim for relief under 42 U.S.C. § 1983 Plaintiffs must prove that: (1) they were deprived of a right secured by the Constitution or laws of the U.S.; and (2) the deprivation was caused by a person(s) acting under color of state law. *Alvarado v. Litscher*, 267 F.3d 648,651 (7th Cir.2001). A dog is property that can be seized and the killing of a dog is recognized as a seizure under the Fourth Amendment. *Pfeil v. Rogers*, 757 F.2d 850, 866 (7th Cir.1985).

7

Furthermore, in order for Plaintiffs to prevail they need to prove that the deprivation of their dog was achieved through unconstitutionally insufficient procedures. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990).

To determine whether the deprivation was unconstitutionally insufficient, federal courts conduct a balancing test, which weighs private interest factors and the risk of erroneous deprivation against government interests. *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). In another case of an alleged unlawful shooting of a dog, a District Court in the Northern District of Illinois found that "while the financial cost and companionship of a dog is not trivial, these interests do not rise to the level of something truly significant, like welfare assistance, which provides the recipient's means to live." *Brandon v. Village of Maywood,* 157 F.Supp.2d 917, 931 (N.D.Ill.2001)

Even if a court determines that a constitutional violation occurred, then a police officer may still be entitled to qualified immunity if the conduct is reasonable under the circumstances. Qualified immunity exists fundamentally to protect officers in the performance of their duties unless they are "plainly incompetent" or they "knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The court is to consider whether an officer's conduct was reasonable in light of the circumstances he is confronting. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Moreover, courts must bear in mind that when considering the conduct of police officers under the totality of the circumstances, "police officers are often forced to make split second judgments in circumstances that are tense, uncertain and rapidly evolving." *Phillips v. Community Ins. Corp.*, 678 F.3d 513 (7th Cir.2012)

In *Brandon v. Village of Maywood*, the owner's dog was shot nineteen times by police officers during a would-be drug bust, and the court concluded that reasonable officers under the

same circumstances could have made a reasonable mistake as to whether the dog was dangerous. 157 F.Supp.2d 917, 931 (N.D.Ill.2001). Ultimately, the court did not find that the officers were plainly incompetent, knowingly violated the law, or had a purpose to cause harm to bystanders, therefore the officers were entitled to qualified immunity. *Id*, at 925, 931.

Similarly, Davis's conduct was reasonable under the circumstances and he is entitled to qualified immunity. Upon being flagged down near the intersection of John and Crescent, in Champaign, Illinois, by a group of bystanders on the evening of November 17, 2012, Davis had to make spur-of-the-moment assessments and decisions. At the time, Davis had a strong interest in protecting the welfare of bystanders, as well as not becoming personally injured by two dogs engaged in a vicious dogfight: each of which, to Davis, were displaying propensities for violence and were dangerous. Further, Davis had a strong interest in protecting Markou's property interest as she was hysterical and wanting Davis to help her and her dog. Unfortunately, Davis mistakenly, but reasonably, determined that the smaller dog engaged in the dogfight was owned by Markou.

Moreover, the decision to use deadly force was not plainly incompetent or knowingly violated the law. CPD "Use of Force" Policy No. 1.3.2.C. provided that, "Deadly force may be used to kill a dangerous animal or an animal that is so severely injured that humanity requires its disposal to prevent further suffering." In Davis's assessment of the scene, he observed two dogs engaged in a vicious dogfight, which presented a danger each other, to bystanders and to him. At that point, Davis could have lawfully used deadly force to kill both of the dangerous dogs involved in the dogfight. However, an important factor in this case is that Davis attempted to aid Markou by saving her dog. In his ongoing assessment of the dogfight, Davis determined that the larger dog appeared to him to be the aggressor mauling and in a dominating position over the

9

smaller dog. Given his assessment of the situation, he performed his law enforcement duties in using deadly force in compliance with CPD "Use of Force" Policy No. 1.3.2.C., and did not violate any law.

Lastly, and perhaps most importantly, the evidence in the record demonstrates that Davis lacked the requisite intent to deprive Plaintiffs of their property rights in the dog. Intent is a condition precedent for a Fourth Amendment violation. The deprivation of Plaintiffs' rights must be proven through means intentionally applied. *Brower v. County of Inyo*, 489 U.S. 593 (1989). It is undisputed that Davis intended to shoot and kill one of the dogs in the dogfight. However, also undisputed is that his intent was to kill the aggressor dog and save Markou's dog. He had every intention to protect Markou's property interest, but made a reasonable mistake in determining which dog belonged to Markou. The evidence in the record shows that Plaintiffs cannot prove that Davis's purpose and intent was to cause Plaintiffs harm by depriving them of their property interest, thus they cannot prove a Fourth Amendment violation occurred. *County of Sacramento v. Lewis*, 523 U.S. 833 (1988).

In light of the important interests in the protection of the safety of bystanders, his own safety, Markou's property interest and the spur-of-the-moment decision-making required under the circumstances, the evidence shows that Plaintiffs cannot prove that the seizure of the dog was an unreasonable intrusion on their Fourth Amendment rights. Therefore, summary judgment in favor of Defendants is appropriate on the Fourth Amendment claim – Count I of Plaintiffs' Complaint.

### C. *Monell* Liability

It is well established that a municipality's liability for a constitutional injury requires a finding that the individual officer is liable on the underlying substantive claim. *Treece v.

*Hochstetler*, 213 F.3d 360, 364 (7th Cir.2000). Because the sole underlying constitutional claim has failed, Plaintiff's *Monell* claim must fail as well and summary judgment should be granted for Defendants on Count II. *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978).

In the alternative, Plaintiffs are required to prove that the alleged constitutional violation was caused by: (1) the existence of an express policy; (2) the existence of a widespread practice or custom; or (3) an act of a person with final policymaking authority. *Roach v. City of Evansville*, 111 F.3d 544, 548 (7th Cir.1997). The record is devoid of any evidence of any prior incidents of improper use of deadly force upon dogs by CPD police officers. In fact, situations where police officers or animal control are called to deal with dogfight situations are rare and there is no specific training available to respond to dog fights because every situation is different. Therefore, Plaintiffs are unable to prove that there existed actual, repeated, recurring situations resulting in a pattern of constitutional violations. *City of Canton v. Harris*, 489 U.S. 378, 396-97 (1989).

Consequently, even proof of a single incident of unconstitutional activity is insufficient to impose liability under *Monell*, unless Plaintiffs are able to prove that there was an existing municipal policy which can be attributed to the municipal policymaker. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-824 (1985). Along those lines, Plaintiffs allege that CPD had policies in place allowing officers to unreasonably use deadly force upon dogs. However, Chief Cobb is the final policymaking authority for CPD and he unequivocally denies the existence of any custom or practice at CPD, which violates CPD policies or procedures, ILEAP standards, or state law. And, there is no proof in the record to the contrary.

Secondarily, Plaintiffs also allege a failure to train officers on the appropriate use of deadly force against animals and use of firearms. To prevail, Plaintiffs must present evidence

that the need for more or different training was so glaring and obvious and so likely to lead to the violation of constitutional rights that the policymaker's failure to respond amounts to deliberate indifference. *Brown v. Muhlenberg Township*, 269 F.3d 205 (3rd Cir.2001). Further, Plaintiffs must show that the deficiency in training actually caused Davis's violation of Plaintiffs' rights.

There is no evidence in the record, which demonstrates a lack of training of CPD police officers in "Use of Force" and use of firearms. Other than K-9 Officers, there is no evidence in the record that CPD police officers receive dog-specific training. Although Plaintiffs may argue that such instruction to patrol officers may be useful, no reasonable jury could find that the absence of such training is so glaring and obvious that its absence makes it extremely likely to result in the violation of constitutional rights of pet owners. To the contrary, CPD police officers receive ongoing training. Davis, individually, has received over 1,300 hours of police training, which includes training in "Use of Force" and use of firearms. Therefore, the evidence in the record shows that Plaintiffs cannot prove at trial that the need for further dog-specific training related to "Use of Force" and firearms was so glaring and obvious that CPD was deliberately indifferent in not offering such training. *City of Canton v. Harris*, 489 U.S. 378, 391 (1989); *Viilo v. City of Milwaukee*, 552 F.Supp.2d 826, 844 (E.D.Wis.2008).

Lastly, ratification of an unconstitutional act requires more explicit approval than merely the alleged failure to discipline after an investigation. *Monfils v. Taylor*, 165 F.3d 511, 517 (7th Cir.). The undisputed evidence in the record demonstrates that CPD conducted an investigation of Davis's actions and concluded that:

>  (1) There was confusion at the scene as to which dog was responsible for the attack;
>
>  (2) Davis was concerned about the safety of bystanders in the immediate area; and

(3) His decision to discharge his weapon was within policy.

There is no evidence in the record of actual recurring situations resulting in a pattern of unreasonable Fourth Amendment seizures of dogs by CPD officers. In addition, there is no evidence in the record of a failure to train CPD police officers, generally, or Davis, specifically, with respect to "Use of Force" and use of firearms. Therefore, summary judgment in favor of Defendants is appropriate on the *Monell* claim – Count II of Plaintiffs' Complaint.

### D. State Law Claims

Among the state law claims in this action, Plaintiffs contend that Davis's conduct caused:

(1) Intentional infliction of emotional distress to Markou (Ex. B, Ct. III);

(2) Conversion of Plaintiffs' property interest in the dog (Ex. B, Ct. IV);

(3) Municipal liability through the doctrine of *respondeat superior* (Ex. B, Ct. V): and

(4) Violations of the Humane Care for Animals Act, 510 Ill. Comp. Stat. 70/16. (Ex. B, Ct. VI).

Significantly, a public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct. 745 Ill. Comp. Stat. 10/2–202. For purposes of the Tort Immunity Act, willful and wanton conduct is "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 Ill. Comp. Stat. 10/1–210.

As discussed in subsection III.B. herein, Davis's judgments and actions were made under circumstances that were tense, uncertain and rapidly evolving. His decision to use deadly force was reasonable and consistent with CPD policies and procedures. Given the totality of circumstances, Davis made a reasonable mistake in determining which of the dogs involved in the dogfight was owned by Markou, however, his conduct is protected by the Tort Immunity Act

because his actions were not made with an actual or deliberate intention to cause harm to Plaintiffs or their dog. His actions were, in fact, made in response to bystanders who flagged him down to handle a dogfight and Markou who was hysterical and wanting Davis to help her and her dog. Along those lines, Davis assessed that the dogs were dangerous to each other, bystanders and him. He shot the larger, dominating dog to help Markou. These circumstances justify the reasonableness of Davis's actions and thus afford him the protections of the Tort Immunity Act.

In addition, no Illinois statute provides for a "wrongful death"- type of cause of action for the death of an animal. In the eyes of the common law, a pet "is an item of personal property." *Anzalone v. Kragness*, 356 Ill.App.3d 365, 369 (2005); *Leith v. Frost*, 387 Ill.App.3d 430 (2008). Further, Illinois does not allow recovery for the loss of companionship of a dog. *Anzalone,* at 369.

> Recovery in the death of a pet is premised upon a common law theory of a pet as a personal item, albeit unique, of personal property and, thus, is tied to the maxim that compensatory damages are not given for emotional distress caused merely by the loss of things.

Restatement (Second) of Torts § 911, comment e, at 465 (1965).

Moreover, because non-economic damages cannot be recovered for harm to property, pet owners cannot recover for emotional distress based on the alleged negligent or malicious destruction of a dog. This fundamental principle applies whether a plaintiff seeks to include emotional harm in calculating damages or sues for infliction of emotional distress. Victor E. Schwartz & Emily J. Laird, Non-Economic Damages in Pet Litigation: The Serious Need to Preserve A Rational Rule, 33 Pepp. L. Rev. 227, 248 (2006). Consequently, Plaintiffs'

ubiquitous requests for emotional damages in their Complaint should be summarily stricken and denied.

In conclusion, the undisputed evidence in the record shows that Plaintiffs cannot prove at trial the requisite intent necessary to overcome the protections of the Tort Immunity Act with respect to the state law claims. Therefore, summary judgment in favor of Defendants is appropriate on the state law claims – Count III through VI of Plaintiffs' Complaint.

### IV.    CONCLUSION

For the foregoing reasons, Defendants move this court to grant their motion for summary judgment and for such other relief as it deems just and proper.

                        Respectfully submitted,

                        Defendants, City of Champaign, Illinois
                        and Officer Andre Davis (Officer # 7786)

                 By: s/Thomas S. Yu_____
                        Thomas S. Yu, Bar No. 6273289

THOMAS, MAMER & HAUGHEY, LLP
30 Main St., Suite 500
Champaign, IL  61824-0560
Phone: (217) 351-1500
Fax:    (217) 351-2017
tyu@tmh-law.com

**CERTIFICATE OF SERVICE**

 I hereby certify that on March 31, 2015, I electronically filed the foregoing Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification to the attorneys of record.

              /s/ Thomas Yu_____

              Thomas S. Yu, Bar No. 6273289
              THOMAS, MAMER & HAUGHEY, LLP

              30 Main St., P.O. Box 560
              Champaign, IL 61824-0560
              Ph: (217) 351-1500
              *tyu@tmh-law.com*