## IN THE UNITED STATE DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **JACOB SAATHOFF, KATHY SAATHOFF,**<br>**and KELSEY MARKOU,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No.  13-cv-02253** |
| | ) | |
| **CITY OF CHAMPAIGN, ILLINOIS and**<br>**OFFICER ANDRE DAVIS**<br>**(officer # 7786),** | ) | |
| | ) | |
| **Defendants.** | ) | |

### PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

NOW COME Plaintiffs, JACOB SAATHOFF, KATHY SAATHOFF and KELSEY MARKOU, through their attorneys, Sorling Northrup, Stephen F. Hedinger of counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7.1(d) of this Court, move for partial summary judgment on their complaint against the Defendants, CITY OF CHAMPAIGN, ILLINOIS and OFFICER ANDRE DAVIS.  In support of this motion, Plaintiffs state as follows:

### I. INTRODUCTION

Plaintiffs have filed a six-Count Complaint against the Defendants seeking damages and other relief for injuries incurred by Plaintiffs from an incident that occurred on November 17, 2012, during which Defendant Andre Davis ("Davis"), while acting under color of state law and as an agent and employee of and for Defendant City of Champaign, Illinois ("City"), shot twice and killed Plaintiffs' full-bred chocolate Labrador retriever named Dog ("Dog").  The shooting occurred in the presence of Plaintiff Kelsey Markou ("Kelsey"), who had sought police

assistance for Dog from an unprovoked attack by another canine, a gray and white pit bull. Count I of the Complaint seeks relief pursuant to 42 U.S.C. §1983 against Davis for violations of Plaintiffs' Fourth Amendment rights under the U.S. Constitution, Count II seeks §1983 relief by Plaintiffs against the City based upon Monell allegations, Count III seeks relief by Kelsey against Davis under an Illinois cause of action for intentional infliction of emotional distress, Count IV seeks relief on behalf of all three Plaintiffs against Davis for conversion under state law, and Count V seeks relief by each of the Plaintiffs against the City for its *respondeat superior* liability for tortious acts committed by Davis while acting as an agent and employee of the City.  Finally, pursuant to Count VI, all three Plaintiffs seek relief against Davis and the City under a cause of action expressly allowed for violations of the Illinois Humane Care for Animals Act, 510 ILCS 70/16.3.  In their Amended Answer to the Complaint, the Defendants have raised as affirmative defenses their purported entitlement to qualified immunity, their purported immunity under the Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/2-202, and the assertion that protection of humans is a defense available to police officers under the Humane Care for Animals Act.

With this motion for partial summary judgment, Plaintiffs seek this Court's ruling finding that there is no genuine issue of material fact and that Plaintiffs are entitled to a judgment as a matter of law as to the Defendants' liability under Counts I (Davis - §1983), II (City - §1983), III (Davis - Intentional Infliction of Emotional Distress), IV (Davis - Conversion), V (City - Intentional Infliction of Emotional Distress and Conversion pursuant to *respondeat superior*), and VI (Davis and City - Illinois Humane Care for Animals Act).  Plaintiffs also request this Court's entry of judgment finding no basis to support any of Defendants' purported affirmative defenses (qualified immunity, local governmental tort immunity and protection of humans).

Plaintiffs request that this Court enter partial summary judgment finding Defendants' liability on each of Counts I through VI, and order that this case proceed to trial on damages only as to each of the six Counts.

## II. UNDISPUTED MATERIAL FACTS

### A.   Background

1.   Davis became employed as a police officer by the City in 2004, and remained employed as a police officer in November of 2012. (Davis, at 12, and Davis Ex. #1).

2.   During the eight years that Davis was employed as a City police officer between 2004 and November 16, 2012, he had discharged his City-issued handgun in the course of his duties as an employed police officer on two occasions.   (Davis, at 21). These were:

    a.   In the summer of 2012, he responded to a call of an injured deer. After obtaining supervisory approval, he shot the deer to end its suffering. (Davis, at 21-25)

    b.   In September 2009, while responding to a report of a suicidal armed man, he negligently discharged his firearm while removing it from his holster.   Davis referred to this shooting as "accidental," and Davis received internal police department discipline as a result of this incident. (Davis, at 55-66).

3.   During the course of his employment as a City police officer between 2004 and November 16, 2012, Davis was involved with interactions involving dogs (Davis, at 35-36) which included the following:

    a.   Several interactions where he was called upon to collect a stray

dog and remove it to the Champaign County Animal Control facility. (Davis, at 52-53).

        b.    A call concerning a deceased dog that had been hit by a car. (Davis, at 40-42).

        c.    An incident that occurred within the first year or two of Davis's employment, when he was called to serve as backup to another officer who responded to a fight between two tied-up pit bulls.  During that incident, the responding officer attempted to use a catchpole, attempted to beat the dogs to separate them, and attempted to use "OC" spray (i.e. pepper spray), none of which was effective in stopping the dog fight, and following which, upon supervisor approval, the pit bull that was winning the fight was shot and killed by the responding officer.  The fight resulted severe injuries to the other dog, including ripped flesh, exposed inner flesh, and substantial blood. (Davis, at 46-51).

        d.    An incident in about 2007 when Davis, as a responding officer, was called to address a situation of two pit bull dogs fighting in a closed bedroom. Davis contacted animal control officers, who arrived and were able to break up the fight.  The dog that was losing the fight suffered severe injuries. (Davis, at 42-46).

4.    City police officers are called upon to interact with dogs as frequently as once per week, including responding to animal neglect calls as frequently as once every three to six months. (Crane, at 16).

5.    In approximately 2005, the City purchased, by and for the use of the police department, a catchpole for purposes of capturing and restraining dogs.  The catchpole was

available for use by any City police officer, and short (approximately 10 minute) training in its use had been provided in a single training session in 2005. Subsequently the catchpole has been used by City police officers on a not infrequent basis. (Davis, at 49, 110-112).

6.     Aside from the short training provided for use of the catchpole, the City did not provide any other training to its employed police officers regarding techniques and legal obligations with respect to dog interactions prior to November 2012. However, in April 2013, the City provided training, conducted by a former city of Urbana animal control officer, concerning proper police officer responses to various scenarios involving dogs, and legal responsibilities involved with such encounters. Fifty-eight City police officers attended, but Davis never attended. (Davis, at 110-114; Crane, at 23-27).

7.     Davis claims to have discovered that he suffers from some degree of colorblindness in or about 1991, when he joined the U.S. Navy. The colorblindness disqualified Davis from certain jobs in the Navy, and he admitted that the condition interferes with some of his regular daily activities, including choosing clothing, and is particularly troublesome in situations where lighting levels are less than optimal. (Davis, at 25-33).

8.     The City's police department has in place an official policy for the guidance of its employed police officers, covering a range of situations and stating acceptable and appropriate responses and reactions to be taken by those police officers. Among other things, the policy includes a provision, section 1.3.2.C, covering the acceptable use of deadly force upon animals. (Cobb, at 46-49; Swenson, at 109-110).

9.     Prior to November 17, 2012, Section 1.3.2.C provided as follows:

> Deadly force may be used to kill a dangerous animal or an animal that is so severely injured that humanity requires its disposal to prevent further suffering. (Cobb, at 46-49, and Cobb Ex. #4).

10.    After November 17, 2012, as a direct result of and response to the incident on November 17, 2012 that is the subject matter of the Complaint in this case, the City revised Section 1.3.2.C to provide as follows:

> Deadly force may be used to kill an animal that either presents an imminent threat of death or great bodily harm to a person or is so severely injured that humanity requires its disposal to prevent further suffering. (Cobb, at 46-49, and Cobb Ex. #5; Swenson, at 109-110).

11.    Plaintiffs Jacob Saathoff ("Jake") and Kathy Saathoff ("Kathy") are husband and wife, and Plaintiff Kelsey Markou is Kathy's daughter and Jake's step-daughter (Complaint, para. 3; Amended Answer, para. 3), and in November 2012 was 18 years old. (Kelsey, at 7). All three reside now, and did reside on November 17, 2012, at a house located on Crescent Drive in Champaign, directly across from Centennial High School and about half a block south of the intersection of Crescent and John Street. (Kelsey, at 8).

12.    Prior to November 17, 2012, Jake, Kathy and Kelsey each was an owner of a chocolate-colored Labrador retriever dog named "Dog." (Complaint, paras. 58 and 67; Amended Answer paras. 58 and 67). They obtained Dog in 2008, and in November 2012 he was about 4 ½ years old. He weighed about 65 pounds, was healthy and athletic, and was well-behaved with a docile, easy-going temperament. (Kelsey, at 27-28).

13.    Jake, Kathy and Kelsey also have another chocolate-colored Labrador retriever, a female named "Boo." (Kelsey, at 11-13).

14.    Prior to and including November 17, 2012, Kelsey took both Boo and Dog on near-daily walks around the family's neighborhood. Kelsey would not walk the two dogs together, but rather would commonly walk Boo first; Boo was more high-strung and energetic

than Dog, and she would move quickly through her usual walk route. In contrast, Dog was relatively reserved, and he simply enjoyed the walking; Kelsey would therefore walk a further distance, on a usual route, different than with Boo, when she walked Dog. (Kelsey, at 11-16).

15.     Never, in the years she walked Boo and Dog, had Kelsey had any troubles with other animals or people during those walks, until November 17, 2012. (Kelsey, at 17-18).

16.     Dog always wore a fabric collar that had attached his dog and rabies licenses. When Kelsey walked him, she also put on him, on top of the fabric collar, a metal "choker" collar for better control, and then attached a leash to that collar. He was wearing both collars on the evening of November 17, 2012, and the leash was attached to the choker collar. (Kelsey, at 18-19).

17.     On her walks with the dogs, Kelsey would normally take along an iPod to listen to music, but would walk with only one ear bud in, so that she could hear what was happening around her. She did not have a cell phone, and her iPod did not have any internet or cellular connection. (Kelsey, at 18-19).

18.     On her walks with Dog, Kelsey would commonly follow a large figure-8 shaped route that would begin and end at the corner of Crescent Drive and John Street, about a half block north of her house. (Kelsey, at 11-13).

19.     Tyrone Jones ("Tyrone") had lived in a house located on Hollycrest Drive in Champaign, which is one block east of Crescent Drive. As of November 2012, Tyrone had lived at that address for about two or three years. Prior to November 17, 2012, he had never seen Kelsey walking through the neighborhood with either of the two chocolate Labs. (Tyrone, at 7-9).

20.     Tyrone had substantial experience with dogs as he grew up in Chicago.  His uncle

had raised and fought pit bulls, and his mother was fond of German Shepherds. These experiences provided him with an understanding of dog behaviors, and he had witnessed and experienced dog fights on many occasions, and from those experiences he gained knowledge of how to stop dogs from fighting, and of how to treat or heal dogs injured during a dog fight. (Tyrone, at 18-20).

B.     **November 17, 2012**

21.    The evening of November 17, 2012 was unseasonably warm and comfortable, and many people were out that evening enjoying the relatively comfortable temperatures. (Complaint, para. 12; Amended Answer, para. 12, Tyron, at 40).

22.    Kelsey and Dog took their usual walk on the evening of November 17, 2012. Dog wore his usual collars and leash, and Kelsey had her iPod with one ear bud attached. By about 5:20 p.m. they had walked the route and returned to about the corner of John Street and Crescent Drive, and were within about a half a block of being home.  (Kelsey, at 19-24; Tyrone, at 8 and 32).

23.    Also on the evening of November 17, 2012, Tyrone left his house on Hollycrest and went toward a friend's house located near the corner of John Street and Crescent Drive. Along the way, Tyrone came across a pit bull that was gray with white spots, including a white belly, which was sniffing around and exploring the neighborhood. Tyrone did not recognize the pit bull, which had no collar or other markings. Along the way to his friend's house the pit bull kept up with and accompanied Tyrone (although Tyrone never touched the dog), and Tyrone stopped at several houses along the way to see if anyone recognized the dog. No one did. (Tyrone, at 8-9, and 33-36).

24.    Once Tyrone reached his friend's house the pit bull left his company and explored

on its own. Tyrone spent some time with his friend, but the friend had to leave for a while, so Tyrone waited for him outside on his front steps. From that location Tyrone could see the intersection of John and Crescent. (Tyrone, at 10).

25.     As Kelsey and Dog turned off of John Street and began to head south on Crescent, the pit bull spied them from across Crescent Street, and ran across the street toward them. Kelsey saw the pit bull as he ran toward them.  (Kelsey, at 20-25; Tyrone, at 10).

26.     Once the pit bull reached Dog, they sniffed each other briefly, both alert to the other.  Then, without warning or provocation, the pit bull lunched toward Dog's neck, trying to bit and get a hold.  Although startled by the attack, Dog immediately began to defend himself, and soon the dogs were locked in a fight. (Kelsey, at 25-28).

27.     Tyrone witnessed the beginning of the attack, and he ran across the street to assist Kelsey. (Tyrone, at 11).

28.     At the beginning of the dogfight only Tyrone and Kelsey were present, but before long three juveniles, two girls and a boy (all black), also arrived at the scene and observed the fight. (Tyrone, at 11-12; Kelsey, at 34-35; Crane Ex. #1, Davis report at 2 of 4).

29.     As the dogs fought, Tyrone and Kelsey attempted to break them apart.  Tyrone suggested that Kelsey drop Dog's leash in order to allow Dog to more freely defend itself, and Kelsey did so.  Then they both tried kicking at the dogs, but were unsuccessful in parting them. Tyrone at one point also grabbed a nearby tree branch and tried to use it to lever between the dogs, but again that was unsuccessful. (Tyrone, at 11-13; Kelsey, at 34-36).

30.     Following a short period of fighting, Tyrone asked Kelsey if she wanted someone to call the police to obtain assistance.  Kelsey agreed and one of the juveniles telephoned the police and reported the dog attack. (Kelsey, at 35; Tyrone, at 11-12).

31.     The police dispatcher reported, over the radio, of a pit bull attacking another dog near the corner of John and Crescent.  An officer other than Davis was initially identified as the responding officer to this call. (Crane, Ex. #2).

32.     Davis, at the time of the dog fight call, was en route to a call of a residential burglary alarm, and his route took him past the corner of John and Crescent, as he passed the group of people surrounding the dogfight (Tyrone, Kelsey and the three juveniles) flagged him down, and so Davis pulled his squad car over, stopping it within about 10 feet of the dogfight. (Davis, at 77-78, and 81-82). Davis had heard the dogfight call and knew it concerned a pit bull attacking another dog (Davis at 77, and 84-85), but if he hadn't been flagged down he wouldn't have stopped, but instead would have proceeded to his burglary alarm call (Davis, at 82). He trained his spotlight on the fighting animals.  (Davis, at 83).

33.     Upon exiting his car, Davis inquired, and was told, that the attacked dog belonged to Kelsey.  Both she and Tyrone described to Davis that her dog was a chocolate-colored Labrador retriever, and was wearing a collar that had attached to it a leash. (Davis, at 86-87; Crane Ex. #1, Davis report at 2 of 4; Kelsey, at 47-49; Tyrone at 13-14 and 43-44 and 67-68).

34.     Davis heard Kelsey and Tyrone describe Kelsey's dog (Davis, at 86), but he claimed to have difficulty distinguishing between the two dogs' colors, and believes both to have been dark in color. (Davis, at 122-123; Crane Ex. #1, Davis report at 2 of 4).

35.     However, Davis also acknowledged that the dogs were not identical, but one was larger and brown and solid colored, while the other shorter dog had a white belly.  He also recognized that one of the two dogs was a pit bull. (Crane Ex. #1, Davis report at 2 of 4).

36.     Davis also claims that, in addition to hearing Tyrone and Kelsey describe Kelsey's dog, the three juveniles commented on the scene, including stating that the aggressive

dog was the brown one, and that the aggressive dog was the gray one. (Crane Ex. #1, Davis report at 2 of 4).

37.     Davis did not ask any further questions or engage in any further conversation. (Davis, at 94; Tyrone, at 67-68). Instead he drew his service weapon and took aim toward the dogs. (Crane Ex. #1, Davis report at 2 of 4; Kelsey at 49-50).

38.     Davis had a clear shot at both dogs, and could have shot the "shorter" dog with the white belly as easily as the "larger" dog that was solid brown in color. (Tyrone, at 16-17).

39.     Davis fired one shot without any apparently effect. Within one or two seconds, he fired a second shot, and this time the dogs separated. Dog immediately began limping toward Kelsey, obviously wounded. (Crane Ex. #1, Davis report at 2 of 4; Kelsey, at 62-63).

40.     Upon seeing the results of the second shots, Kelsey shouted that Davis had shot her dog. She then moved to attend to Dog, who limped toward street and lay down. (Crane Ex. #1, Davis report 2 at  of 4; Kelsey at 63).

41.     After they separated, the pit bull began to move away from the scene, heading back toward Crescent. (Crane Ex. #1, Davis report at 2 of 4 and 3 of 4).

42.     Davis, remaining where he was at, pivoted and followed the pit bull with his gun, and fired four rounds from that location at the pit bull. (Davis, at 95-98). The pit bull ran across Crescent, toward some apartments on the other side of the street. (Davis, at 97-98).

43.     David followed the pit bull across Crescent Street, and fired one last round toward the pit bull. (Davis, at 95-98).

44.     The last round fired by Davis ended up going through the wall of one of the apartment units across Crescent Street, and landing on the floor of the unit's kitchen. The police, following the incident, recovered that bullet. (Crane, at 52-55).

45.     After shooting the final round toward the pit bull, Davis returned to where Kelsey and Dog were at, and requested via his radio for the attendance of a supervisor and for animal control. Kelsey, Tyrone, and the others gathered asked Davis for assistance in getting Dog veterinary care. Davis refused, though, stating that he could not leave the scene because he had fired his weapon, and stating that an ambulance would not be dispatched to the scene for treatment of a dog. (Kelsey, at 66-68; Davis, at 100-101).

46.     Dog died as a result of the gunshot wound. (Complaint, para. 39; Amended Answer, para. 39).

47.     Within approximately ten minutes of his call, the animal control officer arrived at the scene and successfully captured the pit bull and removed him to the Champaign County Animal Control facility. (Davis, at 125; Crane Ex. #1, Crane report page 3 of 5).

48.     At the time of the shooting incident on November 17, 2012, Davis had on his body or in his car, among other things, the following items:  OC spray (pepper spray), a fire extinguisher, and his radio. (Davis Ex. #1).

49.     Following the shooting incident, the City of Champaign Police Department conducted an investigation of Davis's actions. Lieutenant Jon Swenson was responsible for the investigation. (Swenson, at 65-67).

50.     Swenson considered the event to have consisted of three discrete phases:  two shots fired at Dog, four shots fired at the pit bull from the original location of the fight, and one shot fired at the pit bull from across the street. (Swenson, at 86-87).

51.     Swenson, and ultimately the City, determined that Davis was in violation of City policy as a result of the final shot that entered the apartment building. At that point, no human was in any danger, and no other justification existed for firing. (Swenson, at 97).

52.     Swenson found that the four shots fired at the pit bull from the location of the dogfight were justified because Davis was fearful that the pit bull could turn aggressive and attack him or the other onlookers present at the scene. Accordingly, the City determined that those four shots were within Department policy for the protection of humans. (Swenson, at 97).

53.     Swenson, and the City, determined that Davis's first two shots at Dog, that resulted in Dog's death, were also justified and within Department policy based upon the then-current policy that allowed the use of deadly force against "a dangerous animal".  (Swenson, at 97, and 107-110).

54.     However, as a result of the November 17, 2012 shooting death of Dog, the City modified its policy concerning use of deadly force against animals to that now codified at Section 1.3.2.C of its policies. (Cobb, at 46-49).

55.     Davis received discipline as a result of the one shot that ended up in an apartment unit.  He was not punished or found to be in violation of any policy, as a result of shooting Dog. (Swenson, at 97 and 107-110).

56.     In addition to Tyrone and Kelsey, the three juveniles witnessed most of the occurrence, including the shooting of Dog; however, no police officer at the scene ever obtained the identities of any of those three juveniles. (Swensen, at 93-94; Crane, at 65-66; Davis, at 103).

57.     Kelsey witnessed the shooting of Dog in response to her request for police assistance to save Dog.  As a result of witnessing those events, Kelsey has described a number of resulting conditions, including difficulty sleeping, frequent crying spells, inability to be happy about anything, an inability to take her dog Boo on a walk anymore, an inability to sit through movies that have gunfire, and pronounced psychological reactions to hearing gunfire, even on a movie. (Kelsey, at 77-79).

58.     From the time Davis arrived on the scene to the time he fired the seventh shot at the pit bull, only about two minutes had elapsed. (Davis, at 99, and 124). (See also Crane Ex. #2, showing Davis's arrival time as no earlier than 17:27:24, and Davis's request for a supervisor because he "shot the dog" at 17:29:31 -- 2 minutes and 7 seconds later).

59.     Davis admitted that his shooting two shots at Dog was intentional. (Davis, at 71).

60.     At no time either prior to or after Davis's arrival, at least before he shot Dog, was any person in danger of being bit or menaced by the two fighting dogs. (Tyrone, at 17-18; Kelsey, at 33, and 53, 59, and 86; Complaint para. 22; Amended Answer para. 22).

61.     When Davis arrived the dogs were locked on to each other, standing relatively still and focusing upon each other; neither dog had any but superficial wounds, at worst. (Tyrone, at 49-51, 55, 62-63; Kelsey at 59, 115-118).

62.     Davis acknowledged that he was not surprised that, as a result of his shooting Dog when he'd been called to protect Dog, Kelsey has not trust for police officers. (Davis, at 101-103).

## III. ARGUMENT

### A.     Constitutional Violations

1.     Davis violated Plaintiffs' Fourth Amendment rights.

Under the Fourth Amendment to the United States Constitution, the people are promised "to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. Amend. IV. "'Effects' means personal property. A 'seizure' of personal property occurs when 'there is some meaningful interference with an individual's possessory interests in that property.' [citations]. Destruction of personal property is such a 'meaningful interference,' as it changes a temporary deprivation into a permanent deprivation. The seizure of

property is subject to Fourth Amendment scrutiny even if no search occurred." Viilo v. City of Milwaukee, 552 F. Supp. 2d 836-837 (E.D. Wis. 2008), aff'd and appeal dismissed, 547 F.3d 707 (7th Cir. 2008) (quoting Soldal v. Cook County, Ill., 506 U.S. 56, 61 (1992) (other citations omitted).

Since at least 2008, the Seventh Circuit has recognized that "the killing of a companion dog constitutes a 'seizure' within the meaning of the Fourth Amendment." Viilo, 547 F.3d at 710 (citing Altman v. City of High Point, NC, 330 F.3d 194, 204-05 (4th Cir. 2003); Brown v. Muhlenberg Twp., 269 F.3d 205, 210-11 (3d Cir. 2001); Lesher v. Reed, 12 F.3d 148, 150 (8th Cir. 1994); Fuller v. Vines, 36 F.3d 65, 68 (9th Cir. 1994), *overruled on other grounds by* Robinson v. Solano County, 278 F.3d 1007, 1013 (9th Cir. 2002). See also Siebert v. Severino, 256 F.3d 648, 656 (7th Cir. 2001).

Here the facts are undisputed that Officer Davis, acting under color of state law, shot and killed the Plaintiffs' companion animal, Dog, without possessing a search warrant to allow that seizure. Under established precedent, therefore, Davis's "actions, therefore, were constitutional only if reasonable." Viilo, 547 F.3d at 710 (citing United States v. Place, 462 U.S. 696 (1983)).

The reasonableness of Davis's action was also answered by the Viilo court seven years ago: ". . . [T]he use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable." 547 F.3d at 710 (citing Brown, 269 F.3d at 210-11). Illinois law is in full accord; pursuant to the Animal Control Act, dogs found running at large, such as the pit bull in this case, are to be taken up and impounded by animal control authorities, not shot. 510 ILCS 5/9. Even dangerous dogs (510 ILCS 5/15.1) and vicious dogs (510 ILCS 5/15), are entitled to some process prior to being humanely euthanized. (A "dangerous dog" is defined as, among other things, "posing a serious and unjustified imminent

411549702 4/6/2015                                  15                          Case No. 13-02253

threat of serious injury or death to a person or a companion animal - 510 ILCS 5/2.05a, and a "vicious" dog is one "that, without justification, attacks a person and causes serious injury or death," or a dog that has been found to be dangerous on three separate occasions - 510 ILCS 5/2.19b).

Based upon the above authorities and the undisputed facts in this matter, there is no question that the actions of Officer Davis on November 17, 2012, were constitutionally unreasonable. First, there was no basis or legal justification, under either the Animal Control Act or prevailing Fourth Amendment jurisprudence, for Davis to have shot either dog when he did. It is undisputed that no person was at risk at the time of the dog fight. Davis failed to attempt to take any alternative action, such as attempting to apprehend and impound either or both of the dogs, prior to pulling his service weapon and firing away. He could have, should have, but did not: call for back up; call for delivery of the department's catchpole; call for animal control assistance (they arrived later, within about ten minutes of having been summoned); attempting to use his baton/nightstick; attempting to use chemical mace on the dogs; attempting to use a fire extinguisher to interrupt the dogs. He could even have approached closer to the dogs and shot one or both in a non-lethal way. Under any analysis of the scene, it is clear that Davis reacted in a completely unreasonable manner to the call of a dog fight. Indeed, his actions, from beginning to end, lasted less than two minutes, leaving Dog dead in the wake.

Accordingly, regardless of which dog Davis thought was the aggressor, he had no business, under the Fourth Amendment, to shoot either when he did so. Although the pit bull was running loose, and its owner has never stepped forward to claim responsibility, under Illinois law it is clear that the dog did have an owner - see 510 ILCS 5/16 (owner of dog attacking innocent companion animal is liable for civil damages); 510 ILCS 5/2.16 (defining "owner").

The "owner" of the pit bull not only had legal obligations and responsibilities and liabilities, but also had legal rights under the Fourth Amendment.  Simply put, regardless of whether Officer Davis made any "mistakes" with respect to which dog he wanted to shoot, the fact is he should not have shot either dog under the Fourth Amendment or Illinois law.

Moreover, the contention by the Defendants that Officer Davis made some sort of mistake in his shooting is not borne out by the evidence.  The facts are undisputed that Davis shot the dog that he intended to shoot. Davis distinguished between the larger solid-colored brown dog and the shorter dog with the white belly. Davis himself described the dog he wanted to shoot as the "darker" one and the one that Davis believed was acting more aggressively. Davis, however, was not called upon to shoot an "aggressive" dog but instead was called upon to stop an attack by a pit bull against a chocolate Labrador.  That Davis chose to, instead, aim at and shoot the dog he felt was being more aggressive does not constitute any mistake, but instead makes clear that he intended to shoot, and to kill, Dog.  Notably, Davis's prior two dogfight experiences both involved two pit bulls, and Davis was familiar with the breed).

Similarly, Defendants' contention that Davis was somehow confused by instructions he heard from the gathered crowd also is not borne out by the evidence.  First, there were only five people around Davis at the time he shot and killed Dog - Kelsey, Tyrone, and the three juveniles. Davis has never suggested that Kelsey's instructions or guidance were in any way ambiguous, but to the contrary he admits that she described her brown dog with a collar and a leash.  Further, Davis admitted knowing, from his first arrival at the scene, that Kelsey was the owner of the dog being attacked.  Accordingly, there is no reasonable basis for Davis to have listened to the recommendations or advice of any person at the scene except for Kelsey (Tyrone, of course, was recommending action fully consistent with Kelsey's interests).  That he disregarded Kelsey in

favor of some ambiguous remarks from third parties reveals that his true intent was to shoot an aggressive dog, not the pit bull necessarily.

Finally, Defendants' suggestion that somehow the lighting and Davis's self-described minor color blindness somehow make his actions reasonable also defies factual analysis. Davis himself admitted that lighting conditions were sufficient for him to distinguish the white belly of the pit bull and the brown solid color of Dog throughout the engagement. Even if all the other colors truly were indistinguishable, it was unreasonable for Davis to have disregarded the white belly of one dog and solid color of the other in deciding which dog to shoot. Again, at the very least he should have asked Kelsey if her chocolate Lab had a white belly, which would have provided him with the information that the dog he believed to be "less" aggressive was actually the attacker. Again, these facts point to Davis's deliberate and intentional shooting of Dog, under the belief that he was more aggressive, not that he was the attacking dog or a pit bull, but simply more aggressive.

In each of the prior actions Davis had been involved with involving injured animals, lethal force was only taken as a last resort following supervisory authorization. The first instance, involving two pit bulls fighting in a backyard, resulted in the "aggressor" pit bull being killed only after numerous other attempts to stop the fight had been attempted (including use of a catchpole, and use of mace), and only after authorization had been given by the officers' supervisor. Similarly, the second pit bull fight resulted in the involvement of the animal control authorities, and did not result in either dog being shot by a police officer. Finally, even the deer that Davis dispatched for humane reasons was given the benefit of supervisory approval. Here Davis simply bypassed all those reasonable steps, and leaped forward to the unnecessary and patently unreasonable step of shooting and killing Dog, thereby depriving Plaintiffs of their

effects. Davis is clearly liable for having violated the Plaintiffs' Fourth Amendment rights.

    2.    The Defendants are not entitled to qualified immunity.

The Defendants have asserted an affirmative defense claiming Davis, and perhaps the City as well, are entitled to qualified immunity for the constitutional violations in this case. There is no support whatsoever for this affirmative defense.

The District Court in the Viilo case discussed qualified immunity in the context of the shooting of a companion animal. As summarized there, "[t]he defense of qualified immunity shields government officials performing discretionary duties 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known'". 552 F.Supp. 2d at 840 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The Viilo court continued by noting that, where a constitutional right has been shown violated, the court must then determine "whether the right was clearly established at the time, in light of the specific context of the case. [citation]. A right is clearly established when the 'contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.' The relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" 552 F. Supp. 2d at 840-41 (citing and quoting Saucier v. Katz, 533 U.S. 191 (2001)).

The Seventh Circuit's Viilo decision is determinative - "the killing of a companion dog constitutes a 'seizure' within the meaning of the Fourth Amendment," 547 F.3d at 710, and "the use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable." Id. The Viilo court, in fact, found that the constitutional protections against unnecessary shooting of dogs was established in this circuit no

later than 2001, noting that that year's "Siebert decision is enough to give police officers reasonable notice that unnecessarily killing a person's pet offends the Fourth Amendment." 547 F.3d at 711.

Accordingly, there is no question that the shooting of Dog by Davis on November 17, 2012, was a "seizure" under the Fourth Amendment, and any reasonable officer would have known that on that date. Moreover, it is also clear that the actions of Davis that night were constitutionally unreasonable, as discussed above. The Animal Control Act, indeed, provided that animal control efforts aimed at a dog that did not pose any danger to any human being were to capture the dog, not to summarily kill it. Hence, under the undisputed facts in this case, it is clear that neither Davis nor the City are entitled to qualified immunity for Davis's actions that night.

3.    The City is liable under Monell.

Pursuant to Monell v. Dept. of Soc. Servs. of City of New York, 436 U.S. 658 (1978), municipalities are liable under 42 U.S.C. §1983 only for their own acts in violation of constitutional protections; typically this requires proof that the municipality's policies or customs were directly responsible for the violation. See Viilo, 552 F.Supp. 2d at 842-43. "Before the City can be liable under Section 1983, the plaintiff must show either '(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or expressly municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." Roach v. City of Evansville, 111 F.3d 544, 548 (7th Cir. 1997). In this case, the City is liable both for having an express policy that was enforced in this case and which caused the constitutional deprivation, and for

having a widespread municipal policy of failing to train its officers regarding animal encounters that frequently occur; however, at this time Plaintiffs seek summary judgment with respect to the City's express policy.

As the undisputed facts in this case show, at the time Officer Davis shot Dog, the City's policy expressly allowed the officer to shoot a dog which an officer, in his own unchallenged and unfettered discretion, determined to be "dangerous." The City policies do not include any definition of "dangerous," but to borrow from the Animal Control Act, it would appear that such a dog would be one that "poses a serious and unjustified imminent threat of serious physical injury or death to a person or a companion animal, or . . . that, without justification, bites a person and does not cause serious physical injury." The Animal Control Act, though, does not allow for the summary euthanasia of a "dangerous dog," but instead requires that such a dog be impounded, and that under appropriate circumstances a hearing be held to determine the status of the dog as dangerous, and to impose certain restrictions on the dog. 510 ILCS 5/15.1.

Here, the City determined that Davis's shooting of Dog was permitted under the aforementioned policy - accordingly, the City has admitted that its policy permits the summary execution of a dog determined by an officer to be "dangerous," even when that dog is not and cannot be considered "dangerous" under Illinois law, and/or the officer is not permitted to summarily execute the dog under those circumstances.

Notably, following this incident the City changed that policy so that it now does conform with Illinois law - an officer can now shoot a companion animal only if that animal is attacking a person, or if it must be destroyed for humane reasons.

The City has accordingly admitted that its own policy, applied by Davis, resulted in the constitutional deprivation here. The City's Monell liability is accordingly secured, and this

Court should find the City liable for constitutional deprivations suffered by Plaintiffs.

**B.     State Law Tort Violations.**

1.     Davis is liable for intentionally inflicting emotional distress upon Kelsy.

Liability for the Illinois tort cause of action of intentional infliction of emotional distress requires a showing here that (1) the actions of Davis were extreme and outrageous, (2) Davis intended that his conduct inflict severe emotional distress, or knew that there was a high probability that the conduct would cause severe emotional distress to Kelsey, and (3) Davis's conduct in fact caused severe emotional distress. Doe v. Calumet City, 161 Ill. 2d 374, 392 (1994). See also Bristow v. Drake Street, Inc., 41 F.3d 245 (1995); Honaker v. Smith, 256 F.3d 477 (7th Cir. 2001).

Here the undisputed material facts show that these elements have been met, and Davis has no defense.  To start with the final element first, it is clear that Kelsey has suffered from severe emotional distress.  She explained that she is not able to sleep.  She will not walk dogs anymore, despite the fact that she formerly had tremendous enjoyment from that activity.  She cannot go to movies out of fear that a gunshot might be portrayed, and hearing gunshots puts her into a panic.  She cries frequently, and she can never be happy.  All of this was caused by Davis shooting Dog right in front of Kelsey, when all Kelsey wanted was her dog safely back home.

Turning to the first element (extreme and outrageous behavior), again it is clear that the actions of Davis qualify.  Davis knew that he was called to the scene in order to assist a young lady whose dog was being attacked by a pit bull.  Rather than helping her, he shot her dog right in front of her.  As discussed previously, the assertions by Davis that he was confused, or unable to distinguish the dogs or that he somehow made a bona fide "mistake," are simply not supported by any facts produced in this case.  Davis did not care which dog was the pit bull or the

chocolate Labrador retriever - instead, he looked for the bigger and more aggressive dog, and executed that one.  His claimed surprise that his choice of which dog to execute did not match Kelsey's desires is not even relevant.  It was simply outrageous for Davis to have shown up at the scene and begin firing away (consider that, at best, he had a 50/50 chance of shooting the "wrong" dog from the moment he first pulled his trigger).  Under any analysis, this extreme and outrageous behavior qualifies as an infliction of severe emotional distress.

Finally, it is also clear that Davis acted with complete indifference to Kelsey's emotional condition, despite having a high degree of knowledge that shooting her dog in her presence, when he had been called to protect her rather than to injure her, would severely impact her.  He admitted, in fact, that it did not surprise him that, because of his actions, Kelsey will no longer call police for assistance in any situation.  Despite the clear likelihood of such injury, Davis blazed away with his gun.

Accordingly, this Court should enter judgment in favor of Kelsey finding Davis liable for intentionally inflicting severe emotional distress upon her.

　　2.　　Davis is liable for conversion.

Under Illinois law, the tort of conversion "is an unauthorized act that deprives a person of his property permanently or for an indefinite time."  Cruthis v. Firststar Bank, N.A., 354 Ill. App. 3d 1122, 1131 (5th Dist. 2005).  In order to prove a conversion claim, Plaintiffs are required to establish: "(1) a right in the property, (2) a right to the immediate possession of the property, which is absolute, unconditional, and not dependent on the performance of some act, (3) a deprivation of the right by the unauthorized and wrongful assumption of control, dominion, or ownership by the defendant, and (4) a demand for possession of the property."  Fortech, LLC v. R.W. Dunteman Co., Inc., 366 Ill. App. 3d 804, 809 (1st Dist. 2006).  See also Loman v.

Freeman, 375 Ill. App. 3d 445 (4th Dist. 2006).

As addressed above in the undisputed material facts, there is no question that the Plaintiffs here had a right of ownership in Dog, and an immediate and unqualified right to his possession. Indeed, the Defendants have admitted as much. Further, the undisputed facts show that Davis deprived Plaintiffs of their property by permanently destroying it (shooting and killing Dog). Once Dog was shot and killed, any demand for his return and re-possession by Plaintiffs was, of course, futile.

Davis is liable to Plaintiffs for conversion under Illinois law.

3.      The City is responsible under *respondeat superior.*

The Defendants have admitted that, at the time he shot Dog, Davis was acting within the course and scope of his employment as a police officer with and for the City of Champaign. The City was therefore acting as the principal, or employer, of Davis, and pursuant to the recognized Illinois doctrine of *respondeat superior*, the City is liable for the torts committed by Davis. Andrews v. City of Chicago, 37 Ill. 2d 309 (1967); Brown v. King, 328 Ill. App. 3d 717 (1st Dist. 2002).

4.      No local governmental employees' immunity is available.

Defendants have raised, as an affirmative defense, the assertion that the acts of Davis and the City are immune from prosecution pursuant to Section 2 - 202 of the Local Governmental and Governmental Employees' Tort Immunity Act, 745 ILCS 10/2-202.  Pursuant to the undisputed material facts in this case, however, no such immunity is available to either Defendant.  First, the identified immunity only applies where a public employee is involved with "the execution or enforcement of any law." 745 ILCS 10/2-202.  Here, Davis was not enforcing any law, but was simply involved with general police duties and responsibilities at the time he

shot Dog on November 17, 2012 (in fact, he came on the scene accidently, and was actually en route to a different call).   In Aikens v. Morris, 145 Ill. 2d 273 (1991), the Supreme Court recognized that, even though a local police officer was involved in transporting a prisoner from one jail to another (clearly a duty associated with providing police services), that action was not conducted in the enforcement of any particular law, and so the officer had no immunity under the statute for an accident that occurred during that process.   In Simpson v. City of Chicago, 233 Ill. App. 3d 791 (1st Dist. 1992), the court similarly determined that an officer was not executing or enforcing a law at the time of an accident, when the officer was simply engaged in a routine patrol duty of responding to a non-emergency call from the dispatcher.

Second, even if Officer Davis was engaged in executing and enforcing a law at the time he shot Dog, as a matter of law his actions in shooting Dog constitute "willful and wanton conduct" as defined by that statute, because his actions showed "an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210.  As discussed above, and as shown by the undisputed facts, Davis began shooting without having first attempted non-lethal means of stopping the fight, and by shooting without full knowledge of the situation, he never had any better than a 50/50 chance of destroying the very dog he had been called to protect.  This constitutes "willful and wanton conduct" so as to remove the actions from any immunity that might otherwise apply.  745 ILCS 10/2-202.

C.      Humane Care for Animals Act.

Count VI of the Plaintiffs' Complaint alleges the liability of both Davis and the City for violating the Illinois Humane Care for Animals Act, 510 ILCS 70/1 et seq.  Section 16.3 of that statute, 510 ILCS 70/16.3, expressly provides for this cause of action: "Any person who has a right of ownership in an animal that is subjected to an act of aggravated cruelty under Section

3.02 . . . may bring a civil action to recover the damages sustained by that owner."

Here, the Defendants have admitted that each of the Plaintiffs had a right of ownership in Dog. Accordingly, each Plaintiff is entitled to bring an action for damages that have been sustained as a result of an act of aggravated cruelty (Section 3.02) against Dog.

Section 3.02 of the Humane Care for Animals Act, 510 ILCS 70/3.02(a), provides that "[n]o person may intentionally commit an act that causes a companion animal to suffer serious injury or death. Aggravated cruelty does not include euthanasia of a companion animal through recognized methods approved by the Department of Agriculture. . . ."

Defendants have not asserted that shooting Dog was compliant with any Department of Agriculture methodology. Further, it is clear that unnecessarily shooting a dog constitutes "aggravated cruelty" within the meaning of the statute. People v. Primbas, 404 Ill. App. 3d 297 (1st Dist. 2010); People v. Larson, 379 Ill. App. 3d 642 (2d Dist. 2008).

Davis, therefore, clearly violated Section 3.02 of the Humane Care for Animals Act by shooting Dog, and so is liable to each of the Plaintiffs for the damages they sustained. Moreover, as noted repeatedly above, Davis's act was conducted pursuant to and in conformance with the express policy of the City, and in shooting Dog Davis was acting as the agent of the City. Accordingly, both as a result of its own actions in adopting and enforcing a policy calling for Dog to be shot, and pursuant to its *respondeat superior* liability, the City is also liable to each of the Plaintiffs for damages incurred as a result of Dog's shooting death.

The Defendants have raised one final affirmative defense addressed to this Count, having asserted that "[i]t is not a violation of the Humane Care for Animals Act for a law enforcement officer to take those actions necessary to protect humans to use force, and indeed deadly force, against an animal." (Amended Answer (d/e 18), Affirmative Defense Three). There is no

authority for this asserted defense; nowhere in the Humane Care for Animals Act can be found any reference to any such defense. Nor has any case ever stated that police officers are not subject to the statute under the conditions described in the purported affirmative defense. Simply put, the assertion is meritless.

Moreover, as noted repeatedly above, there is no factual basis for any assertion that Davis was protecting any human being at the time he shot Dog. Hence, even if the affirmative defense had any support, it would not be available to the Defendants here.

## IV. CONCLUSION

As detailed above, Plaintiffs in this case are entitled to a summary judgment in their favor finding that Davis violated their Fourth Amendment rights to be secure in their effects by needlessly and unreasonably shooting Dog on November 17, 2012. The City had an express policy that not only permitted, but encouraged, Davis to shoot Dog under those circumstances, and so it, too, is liable under the Monell doctrine for violating the Plaintiffs' Fourth Amendment rights. This case should proceed to jury trial to determine Plaintiffs' damages for these constitutional violations. Similarly, it is clear that Davis committed the tort of conversion against all three Plaintiffs, and intentionally inflicted emotional distress upon Kelsey, by executing Dog. The City is responsible for these torts as Davis's master and employer under the Illinois doctrine of *respondeat superior*. Again, the Defendants should be found liable for these two torts, and the case should proceed to jury trial solely on the question of the amount of damages the Plaintiffs are entitled to for the breaches. Finally, both Defendants are guilty of having committed aggravated cruelty to Dog in violation of the Humane Care for Animals Act, and each of the Plaintiffs is entitled to recover from each of the Defendants the damages allowed by that statute; this Court should enter judgment finding that liability, and setting the case for

jury trial solely upon the amount of damages.  Plaintiffs accordingly request that this Court enter

judgment in their favor, and against both Defendants, as to each of Counts I through VI as to

liability, and set this matter for jury trial devoted to the issue of the damages to be recovered by

Plaintiffs.


Date: April 6, 2015                          Respectfully submitted,

                                             JACOB SAATHOFF, KATHY SAATHOFF and
                                             KELSEY MARKOU, Plaintiffs

                                             /s/  Stephen F. Hedinger

                                             Stephen F. Hedinger (#6198999)
                                             Attorneys for Plaintiffs
                                             Sorling Northrup
                                             1 North Old State Capitol Plaza, Suite 200
                                             P.O. Box 5131
                                             Springfield, IL 62705
                                             Telephone:  (217) 544-1144
                                             Facsimile:  (217) 522-3173
                                             E-Mail:  sfhedinger@sorlinglaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2015, I electronically filed the foregoing Plaintiffs' Motion for Partial Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Mr. David E. Krchak
Mr. Thomas Yu
Thomas, Mamer & Haughey, LLP
30 Main Street, Suite 500
P.O. Box 560
Champaign, IL 61824-0560

/s/  Stephen F. Hedinger

Stephen F. Hedinger (#6198999)
Attorneys for Plaintiffs
Sorling Northrup
1 North Old State Capitol Plaza, Suite 200
P.O. Box 5131
Springfield, IL 62705
Telephone:  (217) 544-1144
Facsimile:  (217) 522-3173
E-Mail:  sfhedinger@sorlinglaw.com