IN THE UNITED STATE DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| JACOB SAATHOFF, KATHY SAATHOFF, and KELSEY MARKOU, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | No.  13-cv-02253 |
| | ) | |
| CITY OF CHAMPAIGN, ILLINOIS and OFFICER ANDRE DAVIS (officer # 7786), | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

NOW COME the Defendants, City of Champaign and Officer Davis, by one of their attorneys, Thomas Yu, and under Local Rule 7.1 and Rule 56 of the Federal Rules of Civil Procedure, requests that this court deny the motion for partial summary judgment by Plaintiffs, Jacob Saathoff, Kathy Saathoff and Kelsey Markou ("Markou") (Docket No. 46), and in support states as follows:

### A.  INTRODUCTION

Plaintiffs have failed to demonstrate that the evidence in the record shows that there is no genuine issue of material fact and, thus, they are not entitled to judgment as a matter of law with respect to either their federal or state law claims. To the contrary, under the totality of the circumstances, Detective Davis ("Davis") acted reasonably in attempting to save the dog that he reasonably, but mistakenly, determined was owned by Markou. Davis mis-identified, which of the two dogs engaged in the vicious dogfight belonged to Markou, however, this was reasonable based upon the confusing nature of the circumstances, which included, among other things:

- Low natural lighting conditions;
- Shadows cast from Davis's police squad car spotlight;
- Confusing communication from Markou and bystanders; and

1

-   Davis's color-blindness.

In addition, Davis's decision to use deadly force against the dog was reasonable and consistent with Champaign Police Department policy because under the circumstances he was presented with at the time, he reasonably determined that the dog he shot was engaged in a vicious dogfight and was dangerous to the other dog, to bystanders and him.

Furthermore, there is no evidence in the record of an express policy, widespread custom or practice, or an act of the final policymaker (Police Chief Cobb) that caused the alleged constitutional violation. Similarly, there is no evidence in the record of a failure to train officers on the use of force or use of firearms as it relates to animals.

To prevail on their state law claims, Plaintiffs must prove that Davis had wilful and wanton intent to harm Plaintiffs and their dog. Significantly, the evidence in the record clearly shows that Davis was attempting to help Markou by trying to rescue her dog.

Consequently, Plaintiffs have not shown that there is no genuine issue of material fact and thus their motion for partial summary judgment of their federal and state law claims should be denied.

## B.  RESPONSE TO UNDISPUTED MATERIAL FACTS

UNDISPUTED MATERIAL FACTS

The following numbered statements of fact asserted by Plaintiffs are undisputed and material.

1. Davis became employed as a police officer by the City in 2004, and remained employed as a police officer in November of 2012.

2. During the eight years that Davis was employed as a City police officer between 2004 and November 16, 2012, he had discharged his City-issued handgun in the course of his duties as an employed police officer on two occasions. These were:

   a. In the summer of 2012, he responded to a call of an injured deer. After obtaining supervisory approval, he shot the deer to end its suffering.

3. During the course of his employment as a City police officer between 2004 and November 16, 2012, Davis was involved with interactions involving dogs which included the following:

   a. Several interactions where he was called upon to collect a stray dog and remove it to the Champaign County Animal Control facility.

   b. A call concerning a deceased dog that had been hit by a car.

   c. An incident that occurred within the first year or two of Davis's employment, when he was called to serve as backup to another officer who responded to a fight between two tied-up pit bulls. During that incident, the responding officer attempted to use a catchpole, attempted to beat the dogs to separate them, and attempted to use "OC" spray (i.e. pepper spray), none of which was effective in stopping the dog fight, and following which, upon supervisor approval, the pit bull that was winning the fight was shot and killed by the responding officer. The fight resulted severe injuries to the other dog, including ripped flesh, exposed inner flesh, and substantial blood.

   d. An incident in about 2007 when Davis, as a responding officer, was called to address a situation of two pit bull dogs fighting in a closed bedroom. Davis contacted animal control officers, who arrived and were able to break up

the fight. The dog that was losing the fight suffered severe injuries.

5. In approximately 2005, the City purchased, by and for the use of the police department, a catchpole for purposes of capturing and restraining dogs. The catchpole was available for use by any City police officer, and short (approximately 10 minute) training in its use had been provided in a single training session in 2005. Subsequently the catchpole has been used by City police officers on a not infrequent basis.

7. Davis claims to have discovered that he suffers from some degree of colorblindness in or about 1991, when he joined the U.S. Navy. The colorblindness disqualified Davis from certain jobs in the Navy, and he admitted that the condition interferes with some of his regular daily activities, including choosing clothing, and is particularly troublesome in situations where lighting levels are less than optimal.

8. The City's police department has in place an official policy for the guidance of its employed police officers, covering a range of situations and stating acceptable and appropriate responses and reactions to be taken by those police officers. Among other things, the policy includes a provision, section 1.3.2.C, covering the acceptable use of deadly force upon animals.

9. Prior to November 17, 2012, Section 1.3.2.C provided as follows:

> Deadly force may be used to kill a dangerous animal or an animal that is so severely injured that humanity requires its disposal to prevent further suffering.

16. Dog always wore a fabric collar that had attached his dog and rabies licenses. When Kelsey walked him, she also put on him, on top of the fabric collar, a metal "choker" collar for better control, and then attached a leash to that collar. He was wearing both collars on the evening of November 17, 2012, and the leash was attached to the choker collar.

17. On her walks with the dogs, Kelsey would normally take along an iPod to listen to music, but would walk with only one ear bud in, so that she could hear what was happening around her. She did not have a cell phone, and her iPod did not have any internet or cellular connection.

18. On her walks with Dog, Kelsey would commonly follow a large figure-8 shaped route that would begin and end at the comer of Crescent Drive and John Street, about a half block north of her house.

20. Tyrone had substantial experience with dogs as he grew up in Chicago. His uncle had raised and fought pit bulls, and his mother was fond of German Shepherds. These experiences provided him with an understanding of dog behaviors, and he had witnessed and experienced dog fights on many occasions, and from those experiences he gained knowledge of how to stop dogs from fighting, and of how to treat or heal dogs injured during a dog fight.

22. Kelsey and Dog took their usual walk on the evening of November 17, 2012. Dog wore his usual collars and leash, and Kelsey had her iPod with one ear bud attached. By about 5:20 p.m. they had walked the route and returned to about the comer of John Street and Crescent Drive, and were within about a half a block of being home.

23. Also on the evening of November 17, 2012, Tyrone left his house on Hollycrest and went toward a friend's house located near the comer of John Street and Crescent Drive. Along the way, Tyrone came across a pit bull that was gray with white spots, including a white belly, which was sniffing around and exploring the neighborhood. Tyrone did not recognize the pit bull, which had no collar or other markings. Along the way to his friend's house the pit bull kept up with and accompanied Tyrone (although Tyrone never touched the dog), and Tyrone stopped at several houses along the way to see if anyone recognized the dog. No one did.

24. Once Tyrone reached his friend's house the pit bull left his company and explored on its own. Tyrone spent some time with his friend, but the friend had to leave for a while, so Tyrone waited for him outside on his front steps. From that location Tyrone could see the intersection of John and Crescent.

25. As Kelsey and Dog turned off of John Street and began to head south on Crescent, the pit bull spied them from across Crescent Street, and ran across the street toward them. Kelsey saw the pit bull as he ran toward them.

26. Once the pit bull reached Dog, they sniffed each other briefly, both alert to the other. Then, without warning or provocation, the pit bull lunched toward Dog's neck, trying to bit and get a hold. Although startled by the attack, Dog immediately began to defend himself, and soon the dogs were locked in a fight.

27. Tyrone witnessed the beginning of the attack, and he ran across the street to assist Kelsey.

28. At the beginning of the dogfight only Tyrone and Kelsey were present, but before long three juveniles, two girls and a boy (all black), also arrived at the scene and observed the fight.

29. As the dogs fought, Tyrone and Kelsey attempted to break them apart. Tyrone suggested that Kelsey drop Dog's leash in order to allow Dog to more freely defend itself, and Kelsey did so. Then they both tried kicking at the dogs, but were unsuccessful in parting them. Tyrone at one point also grabbed a nearby tree branch and tried to use it to lever between the dogs, but again that was unsuccessful.

30. Following a short period of fighting, Tyrone asked Kelsey if she wanted someone to call the police to obtain assistance. Kelsey agreed and one of the juveniles telephoned the police and reported the dog attack.

31. The police dispatcher reported, over the radio, of a pit bull attacking another dog near the comer of John and Crescent. An officer other than Davis was initially identified as the responding officer to this call.

32. Davis, at the time of the dog fight call, was en route to a call of a residential burglary alarm, and his route took him past the comer of John and Crescent, as he passed the group of people surrounding the dogfight (Tyrone, Kelsey and the three juveniles) flagged him down, and so Davis pulled his squad car over, stopping it within about 10 feet of the dogfight. Davis had heard the dogfight call and knew it concerned a pit bull attacking another dog, but if he hadn't been flagged down he wouldn't have stopped, but instead would have proceeded to his burglary alarm call. He trained his spotlight on the fighting animals.

33. Upon exiting his car, Davis inquired, and was told, that the attacked dog belonged to Kelsey. Both she and Tyrone described to Davis that her dog was a chocolate-colored Labrador retriever, and was wearing a collar that had attached to it a leash.

34. Davis heard Kelsey and Tyrone describe Kelsey's dog (Davis, at 86), but he claimed to have difficulty distinguishing between the two dogs' colors, and believes both to have been dark in color.

39. Davis fired one shot without any apparently effect. Within one or two seconds, he fired a second shot, and this time the dogs separated. Dog immediately began limping toward Kelsey, obviously wounded.

40. Upon seeing the results of the second shots, Kelsey shouted that Davis had shot her dog. She then moved to attend to Dog, who limped toward street and lay down.

46. Dog died as a result of the gunshot wound.

49. Following the shooting incident, the City of Champaign Police Department conducted an investigation of Davis's actions. Lieutenant Jon Swenson was responsible for the investigation.

50. Swenson considered the event to have consisted of three discrete phases: two shots fired at Dog, four shots fired at the pit bull from the original location of the fight, and one shot fired at the pit bull from across the street.

53. Swenson, and the City, determined that Davis's first two shots at Dog, that resulted in Dog's death, were also justified and within Departmental policy based upon the then-current policy that allowed the use of deadly force against a "dangerous animal".

55. Davis received discipline as a result of the one shot that ended up in an apartment unit. He was not punished or found to be in violation of any policy, as a result of shooting Dog.

<u>DISPUTED MATERIAL FACTS</u>

The following numbered statements of fact asserted by Plaintiffs are disputed, but material.

2.b. In September 2009, while responding to a report of a suicidal armed man, he negligently discharged his firearm while removing it from his holster. Davis referred to this as "accidental," and Davis received internal police discipline as a result of this incident.

There is no evidence in the record of any witness or document referring to Davis's action as it relates to the September 2009 firearm discharge incident as being "negligent." As explained by Davis during his deposition, this incident was classified as an accidental discharge by the

8

Champaign Police Department and Davis's testimony further clarified that, "It was accidental." (Docket No. 47-3, Davis transcript, p.55, l.1 to p.56, l.20).

4. City police officers are called upon to interact with dogs as frequently as once per week, including responding to animal neglect calls as frequently as once every three to six months.

Sergeant Crane testified that as frequently as once a week, an officer may be called to a house to investigate a crime and collaterally encounter a household dog in the home in a non-confrontational environment. (Docket No. 47-4, Crane transcript, p.15, l.3 to p.16, l.11). Contrary to Plaintiff's alleged statement of fact, there is no evidence in the record of police officers called upon specifically to interact with dogs once per week.

12. Prior to November 17, 2012, Jake, Kathy and Kelsey each was an owner of a chocolate-colored Labrador retriever dog named "Dog." They obtained Dog in 2008, and in November 2012 he was about 4 ½ years old. He weighed about 65 pounds, was healthy and athletic, and was well-behaved with a docile, easy-going temperament.

The ownership of Plaintiffs' dog is undisputed, however, the allegations of fact regarding the dog being docile and easy-going are disputed by Davis' deposition testimony relating to his observations of the dog mauling the other dog engaged in the dogfight. (Davis transcript, p.89, l.11-16).

35. However, Davis also acknowledged that the dogs were not identical, but one was larger and brown and solid colored, while the other shorter dog had a white belly. He also recognized that one of the two dogs was a pit bull.

Plaintiffs' alleged statement of fact cites Davis's police report as the source of these facts, instead of Davis's actual deposition testimony. Davis' testimony elaborates on exactly what he

observed at the time of the dogfight, which is contrary to the misleading statements in Plaintiff's alleged statement of fact. Davis testified in his deposition that at the time of the incident both dogs appeared dark, but one dog was larger and the other appeared smaller and had a white stomach. (Davis transcript, p.85, l.10-16). Davis further testified that one dog appeared to be a pit bull, the other dog he could not clearly identify because he could only see from the midsection to the hind legs. (Davis transcript, p.87, l.6-11; p.88, l.11-18). In addition he observed the smaller dog positioned underneath the bigger dog. (Davis transcript, p.88, l.23 to p.89, l.10). The bigger dog was dominating the smaller dog. (Davis transcript, p.89, l.15-16). The dominating dog appeared dark and the dog being mauled appeared darker. (Davis transcript, p.122, l.10-16). Lastly, to Davis, the larger dog appeared to be aggressive and mauling the other dog. This dog had a muscular build with a large head and it resembled a pit bull to Davis. (Davis transcript, p.91, l.12 to p.92, l.2)

36. Davis also claims that, in addition to hearing Tyrone and Kelsey describe Kelsey's dog, the three juveniles commented on the scene, including stating that the aggressive dog was the brown one, and that the aggressive dog was the gray one.

To the extent that this alleged statement of fact suggests that the communications from the bystanders to Davis to identify the aggressor dog was clear, his deposition testimony contradicts that notion. (Davis transcript, p.87, l.6-11; p.88, l.11-18). Davis testified that the bystanders were providing confusing information regarding which dog was the aggressor. (Davis transcript, p.90, l.1-16). It was only after he shot the larger dog and the two dogs separated that Davis was then able to get a full view of the smaller dog, which he then realized was a pit bull. (Davis transcript, p.94, l.12-20)

37. Davis did not ask any further questions or engage in any further conversation. Instead he drew his service weapon and took aim toward the dogs.

To the extent that this alleged statement of fact suggests that Davis rashly and hastily drew his weapon and intended to shoot at both dogs that is contradicted by Davis's deposition testimony. Davis unholstered his gun and aimed at the larger dog, certain it was the aggressor. (Davis transcript, p.90, l.17-21)

38. Davis had a clear shot at both dogs, and could have shot the "shorter" dog with the white belly as easily as the "larger" dog that was solid brown in color.

Davis's testimony contradicts this statement. Davis testified that his intent was to aim at the larger dog, certain it was the aggressor. (Davis transcript, p.90, l.17-21)

41. After they separated, the pit bull began to move away from the scene, heading back toward Crescent.

Davis's testimony contradicts this statement. The two dogs separated and now Davis observed that the smaller dog is indeed a pit bull. This dog's ears are pinned back; teeth are glaring; eyes are widened; and it is indicating a heightened state of aggressiveness. (Davis transcript, p.94, l.12-20). Davis is concerned that someone may get bit, attacked or mauled by this dog.  (Davis transcript, p.94, l.21-23) Davis shoots at and chases after the pit bull as it flees the scene. (Davis transcript, p.95, l.7-10)

48. At the time of the shooting incident on November 17, 2012, Davis had on his body or in his car, among other things, the following items: OC spray (pepper spray), a fire extinguisher, and his radio.

The source of Plaintiffs' statement is an equipment list that was an exhibit during Davis's deposition. Davis did not testify that he had on his body or in his car these items. Moreover,

there is no testimony whatsoever in the record that Davis had these items on his body or in his car at the time of the subject incident.

57. Kelsey witnessed the shooting of Dog in response to her request for police assistance to save Dog. As a result of witnessing those events, Kelsey has described a number of resulting conditions, including difficulty sleeping, frequent crying spells, inability to be happy about anything, an inability to take her dog Boo on a walk anymore, an inability to sit through movies that have gunfire, and pronounced psychological reactions to hearing gunfire, even on a movie.

To the extent that these statements suggest severe emotional distress suffered by Markou, Markou testified that in January 2013, she went to one free counseling session at Parkland College, but has sought no other counseling or treatment for emotional distress. (Docket No. 47-1, Markou transcript, p.96, l.12 to p.97, l.5).

59. Davis admitted that his shooting two shots at Dog was intentional.

Plaintiffs reference page 71 of Davis's deposition transcript in support of this statement. Significantly, Davis's testimony is regarding the differences in a September 2009 accidental discharge incident and the subject incident in which he intentionally discharged his firearm. Nowhere in page 71 does Davis state that his shooting two shots at Dog was intentional. Such a statement is an improper inference and should be stricken. (Davis transcript, p.71, l.16-19).

60. At no time either prior to or after Davis's arrival, at least before he shot Dog, was any person in danger of being bit or menaced by the two fighting dogs.

Davis testified that his primary concern after he shot the one of the dogs engaged in the dogfight was that the other dog  may bite, attack or maul someone. (Davis transcript, p.94, l.12-23). Furthermore, as a result of the internal Champaign Police Department investigation of the

incident, the Chief Cobb concluded that Davis was concerned about the safety of bystanders in the immediate area of the scene. (Docket No. 47-6, Cobb transcript, p.39, l.19 to p.40, l.1).

61. When Davis arrived the dogs were locked on to each other, standing relatively still and focusing upon each other, neither dog had any but superficial wounds, at worst.

Davis testified that the larger dog was dominating and mauling the smaller dog. (Davis transcript, p.89, l.15-16). In addition, Markou stated that there may have been some rolling around when there were exchanges in leverage and the dogs were moving back and forth and that no dog ever really got on their back for the most part. (Markou transcript, p.55, l.4 to p.56, l.8).

<u>DISPUTED IMMATERIAL FACTS</u>

The following numbered statements of fact asserted by Plaintiffs are disputed and immaterial.

6. Aside from the short training provided for use of the catchpole, the City did not provide any other training to its employed police officers regarding techniques and legal obligations with respect to dog interactions prior to November 2012. However, in April 2013, the City provided training, conducted by a former city of Urbana animal control officer, concerning proper police officer responses to various scenarios involving dogs, and legal responsibilities involved with such encounters. Fifty-eight police officers attended, but Davis never attended.

These allegations of fact are immaterial because the training did not focus on how to respond to dogfights, but on identifying dog behavior and aggressiveness. (Exhibit A, Joos transcript, p.67, l.7 to p.68, l.9). Moreover, this training occurred after the subject dogfight incident and thus was irrelevant to Davis's actions on November 17, 2012.

10. After November 17, 2012, as a direct result of and response to the incident on November 17, 2012 that is the subject matter of the Complaint in this case, the City revised Section 1.3.2.C to provide as follows:

> Deadly force may be used to kill an animal that either presents an imminent threat of death or great bodily harm to a person or is so severely injured that humanity requires its disposal to prevent further suffering.

These allegations of fact are immaterial because the policy was changed as a subsequent remedial measure in order to better define and eliminate any room for interpretation of the words "dangerous animal" as used in the prior policy. (Docket No. 47-5, Swenson transcript, p. 109, l.6-22). In addition, the testimony in the record is that the change in policy language was made as a "result" of the November 17, 2012, not as a response to the incident. (See Cobb Deposition Transcript, p. 47, l.21-23)

47. Within approximately ten minutes of his call, the animal control officer arrived at the scene and successfully captured the pit bull and removed him to the Champaign County Animal Control facility.

Davis testified that he believed that it took at least 10 minutes for animal control to arrive. Further, his actions after he shot Plaintiffs' dog are irrelevant to the inquiry of whether Davis acted unreasonably towards Plaintiffs or their dog.

52. Swenson found that the four shots fired at the pit bull from the location of the dogfight were justified because Davis was fearful that the pit bull could turn aggressive and attack him or the other onlookers present at the scene. Accordingly, the City determined that those four shots were within Department policy for the protection of humans.

There is no testimony in the record that Davis was fearful. He testified that upon the pit bull indicating an increased state of aggressiveness, his primary concern at that point was public

safety and he didn't want anyone getting bit, attacked or mauled by the pit bull. Furthermore, Davis's actions after he shot Plaintiff's dog are irrelevant to the inquiry of whether Davis acted unreasonably towards Plaintiffs or their dog.

56. In addition to Tyrone and Kelsey, the three juveniles witnessed most of the occurrence, including the shooting of Dog; however, no police officer at the scene ever obtained the identities of any of those three juveniles.

To the extent that this statement suggests that a thorough investigation was not conducted by the police, Defendants dispute this statement. Davis testified that after chasing the pit bull he returned to the scene roughly 5 minutes later and the three juveniles were no longer present. (Davis transcript, p.119, l.22 to p.120, l.11)

58. From the time Davis arrived on the scene to the time he fired the seventh shot at the pit bull, only about two minutes had elapsed.

To the contrary, Davis testified that about two minutes elapsed from the time that he left the scene to chase after the pit bull and then return to the scene. (Davis transcript, p.199, l.6-16). In addition, Plaintiffs in appropriately attempt to cite portions of the police report as sufficient evidence in support of an undisputed statement of material fact.

62. Davis acknowledged that he was not surprised that, as a result of his shooting Dog when he'd been called to protect Dog, Kelsey has not trust for police officers.

Whether or not Markou has lost trust for police officers is irrelevant and not an element of actionable emotional distress damages. In addition, to the extent that Plaintiffs have mischaracterized Davis's testimony, the following exchange took place during Davis's deposition after defense counsel's objection for foundation:

Q: Would it surprise you to know that based on the activities and situation of that night that Kelsey no longer trusts police and will never at least according to her never call them again?

A: Would it surprise me?

Q: Yes.

A: It wouldn't surprise me.

(Davis transcript, p.102, l.10 to p.103, l.11)

<u>UNDISPUTED IMMATERIAL FACTS</u>

The following numbered statements of fact asserted by Plaintiffs are undisputed, but immaterial.

11. Plaintiffs Jacob Saathoff ("Jake") and Kathy Saathoff ("Kathy") are husband and wife, and Plaintiff Kelsey Markou is Kathy's daughter and Jake's step-daughter, and in November 2012 was 18 years old. All three reside now, and did reside on November 17, 2012, at a house located on Crescent Drive in Champaign, directly across from Centennial High School and about half a block south of the intersection of Crescent and John Street.

The relationship of the Plaintiffs and location of their residence is immaterial to any of the issues in this case.

13. Jake, Kathy and Kelsey also have another chocolate-colored Labrador retriever, a female named "Boo."

The ownership of a companion dog is irrelevant to any of the issues in this case.

14. Prior to and including November 17, 2012, Kelsey took both Boo and Dog on near-daily walks around the family's neighborhood. Kelsey would not walk the two dogs together, but rather would commonly walk Boo first; Boo was more high-strung and energetic than Dog, and she would move quickly through her usual walk route. In contrast, Dog was relatively reserved,

16

and he simply enjoyed the walking; Kelsey would therefore walk a further distance, on a usual route, different than with Boo, when she walked Dog.

The comparison of the manner in which the Plaintiffs two dogs were walked is immaterial to any of the issues in the case.

15. Never, in the years she walked Boo and Dog, had Kelsey had any troubles with other animals or people during those walks, until November 17, 2012.

Whether or not Plaintiffs had any prior troubles during walks is immaterial to any of issues in the case.

19. Tyrone Jones ("Tyrone") had lived in a house located on Hollycrest Drive in Champaign, which is one block east of Crescent Drive. As of November 2012, Tyrone had lived at that address for about two or three years. Prior to November 17, 2012, he had never seen Kelsey walking through the neighborhood with either of the two chocolate Labs.

The location of Jones's residence and whether he had ever seen Markou before the subject incident is irrelevant to any of the issues in the case.

21. The evening of November 17, 2012 was unseasonably warm and comfortable, and many people were out that evening enjoying the relatively comfortable temperatures.

The weather conditions are irrelevant to any of the issues in the case.

42. Davis, remaining where he was at, pivoted and followed the pit bull with his gun, and fired four rounds from that location at the pit bull. The pit bull ran across Crescent, toward some apartments on the other side of the street.

Davis's actions after he shot Plaintiffs' dog are irrelevant to the inquiry of whether Davis acted unreasonably towards Plaintiffs or their dog.

43. David followed the pit bull across Crescent Street, and fired one last round toward the pit bull.

Davis's actions after he shot Plaintiffs' dog are irrelevant to the inquiry of whether Davis acted unreasonably towards Plaintiffs or their dog.

44. The last round fired by Davis ended up going through the wall of one of the apartment units across Crescent Street, and landing on the floor of the unit's kitchen. The police, following the incident, recovered that bullet.

Davis's actions after he shot Plaintiffs' dog are irrelevant to the inquiry of whether Davis acted unreasonably towards Plaintiffs or their dog.

45. After shooting the final round toward the pit bull, Davis returned to where Kelsey and Dog were at, and requested via his radio for the attendance of a supervisor and for animal control. Kelsey, Tyrone, and the others gathered asked Davis for assistance in getting Dog veterinary care. Davis refused, though, stating that he could not leave the scene because he had fired his weapon, and stating that an ambulance would not be dispatched to the scene for treatment of a dog.

Davis's actions after he shot Plaintiffs' dog are irrelevant to the inquiry of whether Davis acted unreasonably towards Plaintiffs or their dog.

51. Swenson, and ultimately the City, determined that Davis was in violation of City policy as a result of the final shot that entered the apartment building. At that point, no human was in any danger, and no other justification existed for firing.

Davis's actions after he shot Plaintiff's dog are irrelevant to the inquiry of whether Davis acted unreasonably towards Plaintiffs or their dog. Furthermore, Plaintiffs have no standing to

claim any alleged constitutional violations arising out of Davis's chase and shooting of the other dog.

54. However, as a result of the November 17, 2012 shooting death of Dog, the City modified its policy concerning use of deadly force against animals to that now codified at Section 1.3.2.C of its policies.

These allegations of fact are immaterial because the policy was changed as a subsequent remedial measure in order to better define and eliminate any room for interpretation of the words "dangerous animal" as used in the prior policy. (Swenson transcript, p. 109, l.6-22).

ADDITIONAL MATERIAL FACTS

See Undisputed Material Facts in Defendants' Motion for Partial Summary Judgment. (Docket No. 43).

C.  ARGUMENT

Plaintiffs attempt to use the definitions and standards set forth in the Humane Care for Animals Act as a basis to argue that Davis's actions were unreasonable and violated the Plaintiffs' Fourth Amendment rights. (Docket No. 46, p.15). However, this is not a run of the mill, dog running-at-large case. In the case at bar, Davis is called upon to handle a vicious dogfight. And, to properly determine whether he is entitled to qualified immunity, the court is to consider whether his actions were reasonable in light of the totality of circumstances he was facing. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Along those lines, Plaintiffs claim that Davis was constitutionally unreasonable because he did not attempt to take alternative actions. (Docket No. 46, p.16). But, this does not properly take into consideration the spur-of-the-moment assessments and decisions Davis was called upon to make in order to protect the safety of bystanders, the dog being mauled and himself. The dogs

engaged in the vicious dogfight were clearly displaying their violent propensities and were dangerous. To Davis, one of the dogs appeared to be getting mauled. Markou was hysterically pleading for Davis to take immediate control of the situation and save her dog. So, Davis acted reasonably and within Champaign Police Department policy by shooting the dog that he determined was dangerous and aggressive.

In addition, Davis made a reasonable mistake as to which dog belonged to Markou due to a litany of confusing circumstances, including:

- Low natural lighting conditions;
- Shadows cast from Davis's police squad car spotlight;
- Confusing communication from Markou and bystanders; and
- Davis's color-blindness.

Furthermore, the sole argument Plaintiffs assert for the imposition of *Monell* liability is based on the City of Champaign's allegedly express policy, which caused a constitutional violation. *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978). Plaintiffs argue that the City of Champaign's policy with respect to lethal force against animals was not consistent with the Humane Care Act. Again, there is no rhyme or reason given as to why the City's policies are required to be consistent with the provisions of the Humane Care for Animals Act. Merely arguing that a policy can be improved is not sufficient to prove that the policy is actionable pursuant to *Monell*. *Id.*

Plaintiffs cannot prevail on their state law claims because there is no evidence in the record, which supports that Davis had the requisite intent to deprive Plaintiffs of their property rights in their dog. To the contrary, Davis had every intention of acting in order to save Markou's dog.

Lastly, it is unlikely that non-economic damages can even be awarded for harm to property. Nevertheless, Plaintiffs describe the nature and extent of Markou's subjective

emotional distress damages (Docket No. 43, p.22-23). However, the sole objective indicator of her emotional damages is one free counseling session at Parkland College with no further care or treatment. (Markou transcript, p. 96, l.12 to p. 97, l.5)

For the foregoing reasons, Defendants move this court to deny Plaintiffs motion for partial summary judgment and for such other relief as it deems just and proper.

Respectfully submitted,

Defendants, City of Champaign, Illinois
and Officer Andre Davis (Officer # 7786)

By: s/Thomas S. Yu_____
Thomas S. Yu, Bar No. 6273289
THOMAS, MAMER & HAUGHEY, LLP
30 Main St., Suite 500
P.O. Box 560
Champaign, IL  61824-0560
Phone: (217) 351-1500
Fax:    (217) 351-2017
tyu@tmh-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2015, I electronically filed the foregoing Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification to the attorneys of record.

/s/ Thomas Yu_____

Thomas S. Yu, Bar No. 6273289
THOMAS, MAMER & HAUGHEY, LLP

30 Main St., P.O. Box 560
Champaign, IL 61824-0560
Ph: (217) 351-1500
 tyu@tmh-law.com