## IN THE UNITED STATE DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| JACOB SAATHOFF, KATHY | ) | |
| SAATHOFF, and KELSEY MARKOU, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 13-cv-02253 |
| | ) | |
| CITY OF CHAMPAIGN, ILLINOIS and | ) | |
| OFFICER ANDRE DAVIS | ) | |
| (officer # 7786), | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NOW COME Plaintiffs, JACOB SAATHOFF, KATHY SAATHOFF and KELSEY MARKOU, through their attorneys, Sorling Northrup, Stephen F. Hedinger of counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7.1(d)(2) of the United State District Court for the Central District of Illinois, hereby respond to the Motion for Summary Judgment (d/e #43) (hereinafter "Defendants' MSJ") filed by Defendants CITY OF CHAMPAIGN, ILLINOIS (hereinafter "the City") and OFFICER ANDRE DAVIS (hereinafter "Davis"). In support of this Response, Plaintiffs state as follows:

### I. INTRODUCTION

On November 17, 2012, Plaintiff Kelsey Markou (hereinafter "Kelsey") was walking Dog, the chocolate-colored Labrador retriever owned by her family (including her mother, Plaintiff Kathy Saathoff, and her step-father, Plaintiff Jacob Saathoff), near her home in Champaign. As she and Dog reached the corner of John Street and Crescent Drive, a gray and white pit bull with a white stomach ran across Crescent Street from the east, and started a fight with Dog. Kelsey, with the help of passerby/witness named Tyrone Jones (hereinafter

"Tyrone"), attempted to separate the dogs and stop the fight but they were not able to.  Three juveniles approached, and one of them called the police.  Defendant Davis, a City of Champaign Police Officer, responded at approximately 5:27 p.m.  Upon seeing the fighting dogs, and after speaking briefly with Kelsey and Tyrone Davis drew his gun and shot twice, striking Dog with the second shot.  He then turned and began firing at the pit bull, and when the pit bull ran back across Crescent Street Davis followed, and shot again; he hit the pit bull with at least one bullet.  Altogether he fired seven rounds, then returned to his squad car and, at 5:29 p.m., called for assistance and animal control.  In barely two minutes from the time he had arrived, Davis managed to fire off seven rounds and to shoot two dogs, and Dog lay dying on the grass near where he had been shot.

Plaintiffs have filed this action against Davis and against his municiple employer, the City, alleging that the shooting of Dog was an illegal seizure of their property in violation of their Fourth Amendment rights; that the City is also liable for the constitutional violation pursuant to the Monell doctrine because the shooting was warranted by existing City policy and/or resulted from inadequate training; that the shooting of Dog constituted a conversion; that Davis's actions constituted the intentional infliction of emotional distress upon Kelsey; that the City, as Davis's employer, is liable for his tortious actions undertaken during the course and scope of his employment; and that the Plaintiffs are entitled to compensation pursuant to provisions of the Illinois Humane Care for Animals Act.

Defendants have filed a motion for summary judgment, arguing that there is no liability for the Fourth Amendment violation and/or Davis is entitled to qualified immunity, that the City is not liable under Monell, that both Davis and the City are immune for the state law tort actions pursuant to statute, and that recovery for intentional infliction of emotional distress is

unavailable.  None of the bases for Defendants' proposed summary judgment are valid, and the motion should be denied.  Plaintiffs have filed their own motion for partial summary judgment, however, and that motion is well-taken and should be granted.

## II. <u>RESPONSE TO DEFENDANTS' PROPOSED UNDISPUTED MATERIAL FACTS</u>

### A.  UNDISPUTED MATERIAL FACTS

The following paragraphs of the Defendants' asserted "Undisputed Material Facts" (Defendants' MSJ, at 2-7) are conceded to be undisputed and material: Paragraphs 1, 2, 3, 6, 7, 10, 14, 21, 22, 24, 32, 33, 34, 37, 38, 39, 40, 41, 42, 44, 45, and 52.

### B.  DISPUTED MATERIAL FACTS

The following facts identified in the Defendants' "Undisputed Material Facts" are conceded to be material by Plaintiffs, but are disputed in some way.  Following each identified Disputed Material Fact, Plaintiffs provide a short explanation for the dispute, and a citation to support for the dispute.

#11.    Plaintiffs agree that Defendants' Undisputed Material Fact #11 is material, but dispute the word "alternately," which suggests that Kelsey provided Davis with several different descriptions of her dog.  In fact, Davis's testimony itself admits that the description was given altogether, not as several competing descriptions.  (Ex. A, p. 86, L. 13-17).  <u>See also</u> Tyrone's testimony (Ex. C, p. 44, l.11-20) and Kelsey's testimony (Ex. D, pp 44-49).  Additionally, Tyrone testified that he and Kelsey "pointed straight to the Lab and he still shot the Lab." (Tyrone dep., Ex. C, p. 67, l. 18 - p. 68, l.8).

#12.    Plaintiffs concede that the allegations of paragraph 12 are generally material, but dispute that the three other bystanders were all male (in fact, one was male and two were female

-- Davis dep., Ex. A, p. 85, l. 20-24).  Plaintiffs otherwise do not dispute the statements of paragraph 12. (Ex. D, p. 45, l. 17-24; Ex. C, p. 47, l. 7-12).

#19.  Plaintiffs concede that Paragraph 19 is material, and dispute only the word "echoing", the meaning of which is unclear in this context.  Plaintiffs otherwise concede that the assertions of Paragraph 19 are undisputed. (Ex. D, p. 49, l. 12-22).

#30.  The identified portion of Tyrone's deposition is taken out of context in this proposed Undisputed Material Fact.  In the passage cited, Tyrone was not speaking of any particular or specific response of Davis, but rather was speaking generally of Davis's demeanor and behavior throughout the two-minute sequence of events.  Tyrone had described Kelsey's excited and even hysterical behavior (Tyrone, Ex. C, at 72), and described his own demeanor as composed and "humble" (Tyrone, Ex. C, at 72-73), and then was asked by Defendants' counsel whether Davis "got excited and wasn't humble," to which Tyrone responded "I feel like the officer was confused on what was going on, so that made his actions and choice of actions a little weird" (Tyrone, Ex. C, at 73).  Tyrone also testified, though, that the situation "wasn't confusing at all," and that Davis's actions revealed that, "apparently he wanted to shoot her dog...." (Tyrone, Ex. C, at 56, l. 17-24).  And Davis, of course, has admitted that he shot the dog he wanted to shoot (as stated in Defendants' Undisputed Material Facts, his second shot "hit his target" (Defendants' MSJ, at 5, para. 34)).  Accordingly, although Davis's demeanor and behavior are material, Plaintiffs dispute the characterization of Tyrone's testimony as presented in paragraph 30.

#35.  Plaintiffs concede that paragraph 35 of Defendants' proposed Undisputed Material Facts is material, but Plaintiffs dispute the characterization that Davis learned "that he has mis-identified" Kelsey's dog. Davis himself admits that he shot the dog that he believed was

aggressive, and that was the dog he intended to shoot. (See Defendants' proposed Undisputed Material Facts, paras. 32 and 34). There was no mis-identification; although perhaps Davis assumed that Kelsey's dog would not be the one that he perceived as more aggressive, there nevertheless was no mis-identification. Davis shot the dog he intended to shoot. (Davis, Ex. A, at p. 90, l. 17-21 and dep. ex., Crane #1, at 2).

## C. DISPUTED IMMATERIAL FACTS

Plaintiffs contend that the following facts asserted in the Defendants' proposed "Undisputed Immaterial Facts" are, in fact, both disputed and immaterial. Following each identified challenged Undisputed Material Fact, Plaintiffs explain the basis for their belief that the fact is immaterial, and provide explanation and citation to authority for the dispute of that fact.

#23.   This paragraph claims that Kelsey testified that the dogs, as they fought, may have rolled around with exchanges in leverage, that they were moving back and forth, and that no dog ever got on its back. The specific details of the dogfight, particularly prior to Davis's arrival, are irrelevant and immaterial to any issue in this case. Defendants have never asserted that the dogs were engaged in that manner after Davis arrived, and in fact the undisputed evidence is that, by the time he arrived, and for the brief period he observed the dogs together (less than two minutes), the dogs were basically stationary - "locked up", in the words of Tyrone. (Tyrone, Ex. C, at 55).   In addition, Kelsey did not testify that the dogs were ever "rolling around," but those were words put in her mouth by Defendants' attorney. Those words occur in Kelsey's transcript at pages 55, 85, 115, 118 and 119; of those, at most she stated that the dogs engaged in, "maybe a little rolling around when there's exchanges in leverage, but for the most part they are both standing up" (Kelsey, Ex. D, at 55, l. 4-6); the only other time she used the

words was to deny that they were <u>ever</u> rolling around: "They weren't rolling around.  They were pushing up on each other, getting leverage.  No one was ever really on their back."  (Kelsey, Ex. D, at 118, l. 19-21).  Aside from an objection by Kelsey's counsel (Kelsey, Ex. D, at 118, l. 24, and 119 l. 1-4), all other references to the word "rolling" were made by Defendants' counsel, not by Kelsey herself.

#25.    This proposed Undisputed Material Fact asserts that "Davis observed the bigger dog dominating and mauling the smaller dog."  Which dog was "dominating", and whether either dog was being "mauled," is not material, and neither is which dog was "bigger" and which was "smaller."  As noted in Plaintiffs' motion for summary judgment, under the circumstances of November 17, 2012, and under both Illinois and federal constitutional law, Davis had no justification to shoot <u>either</u> of the two dogs within moments after having arrived on the scene, without having attempted some other less final means of resolving the situation.  "…[T]he use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable."  <u>Viilo v. City of Milwaukee</u>, 547 F.3d 707, 710 (7th Cir. 2008). The undisputed facts show that both fighting animals were dogs (i.e., companion animals), and were not an immediate danger to anything or anyone (Kelsey, at 33, 53, 59), and that Davis failed to determine whether legal force was unavoidable (his first, only and immediate response was to draw his gun and shoot, and then, within maybe 3 seconds, shoot a second time) (Kelsey, at 49-62).  At the time of his arrival, the dogs were "locked up", barely moving at all (Tyrone, at 49-51, 55, 62), and neither was in any particular distress. (Kelsey, at 59; Tyrone, at 63-64).  Both Kelsey and Tyrone described the fight at the point Davis arrived as fairly even-matched; Kelsey said the fight was "equal back and forth" and specifically disagreed with the characterization that one dog was dominating over the other (Kelsey, at 115), and Tyrone answered Defendants'

counsel's question as to which dog was "winning the fight by the time the officer got there" by stating: "Well, I mean, they was pretty much solid at this point in time, so the Lab, I would say that the Lab was giving the pit a run for its money, but to clarify that meaning it was defending itself to the best of its ability, as pit bulls are known to be very dangerous." (Tyrone, at 51). Moreover, after obtaining initial information, Davis did not attempt any alternative means of separating the dogs, such as calling for the Department's catchpole, spraying the dogs with a fire extinguisher or pepper spray, calling for animal control or other back up, or even asking additional questions to clarify whose dog belonged to whom. Accordingly, Plaintiffs dispute the characterization that one dog was dominating or mauling the other dog, and dispute the materiality of that observation in any event, since there was no basis to shoot either dog even under those circumstances.

#26.    This Undisputed Material Fact asserts that, "[t]o Davis, the dominating dog was dark and the dog being mauled was darker." Which dog was "dominating," and which was being "mauled" are immaterial for the reasons set forth with respect to paragraph 25, above. Even if the facts of domination by one dog and getting "mauled" by another dog justified shooting either one of the dogs, the characterization of "dark" and "darker" is immaterial in light of the numerous other identifying characteristics presented to Davis, including that the victim dog had on a collar, was a Labrador retriever, and was pointed out directly by both Tyrone and Kelsey, and that the other dog was partly white in color (Tyrone, at 44, 54-55, 67-68; Kelsey, at 47-49). Davis himself, in fact, admitted that one of the dogs had a prominently white belly (Davis, dep. Ex Crane #1, at 2 ("…I could see 2 dogs, both dark colored, one with a white belly")) and the white belly was visible to him at all times (Davis, at 123), yet he never asked whether that clearly distinguishing feature could help him identify which dog was associated with Kelsey (Tyrone, at

67-68). Finally, Plaintiffs also dispute the assertion that the dog perceived by Davis to have been "larger" (that is, Dog) was less dark than the pit bull. Tyrone specifically testified that the coloring of the two dogs was much different, and that contrary to this assertion, Dog was clearly much darker in shade than was the pit bull. (Tyrone, at 37).

#29.   Defendants' Undisputed Material Fact #29 asserts that there were other bystanders providing Davis with confusing information regarding which dog was the "aggressor". Plaintiffs assert that which, if either, dog was "aggressive" is not relevant or material to this case. Again, Davis could not legally shoot either of the dogs under the circumstances. Further, he was not at any time requested to do anything to an "aggressive" dog, but instead was asked to keep a pit bull from attacking a chocolate Labrador retriever. In addition, what, if anything, the "other bystanders" may have said is not relevant, either - Davis has admitted knowing that the dog he was called upon to save and protect belonged to Kelsey, and in fact he initially listened only to her information concerning which dog was which, and Kelsey remained very close to Davis clear through the point that he shot Dog. (Davis, at 86-88). Accordingly, at best these other bystanders should be considered "background noise," which should not reasonably have interfered with Davis listening to the one person he knew to have an interest in the situation. In any event, even if the bystanders' words were relevant, Plaintiffs dispute that they were providing Davis with information which contradicted reality. In point of fact, both Tyrone and Kelsey testified that if they spoke to Davis at all, the bystanders were echoing the words of both of them, and were not providing Davis with any contradictory information. (Kelsey, at 48-50; Tyrone, at 46-48).

#31.   This proposed Undisputed Material Fact provides: "To Davis the larger dog appeared to be aggressive and mauling the other dog. This dog has a muscular build with a large

head and it resembled a pit bull to Davis." Assuming "this dog" refers to the "larger dog", and not to "the other dog," still the asserted facts are immaterial, because as discussed previously, Davis could not lawfully shoot either one, whether one was more aggressive or not. Further, as also discussed above, the relative size of the dogs was not material in light of the other distinguishing characteristics between the dogs, including the fact that one of the dogs had a white belly, and one of the dogs was chocolate brown in color. Further, Davis was not called upon to take any action against a "larger" dog, but instead was asked to separate a pit bull and a Labrador retriever. Finally, even if these allegations are material, they are disputed - Tyrone and Kelsey both testified that the dogs were easily distinguishable in appearance. See paras. 25-29, above.

#43.   This proposed Undisputed Material Fact asserts a summary of "conclusions" reached by Champaign Police Department Chief Cobb concerning the November 17, 2012 incident, including the purported existence of confusion at the scene, and the subjective attitude of Davis during the incident. This assertion is immaterial because it is subject to Plaintiffs' pending motion to strike, pointing out that this particular line of testimony by Chief Cobb had not previously been disclosed to Plaintiffs, even in response to their specific interrogatory. Further, even if not stricken, the proposed "facts" are immaterial because Chief Cobb is not tendered as having been an eyewitness to the incident, nor is his proposed report based upon any admissions made by any party opponent in the case. Chief Cobb's "conclusions" are of no evidentiary value in this case, and hence are immaterial to the case. Finally, even if this Court considers Chief Cobb's conclusions in some way material, they are disputed. Both Tyrone and Kelsey have testified that the scene was not confusing at all, and that clear instructions were provided concerning which dog was which (Tyrone, at 56; Kelsey, at 86); further, there is no

evidence to support the assertion "that Davis was concerned about the safety of bystanders in the immediate area" prior to shooting Dog, but to the contrary (a) during the dogfight, the dogs posed no threat or danger to any person at any time, (Tyrone, at 17-18; Kelsey, at 33, 53, 59 and 86; Complaint, para. 22; Amended Answer, para. 22), and (b) the only time Davis became concerned about safety was _after_ he shot Dog, and the pit bull, freed from its fight, took an aggressive stance and appearance and posed an attitude of some menace (Davis, at 94).

#47 - #50. Each of these proposed Undisputed Material Facts is subject to the current motion to strike by Plaintiffs, which seeks to have these stricken as not having previously been disclosed to Plaintiffs, even in response to specific interrogatories. They are immaterial (for that reason).

# 47 is also immaterial because, whether or not Chief Cobb is the "final" policy maker for the Champaign Police Department, the issue is what the Department's policies _are_, which can take several different forms, including an express written form (which are the best evidence of the Department's policies). This assertion is also disputed because it is the City Manager, not the Department Chief, that is the "last word" on Departmental policies. (Carter, at 18).

In addition, this proposed Undisputed Material Fact asserts that Chief Cobb at no time had "knowledge of any custom or practice" at the police department that violated the Department's own policies, Illinois Law Enforcement Accreditation Program (ILEAP) standards or state law. This is also immaterial because the question is what policies existed, _not_ what Chief Cobb knew or was aware of; moreover, again the issue is whether the policies or customs violated the Plaintiffs' civil rights, not whether they violated the Department's own policies, or the ILEAP standards, or any particular state law. Also of note, no foundation has been laid to support the conclusions of no violations of ILEAP standards (ILEAP, in fact, was not even

identified or defined or described), and Chief Cobb did not provide any basis for any conclusion that he is familiar with all state laws. Further, this assertion is disputed, because the written policy itself, on its face, violates state law by allowing a police officer such as Davis to summarily shoot a dog under circumstances such as those present here, where the dogs were not posing a danger to any person, and in fact the policy in place was changed by the City only after Davis shot Dog on November 17, 2012, in conformance and compliance with the Department's express policy. (Cobb, at 46-49). Finally, it is also undisputed that the City provided no training to its police officers with respect to interactions with dogs prior to November 17, 2012 - "other than K-9 officers, there is no evidence in the record that CPD police officers received dog-specific training." (Defendants' MSJ, at 12).

#48.    This proposed Undisputed Material Fact identifies Stephanie Joos as the Champaign County Animal Control Director, and asserts "that there is no specific training available to respond to dogfights because every situation is so different." This is also immaterial because, for one thing, it misrepresents her testimony, which was that "general animal control training would give you the skills to assess the situation and address it appropriately," in specific answer to a question about training in preparation to deal with animal fights. (Joos, at 26, l. 8-12). (Defendants' citation to page 8 of Joos' transcript seems irrelevant to any point being made - the citation is to discussion by counsel, not any answer by the witness). This proposed Undisputed Material Fact is also immaterial because no foundation is laid to equate the experience of the Champaign County Animal Control Department to the experience of a line-duty City of Champaign police officer. Finally, this assertion is disputed based upon Joos' own testimony, which is that general training in animal control techniques are sufficient to deal with dogfights.

#50.    This paragraph asserts that Joos testified that animal fight incidents only happen once or twice per year, is also immaterial because no foundation has been laid to equate the experience of the Champaign County Animal Control Department with that of the City of Champaign Police Department.  There is simply no basis to assume that, just because the county animal control officers only respond to dogfight incidents once or twice per year, an individual police officer may not have to deal with such incidents more frequently.  Moreover, the assertion is also immaterial because dogfights are only one type of interaction for which generalized animal training can be useful, and Joos herself testified that such generalized training would be sufficient to understand how to respond to a dogfight.  This assertion is therefore disputed based upon Joos' own testimony.

#54.    This proposed Undisputed Material Fact asserts that, apparently for replacement of Dog, "[t]he actual out-of-pocket costs for a replacement dog (new male chocolate-colored Labrador Retriever with comparable bloodlines) is $3,000.00." The authority cited is Plaintiffs' interrogatory answer.  This assertion is immaterial to any issue raised in Defendants' MSJ, which does not seek judgment of any sort with respect to damages suffered by Plaintiffs as a result of the Defendants' actions.  Moreover, the assertion is disputed, because as is clear from the remainder of Plaintiffs' discovery responses, out-of-pocket costs to replace Dog would necessarily require substantial additional investments, including substantial training, the time spent by Plaintiffs (particularly Plaintiff Jacob Saathoff) in training Dog, and other costs and expenses. See Plaintiffs' Answer to Interrogatory No. 14.

## D.  UNDISPUTED IMMATERIAL FACTS

Plaintiffs contend that the following, stated by Defendants as proposed "Undisputed Material Facts," are in fact immaterial, although undisputed.  Following each identified fact, Plaintiffs briefly explain the basis for their argument that it is immaterial.

#4.    The fact that Davis arrived at the scene is material; the fact that he did so because people "were frantically" waving to him is not material.

#5.    That the sun had gone down is not material.  The undisputed facts are that sufficient light existed, even without the police car's spotlight, to see what was going on. (Kelsey, at 44; Tyrone, at 11).

#8.    Whether the dogs were in and out of the spotlight is not material, since sufficient light existed to see them regardless of the spotlight.  See ¶5, above.

#9.    Whether Davis, by positioning himself in front of the spotlight, created a shadow upon the dogs is not material.  See ¶¶5 and 8 above. (Moreover, if Defendants' point is that by standing in the spotlight, Davis interfered with his own vision, then this would seem to add to the willfulness and indifference revealed by his conduct, and not to be a defense for his behavior).

#13.    Tyrone's attempts to calm Kelsey, and whether she was hysterical, are not material, and neither is his speculation that it might have been hard to understand her; Davis never said that he did not understand her, and both she and Tyrone specifically testified that her descriptions and instructions were clear and unambiguous.   Tyrone's understanding or speculation on these points is simply not relevant.

#15.    Tyrone's memory of the color of Dog's collar is not material; more importantly, the color of the collar is not material.  Tyrone specifically recalled seeing a collar on Dog.  Davis

specifically agreed that he was instructed that Dog was attached to a leash, and he agreed that a leash must be attached to a collar. (Davis, at 88).

#16.    Whether Tyrone recalls Kelsey having said Dog was wearing a collar is not relevant; Davis admitted that she told him Dog had a leash, and he admitted that a leash must be attached to a collar.

#17.    Whether the leash, or a collar, could be seen on one of the dogs during the course of the fight is not relevant, because at the time Davis arrived the dogs were standing still, "locked up" as Tyrone described it.  Moreover, whether either a leash or a collar could be identified to either of the dogs is not material, since other identifying characteristics, such as one dog's white belly, were readily apparent even to Davis.

#18.    Whether any particular piece of information "was most important" or of lesser importance is immaterial, because Davis had substantial information to identify the two dogs, and to any extent he was uncertain, he failed to ask for further guidance.  Moreover, as noted previously, Davis had no legal justification to shoot either dog, regardless of the amount of or importance of information he possessed.

#20.    Whether Davis is color blind is not material.  Under the circumstances, he had no legal justification to shoot either dog.  Moreover, even with his condition, he was able to distinguish a white belly, and shades of color, and could distinguish other features relevant to distinguishing between the two dogs.  Moreover, he failed to ask for any further guidance, or to inform anyone that he was unable to distinguish colors.

#27.    Tyrone's assessment about how the fight was progressing is not material, because Davis had no legal basis or justification to shoot either dog under the circumstances.  Moreover, to any extent the status of the fight is material for any reason, the particular quote is taken out of

context, and in fact Tyrone was attempting to characterize the fight as relatively even, with neither dog having an upper hand. Kelsey agreed with that assessment. See discussion of para. 25, above.

#28.    See #17 above.

#36.    Davis's appearance of confusion after he shot Dog is immaterial. First, he had no lawful justification or basis to shoot either dog under the circumstances. Second, he did shoot the dog that he intended to shoot. At most, his look of confusion indicates only a surprise that the dog he perceived as "aggressive," which was the dog he intended to shoot, was the one owned by Kelsey. He still had no basis or justification to shoot it.

#46.    The hours of generic firearm training Davis received is not material. The issue is not whether Davis had general firearm abilities, but rather whether he had sufficient training in interactions with domestic pets and other animals. (Further, this paragraph is subject to Plaintiffs' motion to strike, and is immaterial for that reason as well).

#51.    How Plaintiffs came to possess Dog is immaterial for any issue raised in Defendants' MSJ.

#53.    The amount paid by Plaintiffs for Dog's "companion female chocolate-colored Labrador retriever" is immaterial to any issue raised by Defendants' MSJ.

#55.    The existence, amount or nature of any counseling Kelsey received as a result of Davis's intentional shooting of Dog in her presence is not material to any issue raised by Defendants' MSJ.

### E.  ADDITIONAL MATERIAL FACTS

Plaintiffs incorporate by reference for all purposes the Undisputed Material Facts set forth in Plaintiffs' Motion for Partial Summary Judgment (d/e #46) previously filed in this case, along with all evidentiary exhibits supporting that motion.

In addition, Plaintiffs add the following Undisputed Material Facts:

1.      Plaintiffs' interrogatory number 13 directed to Defendant City of Champaign asked: "If you contend that there is any lawful justification or excuse for the shooting of Dog by Office [sic] Andre Davis on November 17, 2012, state the lawful justification or excuse and state all factual and legal support for the contention." Defendant City of Champaign answered: "No such authority has been identified at this time, yet Defendant will supplement as necessary." The City has never served upon Plaintiffs any supplement. (Defendant City of Champaign's Answers to Plaintiffs' First Interrogatories, para. 13, at 5-6).

2.      Plaintiffs' interrogatory number 14 directed to Defendant Davis asked: "If you contend that there is any lawful justification or excuse for the shooting of Dog by you on November 17, 2012, state the lawful justification or excuse and state all factual and legal support for the contention."  Defendant Davis answered: "All justifications are included in the documentation provided in Plaintiffs on August 5, 2014." Davis has never served upon Plaintiffs any supplement.  No documentation provided to Plaintiffs by Davis included any lawful justification or excuse, nor any factual or legal support.

### III. ARGUMENT

Plaintiffs incorporate by reference all relevant argument stated in their Plaintiffs' Motion for Partial Summary Judgment.  In addition, Plaintiffs state:

## A. UNREASONABLE SEIZURE

Count I of Plaintiffs' complaint identifies itself as seeking relief pursuant to 42 U.S.C. §1983 for Defendant Davis's violation of Plaintiffs' Fourth Amendment right to be free from unlawful seizures. Plaintiffs have never suggested, in their complaint or any other pleading filed in this case, that they seek §1983 recovery for violation of any constitutional provision other than the Fourth Amendment. Despite the clarity and unambiguity of Plaintiffs' pleadings, the bulk of Defendants' "Unreasonable Seizure" argument concerns deprivation of due process under the Fifth and Fourteenth Amendments, not Fourth Amendment violations. Zinermon v. Burch, 494 U.S. 112 (1990), cited at page 8 of Defendants' motion, analyzed the complaint under review for necessary allegations to state a claim for deprivation of due process of law, and turned upon discussions of pre- and post-deprivation remedies under the applicable state law. 494 U.S. at 124-139. Mathews v. Eldridge, 424 U.S. 319 (1976), also cited by Defendants, is of course the seminal Supreme Court case establishing the weighing process to determine the necessary process required by a given situation. The Zinermon Court, in fact, quoted the operative language of Mathews that discussed the various factors necessary "[t]o determine what procedural protections the Constitution requires in a particular case" in order to determine what process is due in a particular situation. Zinermon, 484 U.S. at 127, quoting Mathews, 424 U.S. at 334.

One case cited by Defendants, Brandon v. Village of Maywood, 157 F.Supp. 2d 917 (N.D. Ill. 2001), does include discussion of an alleged Fourth Amendment violation, but Defendants' MSJ relies upon page 931 of that Brandon opinion, in which the court considered one plaintiff's "claim for deprivation of property under the Due Process Clause of the Fourteenth Amendment based on the injuries to her dog from the shooting." 157 F.Supp. 2d at 930. The

court analyzed the issue by balancing the factors identified in <u>Mathews</u>, and ultimately held that, although the plaintiff had essentially received no process in this case, the violation to her property rights "was minimal" and she was not entitled to any other safeguards under the circumstances. 157 F.Supp. 2d at 931. That <u>Brandon</u> plaintiff did not plead the shooting as a Fourth Amendment violation.

This portion of Defendants' MSJ, discussing constitutional provisions of virtually no relevance to this case, is frivolously irrelevant, and this Court should strike, or at the very least disregard, the first two paragraphs of this portion of Defendants' motion.

Defendants also misstate the potential qualified immunity defense available to police officers for constitutional torts. Citing <u>Malley v. Briggs</u>, 474 U.S. 335, 341 (1986), Defendants contend that the qualified immunity defense is available to all "officers in the performance of their duties unless they are 'plainly incompetent' or they 'knowingly violate the law'" (Defendants' MSJ, at 8). Defendants also claim that this determination must include analysis of "whether an officer's conduct was reasonable in light of the circumstances he is confronting." (Defendants' MSJ, at 8, citing <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001)). From these misstatements of legal doctrine, Defendants claim that various circumstances, including an asserted need "to make spur-of-the-moment assessments and decisions" and the alleged hysteria of Kelsey, warranted Davis's action of blasting away and killing Dog before turning his sights on the pit bull. Defendants also claim that the Champaign Police Department's own written policy, which purported to allow the execution of a dog under circumstances such as were present on November 17, 2012, established that Davis "was not plainly incompetent" and that he did not "knowingly violate[] the law." (Defendants' MSJ, at 9).

Defendants' analysis is completely off base.   First, the standard for the "qualified immunity" defense is not merely an assessment of whether the officer in question was "plainly incompetent" or "knowingly violated the law," and the Malley case never said it was.  Malley, in fact, concerned a special species of immunity available only under the qualified circumstances of an officer having an objectively reasonable basis to believe the truth of facts stated in an affidavit in support of issuance of a search warrant; under those specific circumstances, the Malley Court agreed that that "objective reasonableness" immunity established by Harlow v Fitzgerald, 457 U.S. 800 (1982), would be available.  If this is the qualified immunity raised by Defendants' affirmative defense, it is completely inapplicable to this case, since this case does not in any way, shape or form concern liability for obtaining a search warrant pursuant to untrue affidavit assertions.   Moreover, the precise language cited by Defendants as the "qualified immunity" standard is not, in fact, the standard -- the Court, rather, while discussing the evolution of "the qualified immunity defense" noted that the Harlow defense "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." 475 U.S. at 341.  This is not the elements of a qualified immunity defense, but rather merely a description of some of those who receive a benefit from application of the immunity.

Instead, the well-known concept of "qualified immunity" as applied to §1983 actions requires an equally well-known two-step consideration:  First, whether a constitutional violation occurred, and second, if so, whether the right that was violated was clearly established at the time of the officer's actions.  See Saucier, 533 U.S. at 201; see also Viilo v. City of Milwaukee, 552 F.Supp 2d 836, 840 (E.D. Wis. 2008), aff'd and appeal dismissed, 547 F.3d 707 (7th Cir. 2008).  Defendants acknowledge that "[a] dog is property that can be seized and the killing of a dog is recognized as a seizure under the Fourth Amendment" (Defendant's MSJ, at 7), but they

fail to discuss at all the fact that the constitutional right (being free from having one's pet shot by a police officer when it posed no danger to anyone and no alternative measures were even attempted) was clearly established long before Davis killed Dog. In any event, since Defendants do not claim otherwise, they certainly are not entitled to summary judgment finding the applicability of a qualified immunity defense.

Defendants also rely upon the Malley and Saucier decisions, as well as Phillips v. Community INS Corp., 678 F.3d 513 (7th Cir. 2013), for the proposition that Davis should be immunized because his actions were reasonable under the circumstances, where he was acting in an allegedly tense situation, making quick decisions, and attending to allegedly competing motivations.

It should first be noted that there is absolutely no factual basis for Defendants' description of the circumstances surrounding the shooting of Dog. The situation did unfold very quickly once Davis arrived - he has admitted that barely two minutes transpired during the time he: pulled up in his squad car, pointed his spotlight at the fighting dogs, approached the dogs and the onlookers, listened to Kelsey and Tyrone, drew and aimed his gun, fired two shots at Dog, pivoted and fired four shots at the pit bull, followed the pit bull across the street and fired one final round, and then returned again to the squad car. The rapid sequence is undisputed, but it is also undisputed that the record contains virtually no explanation or justification for such rapid deployment. Nothing about Davis's description, or even Defendants' stilted recitation of the facts, explains why other means and methods could not have been employed and attempted in the first instance rather than shooting at the dogs, regardless of which dog Davis thought deserved to be shot. Accordingly, any stress created by a rapidly unfolding situation, as suggested by

Defendants, was purely and completely the result of Davis's own actions, and not the result of any exigent conditions or circumstances requiring his immediate response.

Aside from lacking factual basis, Defendants' argument also lacks any legal support. Qualified immunity simply does not include an element of reasonableness, except in the most extreme circumstances where a court is in a position to declare that actions were reasonable as a matter of law. Those circumstances clearly do not exist here; to the contrary, the undisputed facts establish that, as a matter of law, Davis's actions were completely unreasonable under the circumstances of November 17, 2012. To the extent any factual dispute exists between those two extremes, the reasonableness of the behavior is an element of Plaintiffs' Fourth Amendment claim, and will be part of the jury's decision in this case (7th Circuit Pattern Jury Instruction 7.08, for instance, establishes that the first element for an unlawful seizure claim is whether the taking was unreasonable).

Finally, the Defendants also assert that "[i]ntent is a condition precedent for a Fourth Amendment violation" and that here although Davis clearly "intended to shoot and kill one of the dogs in the dogfight," he made a reasonable mistake in determining which dog belonged to Kelsey. Defendants conclude that "Plaintiffs cannot prove that Davis's purpose and intent was to cause Plaintiffs harm by depriving them of their property interests, thus they cannot prove a Fourth Amendment violation occurred." (Defendants' MSJ, at 10). Defendants cite Brower v. County of Inyo, 489 U.S. 593 (1989), and County of Sacramento v. Lewis, 523 U.S. 833 (1998).

Once again, Defendants' analysis is completely, and indeed frivolously, flawed. The "intent" requirement announced in Inyo applies only in circumstances involving governmental interference with a person's freedom of movement. In Inyo an estate brought an action against a police department that had set up a roadblock to stop a fleeing suspect; the suspect died when he

crashed into the roadblock.  The Court ruled that the roadblock, intentionally created to stop the suspect's freedom of movement, constituted a "seizure" subject to Fourth Amendment analysis. 489 U.S. at 599.  In Lewis, a police officer chased a speeding motorcycle, and the chase ended when the motorcycle skidded out of control; the police car, as it attempted to stop, slid into the motorcycle's passenger, who subsequently died.  Unlike in Inyo, the Lewis Court determined that no Fourth Amendment seizure had taken place, because the motorcycle's driver's freedom of movement was never restricted - the police officer only followed the motorcycle, and did not attempt to forcibly stop it.  523 U.S. at 844-45.  The Inyo Court explained:  "[a] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement through means intentionally applied."  Inyo, 489 U.S. at 596-97.  Important to this case, the Inyo Court further clarified that "[a] seizure occurs even when an unintended person or thing is the object of the detention or taking, but the detention or taking itself must be willful." 489 U.S. at 596 (citations omitted; emphasis added).  Applied here, Defendants have no basis to claim that any lack of intent to kill Dog somehow exonerates Davis, but to the contrary their admission that Davis intended to shoot a dog but mistakenly believed that Dog was the one to shoot establishes that a Fourth Amendment seizure has occurred, even if the principles of Inyo and Lewis apply to a situation such as this which does not implicate loss of liberty.  This Court should apply Defendants' own words and arguments against them, and enter a summary judgment on this issue in favor of Plaintiffs.

## B. MONELL LIABILITY

Defendants assert two reasons why the City should not be held liable under Monell v. Dept. of Soc. Servs of City of New York, 436 U.S. 658 (1978).  First, Defendants claim that, if Davis is not liable for constitutional violations, then neither can the City be liable under Monell. Plaintiffs have no dispute with this assertion, but clearly Davis is not entitled to summary judgment for his Fourth Amendment violations, so this avenue of relief for the City is unavailable.

Defendants secondly argue that Plaintiffs are unable to establish any of the three bases for municipal liability for constitutional violations.  They first claim, without identifying any factual basis, that although Plaintiffs allege that the City enforces policies "allowing officers to unreasonably use deadly force upon dogs", the City, through its police chief, has denied "the existence of any custom or practice at [Champaign Police Department] which violates [Champaign Police Department] policies or procedures, ILEAP standards, or state law," and that no record proof to the contrary exists. (Defendants' MSJ, at 11.)  Plaintiffs respond, first, that Chief Cobb's testimony supporting this assertion should be stricken pursuant to Plaintiffs' Motion to Strike Non-Disclosed Testimony, which Plaintiffs have previously filed.  Simply put, although having had ample time and opportunity to do so, and in the face of Plaintiffs' express request for such information, Defendants never informed Plaintiffs that Chief Cobb would be called upon to testify concerning Champaign Police Department policies or practices, prior to the filing of the motion for summary judgment (which came after the close of discovery in this case).

Plaintiffs' second response is that this assertion overlooks the express policy identified in the record, and which Chief Cobb specifically admitted to in his deposition testimony.  Plaintiffs incorporate by reference Section III.A.3 of their Plaintiffs' Motion for Partial Summary

Judgment, which points to statutory provisions that were clearly violated by Davis's actions on November 17, 2012, and to the City's express policy, Section 1.3.2.C, which at the time of Officer Davis's actions under scrutiny here allowed him to shoot Dog even though Dog did not pose a danger to any person, and even though Davis could have, but did not, attempt any alternative means of separating the dogs prior to pulling his gun and shooting.   Following Davis's actions on November 17, 2012, the City changed its policy in response to that action, so that it now comports with state law.  The City's own policy, therefore, supported and justified Davis's actions, making the City expressly liable under <u>Monell</u>.

Third, and finally, Defendants' argument begs the question as to whether the City's policy violated the Fourth Amendment by authorizing any illegal search or seizure.  All Chief Cobb's affidavit states is that as far as Chief Cobb knows, no custom or practice at CPD violated CPD policies or procedures, or state police policing standards or statutes.  The City's policy itself, though, certainly violates such statutes, and even if it didn't, a constitutional violation could still exist if the statute itself violated the Fourth Amendment.  In any event, Chief Cobb's evidentiary assertions, even if not stricken, simply do not establish the lack of <u>Monell</u> liability.

The Defendants finally assert that Officer Davis, and other City police officers, are given significant amounts of training in the use of firearms and the use of deadly force, and that accordingly, there can be no claim of failure to train.  Defendants admit that the only Champaign police officers who receive dog-specific training are those employed in the K-9 unit, but they conclusorily assert that "no reasonable jury could find that the absence of such training is so glaring and obvious that its absence makes it extremely likely to result in the violation of constitutional rights of pet owners." (Defendants' MSJ, at 12).

Defendants' argument is premised, in part, upon the deposition transcript of Stephanie Joos, of the Champaign County Animal Control Office. As with the testimony of Chief Cobb, Animal Control Officer Joos' testimony is subject to Plaintiffs' Motion to Strike Non-Disclosed Testimony, because Defendants never identified Ms. Joos as a potential witness on their behalf on this (or any other) subject. Moreover, no foundation exists to establish the relevance of her situation to that faced by officers of the Champaign Police Department. No evidence exists to equate the number of dogfight situations experienced by Champaign County Animal Control personnel with the number experienced by members of the Champaign Police Department. It could very well be, for instance, that police officers, as the "first responders" to such potentially violent situations, deal with many more dog fighting situations than do animal control officers. Furthermore, the need for training is not necessarily even limited to situations involving dogfights, but rather should extend to overall dog encounters.

Finally, Champaign Police Department personnel deal with dogs on a very routine basis. In the short time Officer Davis has been employed by the Champaign Police Department, he has been involved in three dogfights, two involving the shooting of a dog, and he himself has discharged his weapon at three separate animals. Sergeant Crane has testified that police interactions with domestic dogs occur as frequently as once a week, and Officer Davis said it is not unusual for a call to be placed from field officers for the use of the Department's dog catchpole. All of this evidence points to a situation where encounters and interactions with dogs are so frequent and expected that the City's failure to provide training for such encounters amounts to deliberate indifference. In any event, Defendants certainly are not entitled to a summary judgment finding otherwise at this juncture.

## C.  STATE LAW CLAIMS

Defendants make two arguments in opposition to Plaintiffs' state tort claims (although Defendants group Plaintiffs' statutory cause of action with the State Law Claims subheading, they raise no arguments requesting summary judgment as to Count VI of the Complaint, seeking relief under the Humane Care for Animals Act, 510 ILCS 70/16).

Defendants first argue that Davis's actions are immunized pursuant to Section 2-202 of the Local Governmental and Governmental Employees' Tort Immunity Act, 745 ILCS 10/2-202. Defendants argue that immunity applies unless Davis's action showed "an actual or deliberate intent to cause harm, or which, if not intentional, shows an utter indifference or conscious disregard for the safety of others or their property," citing 745 ILCS 10/1-210 (defining "willful and wanton conduct") (Defendants' MSJ, at 13).  In support of this proposition, Defendants assert "Davis assessed that the dogs were dangerous to each other, bystanders and him.  He shot the larger, dominating dog to help Markou.  These circumstances justify the reasonableness of Davis's actions and thus afford him the protections of the Tort Immunity Act".  (Defendants' MSJ, at 14).

Plaintiffs adopt and incorporate by reference Section III.D.4 of Plaintiffs' Motion for Partial Summary Judgment in response to Defendants' argument.  In particular, Plaintiffs point out that Davis was not enforcing any law at the time he shot Dog, but to the contrary he was violating the law!  Moreover, the evidence is clear that Davis intended to shoot at least one of the two dogs, and despite the lack of any emergency circumstances or need for immediacy, he simply picked a dog and shot at it, even though he knew, clearly, that there was an even chance that he would be shooting the wrong dog.  Although Defendants assert that Davis was attempting to aid and assist Kelsey by shooting Dog, obviously that is not the case, and his rash and

immediate response of simply shooting one of the dogs reveals his utter lack of concern. As also established in Plaintiffs' Motion for Partial Summary Judgment, Davis had no business shooting either of the dogs in any event, so that his claimed "mistake" is completely irrelevant. Even if shooting one of the dogs, the pit bull, was in anyway justified, though, Davis acted with clear indifference to and conscious disregard for the safety of Kelsey's property by failing to take the time and care needed to clearly and unambiguously identify the pit bull.

No statutory immunity is therefore available to Davis or the City in this instance.

Defendants also argue that Kelsey's claim for intentional infliction of emotional distress is not available by asserting that Illinois does not permit recovery for loss of the companionship of a dog, and that obtaining recovery for intentional infliction of emotional distress from loss of a dog constitutes non-economic damages, which are unavailable for property damage claims. Neither of these points is valid. First, the intentional infliction of emotional distress count does not seek recovery for loss of companionship, but rather seeks recovery for the emotional stress and injury suffered by Kelsey as a result of having to witness her beloved dog being shot before her very eyes by the very person she had called upon to provide rescue. Defendants do not explain why they believe the count seeks recovery for loss of companionship, but clearly it does not. Second, Defendants cite no Illinois cases (in fact, no cases at all - only a citation to a comment from the Restatement (Second) of Torts) for the proposition that non-economic damages are not available for property loss. Again, the intentional infliction of emotional distress count seeks recovery for emotional injuries, not for property damages. This Court need look no further than Seventh Circuit precedent to find that destruction of property certainly can form the basis of an intentional infliction of emotional distress cause of action - in Honaker v. Smith, 256 F.3d 477 (7th Cir. 2001), the Court recognized a viable cause of action for intentional

infliction of emotional distress for the destruction of the plaintiff's house by fire orchestrated by the Village's mayor. Defendants fail to offer any explanation as to why the shooting of Dog in Kelsey's presence, despite her request for assistance in assuring Dog's safety, is not the sort of outrageous act that warrants recovery under this cause of action for the emotional havoc Kelsey has suffered as a result. Defendants definitely are not entitled to a summary judgment as to this count.

## IV. CONCLUSION

Defendants' Motion for Summary Judgment raises no arguments that warrant any ruling by this Court at this time limiting in any way the Plaintiffs' causes of action. Indeed, much of the motion is frivolous. This Court should deny the Defendants' motion, and Plaintiffs reiterate their request that this Court enter summary judgment as to liability on all counts in their favor, and set this matter for trial on the issue of damages only.

Date: Aril 24, 2015                   Respectfully submitted,

                                      JACOB SAATHOFF, KATHY SAATHOFF and
                                      KELSEY MARKOU, Plaintiffs

                                      /s/  Stephen F. Hedinger

                                      Stephen F. Hedinger (#6198999)
                                      Attorneys for Plaintiffs
                                      Sorling Northrup
                                      1 North Old State Capitol Plaza, Suite 200
                                      P.O. Box 5131
                                      Springfield, IL 62705
                                      Telephone:  (217) 544-1144
                                      Facsimile:  (217) 522-3173
                                      E-Mail:  sfhedinger@sorlinglaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 24, 2015, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Mr. Thomas S. Yu
Mr. David E. Krchak
Thomas, Mamer & Haughey, LLP
30 Main Street, Suite 500
P.O. Box 560
Champaign, IL 61824-0560


/s/  Stephen F. Hedinger

Stephen F. Hedinger (#6198999)
Attorneys for Plaintiffs
Sorling Northrup
1 North Old State Capitol Plaza, Suite 200
P.O. Box 5131
Springfield, IL 62705
Telephone:  (217) 544-1144
Facsimile:  (217) 522-3173
E-Mail:  sfhedinger@sorlinglaw.com