# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| **DEIRDRE WRIGHT and CHARLES WRIGHT;**<br><br>Plaintiffs,<br><br>vs.<br><br>**CITY OF DES MOINES**, a Washington municipal corporation; **MICHAEL GRADDON,** in his individual and official capacities; and the marital community or domestic partnership comprised of **MICHAEL GRADDON and DOE GRADDON; STEVEN WIELAND,** in his individual and official capacities; and the marital community or domestic partnership comprised of **STEVEN WIELAND and DOE WIELAND.**<br><br>Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>*Jury Demanded* |

Plaintiffs **DEIRDRE WRIGHT** and **CHARLES WRIGHT,** through attorney of record **ADAM P. KARP** of **ANIMAL LAW OFFICES,** allege:

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1367; and venue is properly set in the United States

**COMPLAINT** - 1

Animal Law Offices of
Adam P. Karp, Esq.
114 W. Magnolia St., Ste. 425 • Bellingham, WA 98225
(360) 738-7273 • Facsimile: (360) 392-3936
adam@animal-lawyer.com

District Court for the Western District of Washington pursuant to 28 U.S.C. § 1391.

2. The causes of action arise from factual allegations occurring in this judicial district.

3. Each of the named Defendants is situated in this judicial district.

4. Plaintiffs **DEIRDRE WRIGHT** and **CHARLES WRIGHT** ("Wrights") reside in the City of Des Moines, King County, State of Washington.

5. The Wrights regarded the now-deceased, three-and-a-half-year-old, female Newfoundland named **ROSIE** as their sentient personalty and immediate family member.

6. **CITY OF DES MOINES** ("City") is a municipal corporation, organized under the laws of the State of Washington, including for purposes of liability under 42 U.S.C. § 1983. It operates the **CITY OF DES MOINES POLICE DEPARTMENT** ("DMPD"), the entity for which **GRADDON** and **WIELAND** worked during the incident complained of.

7. Defendant **MICHAEL GRADDON** ("Graddon") is, and at all germane times was, a resident of King County, and employee and/or agent of DMPD and City, acting within the scope of his employment for purposes of state law, and under color of state law for purposes of federal law. He is being sued in his personal and official capacities. The marital or domestic partnership community

COMPLAINT - 2

Animal Law Offices of
Adam P. Karp, Esq.
114 W. Magnolia St., Ste. 425 • Bellingham, WA 98225
(360) 738-7273 • Facsimile: (360) 392-3936
adam@animal-lawyer.com

of **MICHAEL GRADDON and DOE GRADDON** has also been sued on the basis that the acts of Graddon enriched the marital or domestic partner community. Should such community not exist, Graddon is sued individually.

8. Defendant **STEVEN WIELAND** ("Wieland") is, and at all germane times was, a resident of King County, and employee and/or agent of DMPD and City, acting within the scope of his employment for purposes of state law, and under color of state law for purposes of federal law. He was also a direct supervisor to Graddon on Nov. 7, 2010. He is being sued in his personal and official capacities. The marital or domestic partnership community of **STEVEN WIELAND and DOE WIELAND** has also been sued on the basis that the acts of Wieland enriched the marital or domestic partner community. Should such community not exist, Wieland is sued individually.

9. Plaintiffs' claim for attorney's fees and costs is authorized by, *inter alia*, 42 U.S.C. § 1988. No administrative claim filing or other pre-litigation requirements apply to their claims against Defendants under 42 U.S.C. § 1983.

10. On Jul. 19, 2012, the City was duly served with a *Claim for Damages* on behalf of each Deirdre and Charles Wright in full compliance with claim-notice laws. More than sixty days have elapsed since the Wrights filed the claims with the City.

**COMPLAINT** - 3

Animal Law Offices of
Adam P. Karp, Esq.
114 W. Magnolia St., Ste. 425 • Bellingham, WA 98225
(360) 738-7273 • Facsimile: (360) 392-3936
adam@animal-lawyer.com

11. On Aug. 27, 2012, the City was duly served with another *Claim for Damages* on behalf of each Deirdre and Charles Wright in full compliance with claim-notice laws. More than sixty days have elapsed since the Wrights filed the claims with the City.

12. This court has personal jurisdiction over the Defendants.

## II. GENERAL ALLEGATIONS

13. On Nov. 7, 2010, the Wrights owned Rosie and cared for her at their premises of 26229 16th Ave. S., Des Moines, Wash.

14. Prior to Nov. 7, 2010, Rosie had completed extensive dog training; had never been found by any jurisdiction to be vicious, potentially dangerous, or dangerous; had never been the subject of any complaint by any person for exhibiting vicious propensities; and had never been found to have committed any animal control code violation.

15. On Sat., Nov. 6, 2010, the Wrights secured their residence with more than ample food, water, and an operable dog door, through which Rosie and their St. Bernard named Bentley had free access into their home. The Wrights also made arrangements for their niece to check on Rosie and Bentley over the Wrights' overnight absence.

16. At approximately 12:35 p.m. on Nov. 7, 2010, Marilyn Carlson called 911 to report a "big black dog" running on 16th Ave. S, Des Moines, Wash. She

COMPLAINT - 4

Animal Law Offices of
Adam P. Karp, Esq.
114 W. Magnolia St., Ste. 425 • Bellingham, WA 98225
(360) 738-7273 • Facsimile: (360) 392-3936
adam@animal-lawyer.com

professed fear the dog might "get killed," but never alleged that the dog showed aggression to any person or animal, even to the "couple kids" trying to get her.

17. Over an hour later, DMPD Officer Graddon, Sergeant Wieland, and Officer Dominic Arico arrived at the Wrights' home to find Rosie situated on the Wrights' property, in their driveway. The officers came in three, idling vehicles, with blinking lights, exiting their vehicles in uniform and wielding firearms, staring at Rosie and making advances down the Wrights' driveway.

18. Roughly the moment he arrived, Wieland ran the license plate on the Wrights' Jeep, which was parked in the Wrights' driveway. Dispatch returned the precise address at which he found the vehicle and the names associated with it, confirming that the Wrights owned the realty where Rosie stood.

19. Despite confirming the Wrights' identities, none of the officers present and no employee with DMPD checked the Wrights' *Alarm Registration Application,* dated Apr. 30, 2010, registered with DMPD, for which the Wrights paid an annual fee, and which listed the Wrights' cell and work phone numbers, and two emergency notification contacts, with phone numbers. One of those contacts, Sarah Delaplaines, was the niece described above.

20. Despite confirming the Wrights' identities, none of the officers present and no employee with DMPD checked the Wrights' 2009 *Pet License* form, which provided three phone numbers for the Wrights.

**COMPLAINT** - 5

Animal Law Offices of
Adam P. Karp, Esq.
114 W. Magnolia St., Ste. 425 • Bellingham, WA 98225
(360) 738-7273 • Facsimile: (360) 392-3936
adam@animal-lawyer.com

21. On Nov. 7, 2010, prior to killing Rosie, none of the Defendants or employees called any of the numbers listed on the *Alarm Registration Application,* or either of the Wrights' cell phone numbers listed on the *Pet License* form.

22. Though failing to reach the Wrights or their emergency contacts, the officers present repeatedly expressed their beliefs that Rosie lived at the Wrights' address. At one point, an officer asks Rosie, "You live here, don't you?" An officer then expresses his intent to kill Rosie absent any evidence of vicious behavior, asking, "Why would he go down the driveway if he didn't live here? Hate to kill him in his own yard."

23. Graddon took a photograph of Rosie with his Blackberry device and sent it to off-duty DMPD animal control officer Jan Magnuson. The photograph shows Rosie on the Wrights' property, not exhibiting any vicious propensities. She is not even looking at him or barking. A few minutes later, an officer remarks, "He lives here, I can tell."

24. Though retrieving a catchpole, none of the officers present know how to use it, and Graddon demonstrates his inability to deploy the device, prompting one officer to remark, "Once we get him, what are we gonna do with him?" No officer ventures to guess.

25. After having sufficiently scared Rosie for nearly ten minutes, and Graddon still unable to determine how to use the catchpole, Graddon offers this

**COMPLAINT** - 6

solution for dealing with her: "I say we just shoot him, kill him. He's gonna fight like a fucker once he's Tased; I can try to choke him out."

26. During the officers' presence at the Wrights' residence, witness Joyce Darby saw Rosie sitting in the Wrights' driveway, not barking or showing aggression, adding Rosie "had no expression" and was "just sitting there."

27. Thereafter, Officer Arico Tasers Rosie, sending her fleeing southbound away from the Wrights' property, prompting Wieland to remark, "He ran like a motherfucker."

28. Rosie is not limping, stays on the sidewalk and does not enter the road.

29. Without any sense of emergency, the officers walk slowly to their vehicles, whistling for Rosie, and Graddon exclaiming, "He doesn't want to play, he's gone; maybe we'll chase him into Federal Way."

30. About one minute later, Graddon gives up on any prospect of catching Rosie and commits to killing her instead, stating, "I'll shoot him. Let's just go shoot him."

31. Graddon then gets in his vehicle and drives southbound, drives upon Rosie, and then Tasers her through his vehicle's passenger side window. This sends Rosie shuttling away in fear, racing through a cross-street and continuing southbound.

COMPLAINT - 7

Animal Law Offices of
Adam P. Karp, Esq.
114 W. Magnolia St., Ste. 425 • Bellingham, WA 98225
(360) 738-7273 • Facsimile: (360) 392-3936
adam@animal-lawyer.com

32. At no time does Rosie show aggression to any person or animal or threaten to cause an accident, having stayed on the sidewalk after the initial startling burst from the Taser.

33. At no time prior to being shot to death by Graddon had Rosie been in a motor vehicle accident.

34. Rosie then entered Lora Perry's completely fenced backyard, waded into the blackberry bushes, and presented no threat to Ms. Perry or any other person or animal. Ms. Perry describes her as "just sniffing around" and said Rosie "ran away into the back blackberry bushes" when she called for Rosie.

35. When the officers arrived much later, disregarding Ms. Perry's "No Trespassing" sign facing the sidewalk, and not seeking consent from Ms. Perry to enter her yard, they proceeded to block the entrance to Ms. Perry's yard with police vehicles.

36. Well before the officers set foot into Ms. Perry's backyard; before having seen Rosie; without confirming whether Rosie threatened anyone; and before Graddon slayed an immobile and silent Rosie as described below, Kennet Phillipson distinctly recalls Wieland saying "we're going to shoot the dog."

37. Then, with guns drawn, they entered her backyard without permission. An officer then closed the gate behind them, ensuring Rosie's inability to escape. By this time a fourth officer, named Shields, arrived at the scene.

**COMPLAINT** - 8

38.     Ms. Perry stated, "if I would of known what was going on I would of told the officers to leave, the dog could of stayed there, um for days[.]"

39.     Approximately twenty eight minutes after their arrival at the Wrights' home, Rosie lay dead, having been Tasered twice and shot four times with an assault rifle. At the moment she died, and minutes before, she sat on her haunches, hiding in a thicket of blackberry bushes, in a fenced yard from which she could not escape, approximately 20 yards from the officers, and was not barking, growling, charging, baring her teeth, frothing at the mouth, moving, or threatening any person or animal.

40.     Instead, she stared while Wieland gave the authorization to Graddon to execute Rosie, which Graddon eagerly obliged by discharging an M4 assault rifle, while other officers stood by, although a catchpole was then available to the officers.

41.     After the first shot, one of the officers present blithely exclaimed "Nice!" The other officers then patted Graddon on the back in a congratulatory fashion.

42.     Graddon claims that after the first shot Rosie "immediately fell to the ground without making any noise," had her "eyes rolled back" and "heavy labored breathing," but other witnesses heard Rosie immediately start "whimpering and crying."

**COMPLAINT** - 9

43. The first shot fractured Rosie's right, front leg, shattering her humerus, causing her to fall on her side. This shot would not have killed Rosie and veterinary treatment would have saved her life.

44. Despite her incapacitated condition, at Wieland's direction, Graddon shot Rosie a second time, causing Rosie to yelp.

45. At Wieland's continued authority, Graddon then shot Rosie a third time, causing Rosie to agonize further.

46. Wieland then authorized a fourth shot, resulting in Graddon finally killing Rosie.

47. None of the gunshots entered Rosie's skull. As a result, Rosie did not die immediately or without undue suffering. Thus, any alleged attempt to "euthanize" Rosie failed, and did not comply with standard veterinary, animal control, and law enforcement protocols and standards (viz., gunshot to the brain).

48. Graddon did not fire the four gunshots in rapid succession, but instead delayed approximately one minute between the first and second, 15-20 seconds between the second and third, and five between the third and fourth.

49. On information and belief, none of the four officers had training in humanely neutralizing canine threats, perceiving canine threat behavior, the constitutional limits on use of force against dogs, or animal control specifically.

50. Other than the Taser, no officer present deployed any means of less-

COMPLAINT - 10

lethal force such as chemical immobilization, net, baited trap, or some other lure to befriend Rosie.

51. No officer present attempted to contact animal control officers in neighboring jurisdictions, or even local dog trainers, for assistance with Rosie.

52. No officer present attempted to obtain veterinary care for Rosie.

53. Graddon and Wieland violated DMPD Policy 820.5 by failing to undertake "all reasonable attempts" to contact the Wrights and failing to take Rosie to a veterinarian or bring a veterinarian to her for medical attention.

54. Graddon and Wieland violated DMPD Policy 304.1.1 by killing Rosie without consulting with a licensed veterinarian and the owner/keeper of Rosie; by not shooting her "with reasonable prudence"; by having sufficient advanced notice to develop reasonable contingency plans for dealing with Rosie without the use of deadly force, particularly where she was not potentially dangerous or dangerous, yet failing to develop such plans.

55. On information and belief, Wieland was the "on-duty Shift Supervisor" described in DMPD Policy 304.1.1. Wieland was also Graddon's supervisor for purposes of state and federal claim liability.

56. The DMPD Chief of Police never authorized the slaying of Rosie.

57. None of the officers present at the scene consulted, corresponded, or communicated with the DMPD Chief of Police about Rosie before shooting and

**COMPLAINT** - 11

killing Rosie.

58. At no time on Nov. 7, 2010, while alive, did Rosie bite, injure, or make physical contact with any Defendant or any other law enforcement officer or City employee.

59. Based on Rosie's good nature, socialization, lack of any adverse animal control history (e.g., declaration as dangerous, vicious, potentially dangerous) documented prior to her death, and her behavior on the date she died, Rosie did not act in such a way that a reasonably prudent officer would believe warranted the use of deadly force in quantum or nature as described herein.

60. The slaying of Rosie, as described herein, was accomplished by Graddon and Wieland with evil intent or motive and/or in reckless or callous disregard of the constitutional rights of the Wrights.

61. The City failed to provide an on-duty animal control officer on Sun., Nov. 7, 2010, whether employed by the City or under contract through another jurisdiction.

62. On information and belief, DMPD had been apprised of more than one instance involving its officers' use of force against dogs.

63. Following the incident, Graddon and Wieland faced no discipline from the City. The City expressly exonerated both, showing ratification of their behavior.

**COMPLAINT** - 12

64. Further, the City failed to train Graddon, Wieland, Shields, and Arico in the constitutional limits on the use of force against animals, and perceiving and humanely neutralizing canine threats. Given the prevalence and foreseeability of officers encountering canines, the need for more or different training was so obvious that constitutional violations would likely result as to render the City liable for Rosie's death and the Wrights' concomitant constitutional injuries.

65. The Wrights returned about 7 p.m. on Sun., Nov. 7, 2010 to find Rosie missing and muddy paw prints on their front door.

66. Rosie's unexplained disappearance caused significant anxiety, so the Wrights contacted DMPD – repeatedly. Messages inquiring as to Rosie's whereabouts remained unreturned, so Mr. Wright appeared at police headquarters with a Taser dart found on his property. Thereafter, the DMPD receptionist's face went white and an officer finally came to the counter to admit that DMPD officers killed Rosie on Nov. 7, 2010.

67. The Wrights each lost the intrinsic value of Rosie, as based on her unique qualities, characteristics, behaviors, personality, and training, as well as the loss of her utility, therapeutic value, and solace. At the time of her death, Rosie had no fair market value and could not be replaced or reproduced. Any reasonable person in the Wrights' position would not willingly have sold Rosie at the time just prior to Rosie's death. At the moment or her death, and thereafter, Rosie had an

**COMPLAINT** - 13

immense intrinsic value to the Wrights.

68. Rosie and the Wrights formed a strong relationship, causing Rosie to fundamentally change under their care. She was a close family companion and had special value, aiding the Wrights in their enjoyment of life, well-being, personal development, and daily activities.

69. The Wrights each experienced severe emotional distress from the acts and omissions identified herein.

70. Mrs. Wright suffered wage loss and medical expenses to treat the conditions and symptoms caused by the slaying of Rosie.

71. The Wrights further incurred expenses related to post-mortem evaluation of Rosie, cremation, and other litigation costs.

### III. CLAIMS FOR RELIEF

72. The City is liable to the Wrights based on the following legal claims and doctrines, stated in the alternative under FRCP 8(d)(2), and based on direct and vicarious liability for pendent state claims (e.g., respondeat superior [imputing fault to City based on acts and omissions of Graddon, Wieland, and other City employees]). All allegations above are incorporated by reference and reasserted as to the claims below.

### FEDERAL CLAIM

73. **FIRST CLAIM (Graddon)** – Violation of Federal Constitutional

COMPLAINT - 14

Guarantees (42 U.S.C. § 1983), as to Graddon, whose actions were taken under color of law, violating clearly established rights, of which a reasonable person would have been aware at the time those actions of omission and commission were taken by him. Graddon unlawfully and unconstitutionally seized the Wrights' personalty, to wit, Rosie, in violation of the Fourth Amendment to the United States Constitution.

74. **SECOND CLAIM (Wieland)** – Violation of Federal Constitutional Guarantees (42 U.S.C. § 1983), as to Wieland, whose actions were taken under color of law, violating clearly established rights, of which a reasonable person would have been aware at the time those actions of omission and commission were taken by him. Wieland unlawfully and unconstitutionally directed, acted in concert with, and set in motion a series of acts by his subordinate Graddon to shoot and kill Rosie, as described herein, resulting in his seizure of the Wrights' personalty, to wit, Rosie, in violation of the Fourth Amendment to the United States Constitution.

75. **THIRD CLAIM (City)** – Violation of Federal Constitutional Guarantees (42 U.S.C. § 1983), as to City, based defective training, resulting in the unconstitutional Fourth Amendment seizure of Rosie by Graddon and Wieland.

## PENDENT STATE CLAIMS

76. **FOURTH CLAIM** – Conversion and/or Trespass to Chattels

77. **FIFTH CLAIM** –Outrage/Reckless Infliction of Emotional Distress

Animal Law Offices of
Adam P. Karp, Esq.
114 W. Magnolia St., Ste. 425 • Bellingham, WA 98225
(360) 738-7273 • Facsimile: (360) 392-3936
adam@animal-lawyer.com

78. **SIXTH CLAIM** – Malicious Injury to a Pet

79. **SEVENTH CLAIM –** Negligence

80. The Wrights reserve the right to amend the Complaint to raise additional, alternative claims for relief as discovery commences.

81. **JURY DEMAND:** The Wrights demand a jury.

## PRAYER

THEREFORE, the Wrights seek judgment against Defendants as follows:

A. For punitive damages against Graddon;

B. For punitive damages against Wieland;

C. For economic damages, representing the intrinsic value and loss of use of Rosie, subject to proof and modification at trial;

D. For general damages relating to loss of Rosie's utility;

E. For noneconomic damages, including emotional distress, and loss of enjoyment of life, subject to proof and modification at trial;

F. For litigation-related expenses, including but not limited to post-mortem assessment, transportation, and cremation;

G. Wage loss;

H. For special damages related to medical treatment;

I. For prejudgment interest on liquidated sums;

J. For reasonable attorney's fees and other litigation-related costs as allowed by

**COMPLAINT** - 16

ANIMAL LAW OFFICES OF
ADAM P. KARP, ESQ.
114 W. Magnolia St., Ste. 425 • Bellingham, WA 98225
(360) 738-7273 • Facsimile: (360) 392-3936
adam@animal-lawyer.com

law under 42 U.S.C. § 1988, or, in the alternative, statutory attorney's fees;

K. For costs of suit;

L. For postjudgment interest at the highest rate permitted by law;

M. For such other and further relief as the Court may deem just and proper.

**N. NOTICE: Plaintiffs intend to seek money damages against the Defendants in excess of $10,000. Accordingly, this case is not subject to RCW 4.84.250-.280.**

Dated this Nov. 7, 2012.

ANIMAL LAW OFFICES

**/s/ Adam P. Karp**

_____
Adam P. Karp, WSBA No. 28622
Attorney for Plaintiffs Wright
114 W. Magnolia St., Ste. 425
Bellingham, WA 98225
(888) 430-0001
adam@animal-lawyer.com

**COMPLAINT** - 17