2:12-cv-01962-JLR  Document 14  Filed 02/15/13  Page 1 of 82
Case 2:12-cv-01962-JLR  Document 14  Filed 02/15/13  Page 1 of 82

E-FILED
Friday, 03 July, 2015  05:19:05 PM
Clerk, U.S. District Court, ILCD

ANIMAL LAW OFFICES
ADAM P. KARP, WSB. NO. 28622
114 W. Magnolia St., Ste. 425
Bellingham, WA  98225
(888) 430-0001
Attorney for Plaintiffs

**HONORABLE JAMES ROBART**

## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| **DEIRDRE and CHARLES WRIGHT**,<br><br>        Plaintiffs,<br><br>    vs.<br><br>**CITY OF DES MOINES, et al.;**<br><br>        Defendants. | Case No.: 2012-cv-1962JLR<br><br>**PLAINTIFFS' MOTION FOR REASONABLE FEES AND COSTS**<br><br>**NOTE ON MOTION CALENDAR:**<br>**Fri., Mar. 8, 2013**<br>**Response Due: Mon., Mar. 4, 2013**<br><br>*Clerk's Action Required* |

### I.    RELIEF REQUESTED

Plaintiffs Deirdre and Charles Wright move under 42 U.S.C. § 1988, 28 U.S.C. § 1920, and FRCP 54 for an award of fees, costs, and expenses in this action. A declaration of the Wrights' counsel Adam P. Karp describes his expertise, and appends spreadsheets with detailed work performed and expenses and costs incurred. ***Karp Decl.*** A declaration of the Wrights' former counsel Elizabeth L. Elliott provides similar information. ***Elliott Decl.*** The declarations of attorneys Franklin W. Shoichet and Breean L. Beggs further support this application. ***Shoichet and Beggs Decls.***

The Wrights request that the court apply a lodestar multiplier of at least 2.0

to the work performed on the case prior to service of the FRCP 68 *Offer of Judgment* on Jan. 19, 2013, and work connected with this fee application thereafter based on the figures presented in the table below:

| Work Prior to Jan. 19, 2013 | | | |
|---|---|---|---|
| Elizabeth L. Elliott | $225/hour | 2.87 hours | $645.75 |
| Adam P. Karp | $300/hour | 127.58 hours | $38,274.00 |
| Costs/expenses | | | $2551.24 |
| TOTAL | | | $41,470.99 |
| Work Preparing Fee Application | | | |
| Adam P. Karp | $300/hour | 13.35 hours | $4005.00 |

## II.  FACTS

### A. The Slaying of Rosie the Newfoundland.

As more fully described in the *Complaint* [**Dkt. 1**], on Nov. 7, 2010, at the direction of Des Moines Police Department ("DMPD") Sergeant Steven Wieland, DMPD Officer Michael Graddon repeatedly shot, and ultimately killed, the Wrights' Newfoundland named Rosie. Approximately twenty-eight minutes after their arrival at the Wrights' home, Rosie lay dead, having been Tasered twice and shot four times with an assault rifle. At the moment she died, and minutes before, she sat on her haunches, hiding in a thicket of blackberry bushes, in a fenced yard from which she could not escape, approximately 20 yards from the officers, and was not barking, growling, charging, baring her teeth, frothing at the mouth, moving, or threatening any person or animal. The Defendants admitted:

- They knew Rosie lived at the address from which they rousted her with a Taser, acknowledging saying, "You live here, don't you?" and "He lives

here, I can tell." ***Answer, ¶¶ 22, 23***.

- After sending Rosie running, Wieland remarked, "He ran like a motherfucker," or words to that effect. ***Answer, ¶ 27***.

- Graddon said, "He doesn't want to play, he's gone; maybe we'll chase him into Federal Way," or words to that effect. ***Answer, ¶ 29***.

- At no time on the date she died did Rosie bite, injure, or make physical contact with any defendant or other law enforcement officer or city employee. ***Answer, ¶ 58***.

- No officer present tried to contact animal control officers in neighboring jurisdictions, or even local dog trainers, for assistance with Rosie. ***Answer, ¶ 51***.

- No officer present tried to get veterinary care for Rosie. ***Answer, ¶ 52***.

Though not admitted, the dashcams captured virtually all of the interactions between the officers and Rosie, including numerous statements showing a concerted effort to hunt her down and kill her even before they sent her shuttling away from the Wrights' home in fear, such as Graddon stating, "I say we just shoot him, kill him. He's gonna fight like a fucker once he's Tased; I can try to choke him out" (***Complaint, ¶ 25***) and "I'll shoot him. Let's just go shoot him," (***Complaint, ¶ 30***). When shot the first (of four) times, all without providing Rosie any veterinary care culminating in an officer blithely exclaiming "Nice!" and one officer patting Graddon on the back in congratulatory fashion after he discharged the first bullet from his M4 (***Complaint, ¶ 41***).

## B. Mr. Wright's Private Criminal Complaint.

Public outrage resulted in a candlelight vigil, attended by large numbers of

ADAM P. KARP, ESQ.
114 W. Magnolia St., Ste. 425, Bhm, WA 98225
(360) 738-7273 * Facsimile (360) 392-3936

concerned citizens, including the Des Moines Mayor.[1] Discord between the Des Moines Mayor and the Police Guild ensued, with the latter calling for the former's resignation. Internal investigation by DMPD yielded no referral to the prosecutor for criminal charges and no discipline of the officers involved. Outside review by the King County Prosecuting Attorney's Office *for felony charges only* had similar result. Devastated by the slaying of Rosie and the inconceivable failure of law enforcement and public prosecutors to ensure justice was meted out, on Feb. 11, 2011, Mr. Wright lodged a private criminal complaint against Graddon and Wieland pursuant to CrRLJ 2.1(c) with the Des Moines Municipal Court (*attached as **Exhibit 1** w/o exhibits*). He submitted a supplemental petition on Feb. 17, 2011 (*attached as **Exhibit 2** w/o exhibits*).

When the matter came before Des Moines Municipal Court Judge Alicea-Galvan on Feb. 28, 2011, the Wrights were relieved to finally have a judicial officer take their concerns seriously. But Judge Alicea-Galvan recused herself and then transferred the case to King County District Court. From the start, the City of Des Moines fought Mr. Wright's efforts from the start, first by filing a lengthy motion to dismiss his CrRLJ 2.1(c) petition on constitutional, rule-based, and evidentiary grounds. It then filed a supplemental motion to dismiss when the case finally found a judge willing to hear it – asserting lack of jurisdiction months after

---

[1]   Luke Duecy, *Vigil for Rosie: 'We all just hurt for each other'*, Nov. 14, 2010 (www.komonews.com/news/local/108030544.html).

**PLAINTIFFS' MOTION FOR FEES AND COSTS** [2:12-CV-1962JLR] - 4

the entire King County District Court disqualified itself, resulting in a second transfer and disqualification of the entire Pierce County District Court, ultimately finding refuge before Snohomish County District Court Chief Judge Tam Bui sometime in late April 2012.

The Wrights attended two hearings before Judge Bui, along with a packed courtroom of supporters and a few Newfoundlands sympathetic to Rosie's plight. Notably, Defendants' counsel Shannon Ragonesi was also present at one of the hearings. Finally, on Sept. 19, 2012, after taking the matter under consideration for nearly eight weeks, Judge Bui issued a two-page ruling (*attached as **Exhibit 3***). While rejecting the constitutional arguments made by the City, she issued an opinion barren of any detail when finding no probable cause that either officer committed a crime under state or local law. Mr. Wright timely sought appellate review by RALJ and writ, attempting to persuade a superior court judge to allow him to file the criminal complaint.

As in district court, at the superior court level the City vigorously opposed Mr. Wright by claiming he lacked standing to appeal, and recycling the arguments made below. Initially, Snohomish County Superior Court Judge Richard Okrent denied the City's motion to dismiss and permitted the parties to brief the RALJ appeal. On Mar. 9, 2012, finding the matter mooted by the statute of limitations, Judge Okrent dismissed Mr. Wright's appeal (*attached as **Exhibit 4***).

Having vigilantly pursued the matter through the criminal justice system and finding relief wanting, the Wrights then turned their attention to the civil justice system by filing notices of claim with the City (notices that explicitly incorporated by reference the CrRLJ 2.1(c) petitions and supporting materials) and the present civil action. After filing suit, on Nov. 27, 2012, Mike Carter wrote *Lawsuit says police didn't need to shoot, kill Rosie,* soliciting 778 online comments and related television and radio coverage.[2] To date, 66,649 people have signed an online petition demanding that the defendants be held accountable for Rosie's death.[3]

## C. **Accepted FRCP 68 *Offer of Judgment.***

On Jan. 16, 2013, Defendants made an FRCP 68 *Offer of Judgment*[4] in the sum of $51,000 plus reasonable fees and costs set by the court. On Jan. 29, 2013, the Wrights accepted the offer. [**Dkt. 12**]. This sum is higher than any known, contested (non-default) judgment obtained by jury verdict, bench verdict, or arbitration award in the State of Washington related to the death of an animal. ***Karp Decl., ¶ 2***.

## D. **Fees, Costs, and Expenses Sought.**

The Wrights originally hired Elizabeth L. Elliott to take steps to present

---

[2]    Seattletimes.com/html/localnews/2019777053_rosie28m.html; see also Josh Kerns, *Des Moines couple sues police for shooting beloved dog,* mynorthwest.com/11/2139096/Des-Moines-couple-sues-police-for-shooting-dog.

[3]    www.causes.com/actions/1703250-justice-for-rosie-demand-that-the-people-who-killed-her-are-held-accountable.

[4] As no electronic service agreement was in effect, service was not deemed effective until three days after mailing on Jan. 16, 2013, or Jan. 19, 2013.

---

ADAM P. KARP, ESQ.
114 W. Magnolia St., Ste. 425, Bhm, WA 98225
(360) 738-7273 * Facsimile (360) 392-3936

Rosie's body for forensic evaluation. *Elliott Decl.* Thereafter, three itemized

spreadsheets identify work performed by Mr. Karp, as more fully described in his

declaration. *Karp Decl.,* **¶ 3 & Exhs. E-G.** The Wrights also incurred litigation-

related costs and expenses as identified in a fourth spreadsheet. *Karp Decl.,* **¶ 3 &**

**Exh. H.**

Undeniably, a criminal conviction would have furnished offensive collateral

estoppel effect against Graddon and/or Wieland in this civil suit. However, because

the City refused to prosecute the officers or even discipline them (a form of

ratification aiding a claim of *Monell*-style § 1983 liability, raised in the *Cmpt.,* **¶¶**

**63, 75**), CrRLJ 2.1(c) remained the only viable mechanism for criminal

prosecution – one the City fought against strenuously by seeking to declare CrRLJ

2.1(c) unconstitutional facially and as applied. Since turnabout is fair play, and

while a "no probable cause" finding does not have preclusive effect, the

Defendants nonetheless linked the two proceedings in their *Answer* as an

affirmative defense. *Answer,* **Aff. Defs. ¶ 3.** Fees incurred in a proceeding prior to

preparation of a civil rights lawsuit are recoverable if "both useful and of a type

ordinarily necessary to advance the civil rights litigation." *Webb v. Board of Educ.,*

471 U.S. 234, 235 (1985).

As additional fees are anticipated in the course of litigating this motion, the

Wrights intend to submit a supplemental cost bill with their reply brief and ask the

court to compensate them at the same hourly rate and upward-adjustment modifier. Time spent preparing and litigating fee applications is compensable. *Harris v. Marhoefer,* 24 F.3d 16 (9th Cir.1994).

## III.   ISSUES

What reasonable attorney's fee and costs should the court award?

## IV.   ARGUMENT

### A. No Dispute Plaintiffs Prevailed – Entitlement to Fee/Cost Award.

Defendants' FRCP 68 *Offer of Judgment* explicitly contemplated an award of reasonable fees and costs. Thus, the Wrights are entitled to statutory costs, expenses, and fees under 42 U.S.C. § 1988, 28 U.S.C. § 1920, and FRCP 54.

### B. Costs Incurred are Reasonable and Fully Compensable.

The Wrights are entitled to all reasonable expenses incurred in investigating and litigating this action. In the case of preserving evanescent (or perishable) evidence for trial, viz., Rosie, in the form of images and reports (here, CT scan and necropsy), the costs associated with effectuating those tests and preserving such evidence are recoverable litigation expenses. *See Harris v. Marhoefer,* 24 F.3d 16, 19-20 (9th Cir.1994). Costs incurred by the plaintiff herself are properly taxed as well. *Laffey v. NW Airlines, Inc.,* 746 F.2d 4, 37 (D.C.Cir.1984).

### C. Time Spent by Wrights' Counsel Sufficiently Documented.

The Wrights submitted detailed time records describing with particularity

the date, activity, and time spent on each litigation task, easily satisfying case law's documentation directive. *See Hensley v. Eckerhart,* 424 U.S. 424, 433 (1983).

### D. Time Spent on Private Criminal Complaint Recoverable.

Fees incurred to prosecute the private criminal complaint also warrant recovery as it not only furthered "the underlying purposes of 42 USC §1983, *which include deterrence of official wrongdoing,*" but had it been the Defendants' official wrongdoing that caused the Wrights to be prosecuted criminally, the Wrights' fees defending that prosecution would have been awardable under § 1988. ***Shoichet Decl., ¶ 7 (**citing *Borunda v. Richmond,* 885 F.2d 1384, 1389-90 (9th Cir.1988)**; Beggs Decl., ¶ 9** ("The work on these ancillary matters was both transferable to the 1983 claim and strengthened that claim."). Successful prosecution would have undoubtedly furthered the Wrights' claims against the individual Defendants.

### E. Defendants' Opposition at Every Stage of the Private Criminal Complaint Litigation.

Another important factor to consider when evaluating the reasonableness of the time expended by the Wrights is the manner in which Defendants approached the private criminal complaint litigation. "The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." *City of Riverside v. Rivera*, 477 U.S. 561, 580 n. 11 (1986) (*quoting Copeland v. Marshall*, 641 F.2d 880, 904 (D.C.Cir.1980)). *See also Gay Officers Action League v. Puerto Rico,* 247 F.3d 288, 298 (1st Cir.2001), finding

that appellants mounted a "Stalingrad defense," resisting plaintiffs at each juncture. After "battling from rock to rock and tree to tree, … it seems disingenuous for the Commonwealth to castigate the plaintiffs for putting too many troops into the field." *Id.,* at 298.[5]

### F. Result Warrants Award of Fees for All Time and a Multiplier.

Where, as here, the Wrights "ha[ve] obtained excellent results," they "should recover a fully compensable award." *Hensley,* at 435. An attorney's current (not historical) market rate should normally be applied retroactively, to account for delay in payment and lost value of money. *Missouri v. Jenkins,* 491 U.S. 274, 283-84 (1989). While an attorney's own declaration, standing alone, may be insufficient to establish that his rates fit within the prevailing rates in the relevant community for lawyers of similar skill and experience, where additional documentation confirms those rates conform to the market, those rates should be used in the lodestar calculation. To that end, please see Mr. Karp's recitation of credentials (***Karp Decl.,*** ¶ 1) and the *Beggs* and *Shoichet* declarations, confirming his fee is on the low side and "eminently reasonable." ***Beggs,*** ¶ **10;** ***Shoichet,*** ¶ **3.**

Efficiency in the face of legal and factual complexity also warrants Mr. Karp's fee. While highly experienced, Mr. Beggs notes that Mr. Karp:

---

[5] Indeed, today counsel received eleven interrogatories and four RFPs by Defendants seeking detailed records on every cost, expense, and fee, as well as information from kindhearted individuals who donated money to help defray litigation expenses. Before receiving discovery, Mr. Karp shared copious authority with Ms. Ragonesi demonstrating that such attempt to claim a windfall from the collateral donor source lacked a shred of legal support.

---

**PLAINTIFFS' MOTION FOR FEES AND COSTS** [2:12-CV-1962JLR] - 10

ADAM P. KARP, ESQ.
114 W. Magnolia St., Ste. 425, Bhm, WA 98225
(360) 738-7273 * Facsimile (360) 392-3936

seems to have been extremely efficient in preparing pleadings and briefing compared to my experience of how long it would take a similarly experienced attorney to prepare legal work. I believe that Mr. Karp's specialized expertise in animal law and civil rights work allowed him to be this efficient and remarkable results more than justify an upward adjustment of the lode star.

***Beggs Decl., ¶ 11.*** Even Defendants' counsel remarked at the novelty of the legal

argument, telling the *Seattle Times* (supra, *Carter* (Nov. 27, 2012)) that:

Karp has adopted an "uncommon use" of the section of the civil-rights section of the U.S. Code, usually applied in cases in which people address illegal seizures in the form of police misconduct like excessive use of force or wrongful arrest.

Courts may adjust upward fees to account for exceptional results and to

entice counsel with commensurate skill and experience. *Blum v. Stenson,* 465 U.S.

886, 899 (1984). In repeatedly touting "the officers' actions were justified" after a

"thorough internal review" and external review by the King County Prosecuting

Attorney, as well as having persuaded Judge Bui to dismiss Mr. Wright's private

criminal complaint for no probable cause, the City then raised affirmative defenses

of collateral estoppel, comparative fault, and qualified immunity, and in a letter to

Mr. Karp of Jan. 16, 2013, counsel made this assertion:

No one knows better than you the difficulty in trying to obtain an award of damages greater than fair market value for the death of a pet. The law simply does not allow for the type and amount of damages the Wrights would like to receive for the loss of their pet. Although they are bringing claims of intentional torts and seeking damages for alleged malicious actions by the police, a court has already determined there is no evidence to support an allegation of maliciousness against the officers. In addition, the Wrights' contributing decisions, actions and omissions as pet owners make it unlikely that a jury will place all of the blame on the police for what happened in this situation[,]

ADAM P. KARP, ESQ.
114 W. Magnolia St., Ste. 425, Bhm, WA 98225
(360) 738-7273 * Facsimile (360) 392-3936

*Letter, at 1 (**attached as Exhibit 6**),*[6] warranting at most a three-figure recovery. Yet the Defendants confessed judgment of $51,000 plus fees and costs, the largest, non-default figure recovered in any animal case in Washington State history.

Additionally, this result will deter law enforcement who shoot dogs first, and ask questions later; and may encourage law enforcement to train officers in neutralizing perceived canine threats by garnering accurate perceptions and utilizing less-lethal force modalities. The prevalence of dog-related shootings by law enforcement captured the attention of the U.S. Department of Justice, which authored *The Problem of Dog-Related Incidents and Encounters.*[7] The guide confirms that more than half of all officer-related shootings involve dogs.[8] Such an exceptional outcome warrants a multiplier of at least 2.0.

## CONCLUSION

The court should award the Wrights the entire sum sought, multiplied by at least 2.0, along with judgment for $51,000.00 in damages.

Dated this Feb. 15, 2013.

---

[6]  This excerpt is not offered to prove or disprove the validity or amount of any disputed claim, if only because the claim is no longer disputed as to validity or amount. Neither need be proved. Rather, it is offered for the purpose of proving its exceptional result and awarding a multiplier. Settlement negotiations have been found admissible under the "another purpose" exception of ER 408 when attempting to reduce a fee award because plaintiff rejected defendant's settlement offer, *Lohman v. Duryea Borough,* 574 F.3d 163, 167 (3rd Cir.2009), or to support defendant's claim for § 1988(b) fees on the ground that plaintiff's litigation was objectively unreasonable, *Longmoor v. Nilsen,* 312 F.Supp.2d 352 (D.Conn.2004).

[7]  Available for download: seattletimes.com/ABPub/2012/12/01/2019809760.pdf.

[8]  *See also* Mike Carter, *Half of intentional shootings by police involve dogs, study says,* Seattle Times (Dec. 3, 2012) [seattletimes.com/html/locallnews/2019809359_rosie02m.html].

---

ANIMAL LAW OFFICES

**/s/ Adam P. Karp**

_____
Adam P. Karp, WSBA No. 28622
*Attorney for Plaintiffs*

### CERTIFICATE OF SERVICE

I certify that on Feb. 15, 2013, I served Defendants the foregoing by ECF.

Dated this Feb. 15, 2013.

ANIMAL LAW OFFICES

**/s/ Adam P. Karp**

_____
Adam P. Karp, WSBA No. 28622
*Attorney for Plaintiffs*



**IN THE MUNICIPAL COURT OF THE CITY OF DES MOINES**
**STATE OF WASHINGTON**

| | |
|---|---|
| CITY OF DES MOINES *ex rel.* CHARLES H. WRIGHT; <br><br> Plaintiff, <br><br> vs. <br><br> MICHAEL GRADDON and STEVE WIELAND, <br><br> Defendants. | Case No.: <br><br> **DECLARATION OF COMPLAINING WITNESS** <br><br> ***Clerk's Action Required*** |

## DEFENDANTS:

| | | | | |
|---|---|---|---|---|
| Name: | **Michael Graddon** | | Name: | **Steve Wieland** |
| Address: | Des Moines P.D. | | Address: | Des Moines P.D. |
| Phone: | (206) 878-3301 | | Phone: | (206) 878-3301 |

## WITNESSES:

Name: **Defendants**
Address: See above
Phone: See above

Name: **Marylin J. Carlson**
Address: 1604 S. 262nd Pl., Des Moines, WA 98198
Phone: (253) 945-8226

**DECLARATION OF COMPLAINING WITNESS** - 1

ANIMAL LAW OFFICES OF
ADAM P. KARP, ESQ.
114 W. Magnolia St., Ste. 425 • Bellingham, WA 98225
(360) 738-7273 • Facsimile: (360) 392-3936
adam@animal-lawyer.com

Name:        **Bryan R. Burnett**
Address:     26709 16th Pl. S., Des Moines, WA  98198
Phone:       (206) 790-2265

Name:        **Lora B. Perry**
Address:     26825 16th Ave. S., Des Moines, WA  98198
Phone:       (253) 854-7440

Name:        **John Carlson**
Address:     1604 S. 262nd Pl., Des Moines, WA  98198
Phone:       (253) 839-5582

Name:        **Deirdre Wright**
Address:     26229 16th Ave. S., Des Moines, WA  98198
Phone:       (253) 409-2323

Name:        **Charles Wright**
Address:     26229 16th Ave. S., Des Moines, WA  98198
Phone:       (253) 409-2323

Name:        **Kennet M. Phillipson**
Address:     7908 110th Ave. SE #402, Newcastle, WA  98056
Phone:       (206) 304-4083

Name:        **Joyce Darby**
Address:     1739 S. 262nd Pl., Des Moines, WA  98198
Phone:       (253) 941-0262

Name:        **Robert W. Kramer, DVM, DACVR**
Address:     23914 – 56th Ave. W., Mountlake Terrace, WA  98043
Phone:       (425) 771-8100

Name:        **Kevin K. Lahmers, DVM**
Address:     PO Box 647034, Pullman, WA  99164
Phone:       (509) 335-9696

## PROPOSED CHARGES:

Violation of RCW 16.52.207(1), DMMC 9.16.010, and DMMC 9.16.030, which state:

**DECLARATION OF COMPLAINING WITNESS** - 2

ANIMAL LAW OFFICES OF
ADAM P. KARP, ESQ.
114 W. Magnolia St., Ste. 425 ● Bellingham, WA 98225
(360) 738-7273 ● Facsimile: (360) 392-3936
adam@animal-lawyer.com

**RCW 16.52.207**
Animal cruelty in the second degree.
(1) A person is guilty of animal cruelty in the second degree if, under
circumstances not amounting to first degree animal cruelty, the person knowingly,
recklessly, or with criminal negligence inflicts unnecessary suffering or pain upon
an animal.

**DMMC 9.16.010 State provisions adopted.**
The following state statutes are adopted by reference and are applicable within the
city: ... RCW 16.52.207 Animal cruelty in the second degree.

**DMMC 9.16.030 Wounding or trapping of animals.**
(1) It is unlawful for a person to willfully and without authority in law kill,
wound, or trap an animal or bird, or remove or destroy the young of the animal or
the egg of the bird, except this section shall not apply to insect, pest, and rodent
control.
(2) A violation of or failure to comply with this section is a misdemeanor.

I, the undersigned complainant, understand that I have the choice of complaining to a prosecuting
authority rather than signing this affidavit. I elect to use this method to start criminal
proceedings. I understand that the following are some but not all of the consequences of my
signing a criminal complaint: (1) the defendant may be arrested and placed in custody; (2) the
arrest if proved false may result in a lawsuit against me; (3) if I have sworn falsely I may be
prosecuted for perjury; (4) this charge will be prosecuted even though I may later change my
mind; (5) witnesses and complainants will be required to appear in court on the trial date
regardless of inconvenience, school, job, etc.

I bring this complaint on behalf of our dog, Rosie, who was executed by Ofc. Graddon, as
ordered by Sgt. Wieland, on Nov. 7, 2010. My wife and I owned and loved Rosie on the date she
died.

Attached is a petition prepared by my attorney Adam P. Karp (including referenced evidence),
outlining steps he has taken in consultation with law enforcement, who in turn have sought
investigation by the King County Prosecuting Attorney's Office in this matter.

I declare under penalty of perjury under the laws of the State of Washington that the above is true
and correct to the best of my knowledge.

Dated this Feb. 6, 2011 in the city of Des Moines, Washington.

**DECLARATION OF COMPLAINING
WITNESS** - 3

ANIMAL LAW OFFICES OF
ADAM P. KARP, ESQ.
114 W. Magnolia St., Ste. 425 • Bellingham, WA 98225
(360) 738-7273 • Facsimile: (360) 392-3936
adam@animal-lawyer.com



# ANIMAL LAW OFFICES
## OF ADAM P. KARP, JD, MS
114 W. Magnolia Street, Suite 425
Bellingham, Washington 98225

**Bellingham:** (360) 738-RARF (7273)
**Outside Bellingham:** (888) 430-0001
**Fax**: (360) 392-FYDO (3936)
**E-Fax**: (866) 652-3832
**Email**: adam@animal-lawyer.com
**Web**: www.animal-lawyer.com

**By First-Class Mail**

Friday, February 11, 2011

Jennefer Johnson, Administrator
Des Moines Municipal Court
21630 11th Ave. S., Ste. C
Des Moines, WA 98198-6317
(206) 878-4597
jhenson@desmoineswa.gov

**RE:** *City of Des Moines ex rel. Charles H. Wright v. Michael Graddon & Steve Wieland*
**Petition for Citizen Criminal Prosecution (CrRLJ 2.1(c))**
**Hearing Date: TBD**

Dear Ms. Johnson and Judge Alicea-Galvan,

On behalf of Charles Wright, at whose request this petition for private prosecution commences, I provide the essential documents for the CrRLJ 2.1(c) citizen criminal complaint for misdemeanor animal cruelty under DMMC 9.16.010 and DMMC 9.16.030 against Michael Graddon and Steve Wieland, to be heard in your court. A copy has been mailed to Mssrs. Graddon and Wieland care of the Des Moines Police Department ("DMPD"), as well as the Des Moines City Attorney. I await your call to schedule the PC hearing.

## FACTS

The Wrights last saw Rosie, their female Newfoundland, alive on Sat., Nov. 6, 2010, secured on their property at 26229 16th Ave. S., Des Moines, Wash., with more than ample food, water, and free access into their home through an operable dog door. Bentley, their St. Bernard, accompanied her during the Wrights' short, overnight absence. Rosie, a three-and-a-half-year-old, female Newfoundland, completed Puppy Kindergarten, Basic Obedience, and Beyond Basic Obedience at Paws-Abilities Training Center in Tukwila. Prior to her death, she had no reported history of any animal control violation. Nor had there been any complaints against Rosie for exhibiting vicious propensities of any nature.

When they departed, Mr. Wright's black Jeep remained in the driveway to their home. The Wrights returned about 7 p.m. on Sun., Nov. 7, 2010, but could not find Rosie, any sign of forced entry or breach of their perimeter chain link fence. However, they did notice muddy paw prints on their front door not present when they left on Nov. 6. Bentley remained, as well as most of the food. Rosie's unexplained disappearance caused significant anxiety, so they contacted the police department – repeatedly. Despite numerous unreturned messages inquiring about Rosie's whereabouts, it distinctly appeared that DMPD went out of its way to avoid contacting the Wrights though they knew all along what had transpired on Nov. 7, 2010. It was only after Mr. Wright appeared at police headquarters on Nov. 8, 2010 with a TASER cartridge found on his property that the police department receptionist's face went white and, on information and belief, Sgt. D. Bell came to the counter to admit that his officers killed Rosie on Nov. 7, 2010. He added that Rosie "charged" and they killed her in "self-defense."

Photographs of the vicinity follow:



*Aerial View of 16th Ave. S., 26200 Block with "A" as Wright home*

2



*Street View of 26229 16th Ave. S., South Driveway*



*Street View of 26229 16th Ave. S., North Driveway*

On Sun., Nov. 7, 2010, at about 12:35 p.m., Marilyn Carlson called 911 to report a "big black dog" running on 16th. The CAD below identifes the caller, her address (1604 S. 262nd Pl.), and time:

3

```
Incident History for: #DP10016383  CN:   $DP10002533   Xref: #DP10016387
Received     11/07/10  12:33:10  BY CR11  /VC7389
Entered      11/07/10  12:35:06  BY CR11  /VC7389
Dispatched   11/07/10  13:33:31  BY PD33  /VC4898
Enroute      11/07/10  13:38:18
Onscene      11/07/10  13:47:04
Closed       11/07/10  17:43:22

Initial Type: ANIMAL   TG:    Initial Alarm Level:
Final    Type: ANIMAL  (ANIMAL COMPLAINT) Pri: 4 Dispo: N     Alrm Lev:
Police  DP0083  Fire  1611  Grp: D1 Beat: D4  Lt/Lg:
Police Rms: DP0004  Fire Rms:          Medic Rms:  KC1611
Loc: 1604 S 262 PL ,DES near UNK  (V)
Name: CARLSON,MARYLIN/NABOR   Addr:                  Phone: 2538395582
Contact: N

12:35:06   VC7389 CR11    ENTRY        ACROSS 16TH FROM LOC.. LG BLK UNK TYPE D
                                       OG RUNNING BACK AND FORTH INTO RD WAY..U
                                       NK COLLAR.. RP CONCERNED IS GOING TO BE
                                       HIT BY CARS.. CHILDREN CHASING T HE DOG
                                       AS WELL TRYING TO CATCH
```

**Exh. A (CAD).** She professed a fear that the dog might "get killed." At no time did she allege that the dog in question showed aggression to any person or animal, including "a couple kids" trying to get her. Listen to the actual 911 call by clicking the object below:



Nearly an hour later, DMPD Ofc. Dominic Arico (callsign 1D2) responded to the dispatch at 1:33 p.m., followed by Ofc. Michael Graddon (callsign 1D3) at about the same time, and finally Sgt. Steven Wieland (callsign 6D1) at about 1:50 p.m. Arico and Graddon arrived at the Wright home at 1:47 p.m., as shown below:

```
13:33:31   VC4898 PD33   DISP      1D2   #DP0104 ARICO, DOMINIC
13:33:43          PD33   ASST      1D3   [1604 S 262 PL ,DES] #DP0203 GRADDON,M(D
                                         RE)206.786.2326
13:38:18   DP0104 1D2   *ENROUT    1D2
13:38:37   DP0203 1D3   *ENROUT    1D3
13:44:49   DP0104 1D2   *REMINQ    1D2   561SNB...
13:45:02          1D2   *REMINQ    1D2   GORGE.R.D.08281947...
13:45:07          1D2   *MISC      1D2   , REMINQ: ACC/DFP.GORGERD534N8 , ACC/DK.
                                         GORGERD534N8
13:47:04   DP0203 1D3   *ONSCNE    1D3
13:47:25   DP0104 1D2   *ONSCNE    1D2
13:50:46   VC4898 PD33   ASSTOS    6D1   [1604 S 262 PL ,DES] #DP8202 WIELAND, ST
                                         EVEN C
```

4

*Id.* At 1:50 p.m., Sgt. Wieland ran Mr. Wright's plate 825VMZ, confirming that the 2007 Black Jeep came back to the precise address at which he found the vehicle. *Id.*

Twenty-eight minutes later, Rosie lay deceased, Tased twice, and shot four times with an assault rifle. At the moment she died, and minutes before, she sat on her haunches, hiding in a thicket of blackberry bushes, in a completely fenced yard, not barking, growling, charging, or threatening a soul. Instead, she stared, scared and defenseless while Sgt. Wieland gave the order to Ofc. Graddon to execute Rosie, which Ofc. Graddon eagerly obliged, while two other officers stood by doing nothing to halt the slaughter. The following highlights significant developments within that period and demonstrates that, aside from lies, conduct unbecoming law enforcement, excessive force, and cruel and incompetent, torturous attempts at putting Rosie "out of her misery" (instead of getting her immediate veterinary care), probable cause exists to prosecute both Ofc. Graddon and Sgt. Wieland with second-degree animal cruelty and unlawful wounding/killing of animal.

## Scene: The Wright Home (1:47 p.m.)

Despite the fearsome arrival of three officers in three, idling vehicles, with blinking lights positioned at the entrance to her home, each exiting in uniform wielding firearms, staring at Rosie and making advances down the driveway, Rosie undisputedly remained situated on the Wrights' private property. At no time did she leave the property until Ofc. Arico frightened her with a hit by Taser, sending her fleeing several blocks southbound on 16th Ave. S. At no time during her provoked departure from the Wrights' property to the location where she perished did she attack, threaten, bite, or injure any person or animal without provocation. In-car dashcams reveal that officers approached Rosie with guns drawn mere minutes into their interaction with her. That they were menacingly standing at the edge of the Wrights' property no doubt explains Rosie's barking reaction, and when officers encroach further down the driveway, using a noisy garbage can as a "shield," it should not strike any observer, particularly one who knows anything about dogs, that Rosie's territorial reaction was not out of character for a normal dog, and, indeed, quite natural.[1]

---

[1] As an aside, such conduct would exempt Rosie from facing a declaration as "dangerous" or "potentially dangerous" whether she chased, menacingly approached, bit, injured, or even killed the officers, on account of provocation. Washington State dangerous dog law recognizes that a dog cannot be declared "dangerous":

> if the threat, injury, or damage was sustained by a person who, at the time, was committing a wilful trespass or other tort upon the premises occupied by the owner of the dog, or was tormenting, abusing, or assaulting the dog or has, in the past, been observed or reported to have tormented, abused, or assaulted the dog or was committing or attempting to commit a crime.

RCW 16.08.090(3). The Des Moines Municipal Code also exempts from the "dangerous dog" or "potentially dangerous dog" label provoked incidents, defining "provocation" to:

> include[] taunting, teasing, willfully causing undue pain, and/or unlawful entry upon or into the property of the owner or keeper.

DMMC 8.04.020(21).

Prior to being Tazed, the officers attempted to identify the owner of the home where she was lingering. They confirmed this through Mr. Wright's Jeep's license plate, but claim they could find no in-service phone number to reach either of the Wrights. That they tried to make contact with the Wrights would not excuse their error, however, in concluding that she did not reside at that address, since, as shown below, they all had an abiding belief that she was at her home and lawfully on private property. In other words, she was not in violation of any municipal code at the time.

While the officers did ask DMPD to confirm if the Wrights had any dogs licensed through the City, the records specialist Catherine Palmer only searched for then-current licenses (i.e., 2010), but did not think to see whether the Wrights had merely failed to renew a 2009 license. *See Palmer Report at 1* (**Exh. B**). Though Rosie had not been licensed in 2009 or 2010, the Wrights had licensed their St. Bernard Bentley and Spaniel named Cadbury. As discussed below, the officers saw a St. Bernard on the Wrights' property that day. The license form listed <u>three</u> phone numbers, including their cell phones, neither of which the officers called before killing Rosie. Further, ACO J. Magnuson confirmed that Rosie was microchipped, as the Wrights had stated when speaking to Sgt. Bell on Nov. 8, 2010. *See also WADDL Report* (**Exh. M).**

Additionally, the Wrights had registered their alarm system with DMPD, paying an annual fee, and providing the City with not only cell phone information but also contact information for relatives in the area, all of which could have been found simply by searching on their home address.

Of course, whether or not they confirmed that Rosie lived at the Wrights' address would not have mattered, since before Tasing Rosie the first time, the officers repeatedly stated their belief that she lived at the Wrights' address. For instance, mere moments after arriving, the officers state this belief, note that Bentley looks like a St. Bernard, and laugh about shooting a dog in his own yard. The video clip does not show Rosie rushing or charging, or a sense of fear for officer safety:



***Dashcam Car 545 (Graddon),*** 13:42.50—13:44.05.[2]  A few minutes later, the officers again acknowledge their belief that Rosie is situated on the property where she lives, surmising that she pushed the fence down. At one point, an officer asks, "You live here, don't you?" Again, they identify a St. Bernard and discuss Tasing him <u>in his own yard</u> just in case he can escape. At no time do officers evince fear and Rosie is not seen rushing or charging:

---

[2] Note: all videos are hyperlinked.



*Id.,* 1347.15 – 1349.30. Seconds later, dispatch reports back to the officers, confirming that the Wrights own the property where Rosie stands.



*Id.,* 1349.43-1349.52. Less than one minute thereafter, an officer expresses his intent to kill Rosie absent any evidence of vicious behavior, asking, "Why would he go down that driveway if he didn't live here? Hate to kill him in his own yard.":

8



*Id.,* 1350.45-1350.52. At about this time, Graddon takes a picture of Rosie using his Blackberry and sends it to off-duty ACO Jan Magnuson from his cell phone. The photograph shows Rosie on the Wrights' property, not exhibiting any vicious propensities. Indeed, she is not even looking at him or barking:

**Jan Magnuson**

| | |
|---|---|
| From: | Michael Graddon |
| Sent: | Sunday, November 07, 2010 1:50 PM |
| To: | Jan Magnuson |
| Subject: | IMG00403.jpg |
| Attachments: | IMG00403.jpg |

Do u know this dog, maybe a newfie?
--------------------------
Sent using BlackBerry



Approximately two minutes later, an officer states, "He lives here, I can tell.":



*Id.,* 1352.07-1352.22. One minute later, officers shout at Rosie. One says, "Here she comes!" and then all officers point firearms/Tasers at Rosie – who never leaves the property, and there is no visual evidence of a charge from the dashcam footage. At one point, Graddon yells, "I got lethal!" but the behavior of the officers during much of this clip does not demonstrate fear. Even when Graddon loudly yells, "Bad Dog Go Home," there is no evidence Rosie attempts to charge or bite him or any other officer. Meanwhile, Wieland sluggishly retrieves a catchpole from a

vehicle and hands it to Graddon, with no sense of urgency. Graddon remarks, "I'm not real good at comealongs." This clip perhaps demonstrates one of the occasions where Graddon reports that, on two separate occasions, Rosie "charged at us quickly, and retreaded (sic) after several loud shouts of, "Bad Dog Go Home". *Graddon Report,* at 2-3 (**Exh. C**).



*Id.,* 1353.43—1355.10. Half a minute later, with Graddon demonstrating his incompetence in attempting to deploy the catchpole, an officer astutely remarks, "Once we get him, what are we gonna do with him?" <u>No officers venture to guess an answer</u>:



*Id.,* 1355.38-1355.51. After having sufficiently scared and aggravated Rosie for nearly ten minutes, and with Graddon still unable to determine how to use the catchpole, he states that

11

Rosie is "getting pretty mad." His solution for dealing with Rosie? "I say we just shoot him, kill him. He's gonna fight like a fucker once he's Tased; I can try to choke him out." This statement reveals that the answer to the question posed minutes prior is to get her in the catchpole and then extinguish her last breath.[3] Moments later, Rosie is Tasered. She then runs southbound:



*Id.,* 1359:09-1359.38.

## **Scene: Rosie on the Run (1:55 p.m.)**

Two dashcams capture Rosie's flight from the threatening officers – Wieland's vehicle (514) and Graddon's (545). Notably, in Tasing her and observing her fearful reaction, they have dramatically increased the risk of a major motor vehicle accident. Thankfully, Rosie knows well enough to stay on the sidewalk and not enter the road:

---

[3] Of course, if he cannot operate the catchpole, and the purpose of Tasing was to immobilize Rosie so he could place her at the end of the pole, then why Tase her at all?

**12**



***Dashcam Car 514* (Wieland),** 1505.44-1506.21. Graddon's camera picks up Wieland's remark, "He ran like a motherfucker." Without any sense of emergency, the officers walk slowly to their vehicles, whistling for Rosie, and Graddon exclaims, "He doesn't want to play, he's gone; maybe we'll chase him into Federal Way."



***Dashcam Car 545* (Graddon),** 1401.14-1401.34. A minute later Graddon capitulates to any notion of catching Rosie and commits to killing her, stating, "I'll shoot him. Let's just go shoot him.":



*Id.,* 1402.21-1402.37. One sees Rosie continue to run southbound with no evidence of limp or aggressive behavior. She continues to stay on the sidewalk:



*Id.,* 1403.29-1403.42. Shortly thereafter, Graddon issues an audible sigh, showing boredom or exasperation. He then whistles for Rosie and, having obviously learned nothing from the prior experiment, Tases her outside his passenger side window.[4]

The predictable result? To send her shuttling away in fear. And how were the officers to then capture her after the 5-second Taser burst? Would they just leave the Taser cycling for over a minute as they exited their vehicles and then tried to secure her, while 50,000 volts continued

---

[4] Again, to what end, if he cannot deploy the catchpole or believes it will not get over her head?

coursing into her body? If their purported concern was to prevent Rosie from entering traffic, and calm her to the point where they could safely take her into custody, any person (particularly law enforcement) would see that this strategy lacked any likelihood of success. Rather, it would create a hazard, and the video below shows Rosie racing through a cross-street and continuing southbound. Again, at no time does Rosie show aggression to any person or animal or threaten to cause an accident, having stayed on the sidewalk after the initial startling burst:



*Id.,* 1403.58 – 1404.21.

Graddon reports that after being darted by Ofc. Arico, Rosie "appeared to be limping." *Graddon Report, at 3* (**Exh. C**). He then suggests that she might have suffered "other recent trauma, such as getting his (sic) by a car." Video footage from the dashcams does not support evidence of such a limp. Nor did the CT scan or necropsy reveal same, notwithstanding the gunshot to her right front limb. Nor was there any report of a motor vehicle accident involving a black dog prior to her death that day.

## Scene: The Perry Property (2:14 p.m.)

The officers then lose track of Rosie for at least ten minutes prior to executing her in Lora Perry's backyard, where she was "located hiding in the blackberry bushes in a partially fenced backyard," approximately "10-15 yards" away, with no allegation that she had moved, was barking, charged, growled, bore her teeth, or had in any way threatened Graddon, his fellow officers, or the "female and a small child" (i.e., Lora Perry and her daughter) whom he asked to "remain inside." Graddon then remarks, without a shred of evidentiary support, that:

I felt both my safety, and the safety of the public was in jeopardy because of this dogs (sic) vicious behaviors, and determined lethal force was necessary.

15

*Graddon Report,* at 3. Even Ofc. Shields, who arrived last at the scene, said Rosie "watched us and did not move." *Shields Stmt. at 1* (**Exh. D**) While Ofc. Arico claims to have seen Rosie "in a heavily vegetated area east in some blackberry bushes," and notes that Rosie was "cornered only as it could have escaped via the same way it entered the yard," no officer could explain how Rosie entered Ms. Perry's yard. *Arico Stmt. At 3* (**Exh. E**). Nor did any officer recall that they had blocked the entrance to Ms. Perry's yard with police vehicles and had closed the gate behind them. Nor did any officer think to ask Ms. Perry or Mr. Phillipson whether the back yard was completely fenced, or to take a look for themselves by inspecting the perimeter while Rosie sat motionless. Instead, within mere minutes of confirming Rosie entered Ms. Perry's property, Wieland gave the order for Graddon to execute Rosie. Rosie simply could not have escaped the yard. Photos taken by the officers that day show as much:



***Perry's Gate to Fenced Frontyard***



*Perry's Gate to the Fenced Backyard*



*North Side of Perry's Backyard (see Chainlink Fence)*

Below are photographs taken by DMPD of the scene where Rosie sat, scared and defenseless, facing three officers carrying firearms pointed directly at her.





At 2:14 p.m., Wieland reported to dispatch that the "dog keeps charging us, will likely have to put down." Based on reviewing the materials herein, including Sgt. Wieland's own statement concerning Rosie's behavior at Ms. Perry's property, this statement to dispatch was so misleading as to constitute an intentional deception since the last alleged "charge" was a good twenty minutes before Graddon executed her. Listen to the radio traffic below:



Minutes later, at 2:18 p.m., Ofc. Shields reported "dog has been put down."

| 14:14:25 | PD33 | MISC | 6D1 | , DOG KEEPS CHARGING US, WILL LIKELY HAVE TO PUT DOWN |
| 14:14:50 | PD33 | ASSTOS | 1D4 | [1604 S 262 PL ,DES] #DP0201 SHIELDS, DAVID |
| 14:18:50 | PD33 | MISC | 1D4 | , DOG HAS BEEN PUT DOWN |

**Exh. A.**

Wieland gave Graddon "the OK" and he shot one round from his Colt M-4. Even before firing the weapon, while back at the Wrights' home, Wieland advised Graddon to arm himself "with his M4 rifle." *Wieland Report at 4.* Below is a photograph of a Carbine, 5.56 mm, M4 with Rail Adapter System, flip-up rear sight, vertical forward grip with bipod and Aimpoint M68 CCO. Without all the bells and whistles, the M4 traces its lineage to the earlier carbine version of the M16, and is a shorter and lighter version of the M16A2 assault rifle.



A disturbing and inculpatory piece of evidence, curiously excluded from DMPD Professional Standards Sgt. D. Mohr in his internal assessment, is the audio from a dashcam he claims did not exist. *Mohr Report* ("There was no video footage for car 521 assigned to Officer Shields.") This is false, for at about 2:18 p.m., moments after Graddon first shot Rosie, one of the officers blithely exclaimed, "Nice!" as heard below:

19



*Dashcam Car 521 (Shields).*

Graddon then remarks that:

the dog immediately fell to the ground without making any noise. I approached the dog and observed its eyes rolled back and it had heavy labored breathing.

*Graddon Report, at 3-4.* Despite the fact that Rosie no longer presented any conceivable threat, at Wieland's direction, Graddon "fired another around from [his] rifle" into "the dog's center mass," causing Rosie to yelp. *See also Wieland Stmt. at 4* (**Exh. F**)("I told MPO Graddon to shoot the dog again to put him out of his misery.")

Assuming *arguendo* that Graddon had <u>any legal right</u> to shoot Rosie in the first place, much less kill her, the decision to shoot center-mass shows at least criminal negligence, if not malice, knowing that this is decidedly <u>not</u> the proper way to euthanize by gunshot, but rather the method of inflicting maximal pain and suffering. Graddon nonetheless continued torturing Rosie, at Wieland's direction, the other officers standing by, by firing a third round into "the same general location," causing Rosie to "s[i]t up and beg[i]n to move around" in sheer agony. "I told MPO Graddon to shoot the dog again and put it out of its misery." *Wieland Stmt. a*t 4. Finally, with the fourth shot "into the same general portion of the body," Graddon killed Rosie. Wieland "was present at the time of the shooting." *Graddon Stmt.* at 4.

Minutes later, in the height of callous indifference to Rosie's suffering, Graddon remarks, "It's funny, the first two shots, he didn't whimper." Putting aside that this statement is disputed, it suggests that Graddon either wanted to keep shooting Rosie to elicit some evidence of pain through vocalization, or he kept shooting because he thought the first two shots did not sufficiently mitigate any threat to public safety that he wrongheadedly perceived. That by all accounts he came upon Rosie immobilized after the first shot negates the latter explanation, leaving the wholly unacceptable and atrocious former one. The clip below taped this statement:

20



Photographs of Rosie's body, where she died from four gunshot wounds, are shown below:







A photograph purportedly taken from Rosie's point of view follows:



## <u>Civilian Witness – *Bryan Burnett*</u>

Witnesses to the shooting tell a story that casts significant doubt on the veracity of the officers's assessments of "viciousness." For instance, Bryan Burnett, residing at 26709 16th Pl. S., in Des Moines, witnessed the Tasing and shooting of Rosie. After watching the first shot into Rosie, he states, "The four officers then, disgustingly, high fived each other." *Burnett Stmt.* (**Exh. G).** He adds that the officers "corned (sic) the terrified dog in the corner of said backyard" before executing her. *Id.*

In his interview with Sgt. Mohr, he states that the officers told him that Rosie had "charged a couple people, came at … a couple civilians and … the officer had said it … charged him … [and] then they pursued it to where they got it in the back yard." *Burnett Interview,* at 3 (**Exh. H**). Of course, the police reports indicate that Rosie <u>never</u> charged any civilians, making this statement a *post hoc* fabrication to justify the killing.

Later in the interview, Mr. Burnett describes seeing Rosie cornered in the Perry yard behind two fences, "pretty far away from the officers." *Id.,* at 6. Standing across the street on the sidewalk, he saw Graddon take aim and shoot Rosie the first time, and the officers "kinda congratulated him oh you know they were pattin him on the back like good kill, good shot[.]" *Id.,* at 4.

With respect to shooting Rosie <u>four</u> times, Mr. Burnett reports that he watched one officer retrieve a catchpole and return to the backyard. By the time he arrived, however, Rosie had already expired. *Id.,* at 7. Ms. Perry also saw the catchpole. *Perry Interview,* at 5 (**Exh. I**). This confirms that the officers had the pole available and could have attempted to secure Rosie in it after the first shot, where she lay immobilized. Remember: this was the purported reason for

using a Taser in the first place – i.e., as a means of electroimmobilizing Rosie so they could place the noose over her head.

## Civilian Witness – *Lora Perry*

Lora Perry, resident of the premises where Rosie died, noted that when she first encountered Rosie in her yard (before police arrived), she "was just sniffing around" for "about twenty minutes minimum." *Perry Interview,* at 3 (**Exh. I**). And when Ms. Perry called to her, Rosie "ran away into the back blackberry bushes." *Id.* Ms. Perry also notes that Rosie had practically nowhere to go upon entering the bushy area. *Id.* Further, the back yard is "completely fenced off … with a gate … and then the front yard is completely fenced off as well with a gate[.]" *Id.,* at 6. As to the front gated area, "it's obvious because there's gates you know it's completely fenced … all the way to Pacific Highway on all four sides its completely fenced." *Id.,* at 8. As to the back gated area, you can "see the fence through the, through the sticker bushes [where Rosie was hiding]." *Id.* She adds that at the time they killed Rosie, she knows the gates to her fenced yard were "certainly closed." *Id.,* at 5. At one point, Ms. Perry called to her in the bushes but Rosie "just kinda stared at me she never moved[.]" *Id.* Ms. Perry was not fearful or worried "at all" about Rosie, who showed no sign of anger or aggression and made no noise. She just stared. *Id.,* at 4.

After Rosie's execution, Ms. Perry spoke to an acne-faced officer, whom she says was "chuckling as he said you know they never had … one this big before" and "they … had been chasing the dog for two days, which I found out wasn't true." *Id.,* at 5. While Ofc. Emly claims to have received a call of a loose bear at about 4 a.m. on Nov. 7, 2010, and Sgt. Wieland claims to have seen a Newfoundland near the Wrights' home at about 8 a.m. on Nov. 7, 2010, the "chase," as it were, began less than half an hour before they killed Rosie.

Importantly, the Perry property has a clearly marked "No Trespassing" sign facing the sidewalk (as photographed by the officers involved):

24



At no time did the officers seek consent to enter Ms. Perry's fenced frontyard or fenced backyard. Rather, Wieland called to Ms. Perry to determine if she had seen a large black dog, radioed for backup, and then the other officers entered with guns drawn, whereupon they proceeded to kill Rosie. Indeed, Ms. Perry states that one officer told her to "get in the house right now," but she refused, as she was trying to get her own dog in the house. *Perry Interview,* at 6-7. Ms. Perry continues, "if I would of known what was going on I would of told the officers to leave, the dog could of stayed there, um for days[.]" *Id.* at 7. This willingness to let Rosie stay was based on her lengthy, nonviolent interaction with Rosie and the officer's admission that Rosie had not bitten anyone. *Id.*

## Civilian Witness – *Kennet Phillipson*

Kennet Phillipson confirms Ms. Perry's testimony, stating that from the vantage point inside the back yard, he could see Rosie "sitting … back in the blackberry bushes" while "on its haunches with its head up[.]" *Phillipson Interview,* at 3 (**Exh. J**) While watching Rosie and trying to get her attention, Wieland entered the property. They spoke to Wieland, who was out on the sidewalk, from the backyard while the gates to the front and backyard were both closed. *Id.,* at 3. He confirms that both front and back yards were completely enclosed by chain link fencing. *Id.* Wieland asked if they had seen a large black dog. Either he or Ms. Perry answered yes, causing Wieland to radio for support. He then opened the front gate and started walking back toward them, gun drawn but held by his side. Wieland said "we've been looking for this dog for … a couple days," "it's been … aggressive," and "you should get back in the house." *Id.,* at 3-4; see also at 8 (accord).

At this first contact, however, Mr. Phillipson distinctly remembers that Wieland said "we're going to shoot the dog." *Id.,* at 8. In other words, the decision to kill Rosie was made

25

<u>before</u> Wieland or any other officer had even set foot into Ms. Perry's backyard, before seeing Rosie, without confirming that Rosie had threatened anyone, and without even observing her.

Then Wieland began to open the back gate – never seeking permission from either Ms. Perry or Mr. Phillipson.

After returning inside the house, Mr. Phillipson saw the officers "standing side by side maybe ten yards from the blackberry bushes probably twenty yards from from (sic) the dog that was still sitting back there." *Id.,* at 4. At no time did she bark or growl. *Id.,* at 13. After the first shot, both he and Ms. Perry "immediately" heard Rosie "whimpering and crying," contradicting what Graddon self-servingly stated. *Id.,* at 4.

About twenty minutes after killing Rosie, Wieland and another officer came to Ms. Perry's front door, explaining the need to bring a city truck to remove Rosie due to her size and that they had never "had one this big before they never shot one this big before," at which point the officer standing behind Wieland "smiled and kind of looked amused by that." *Id.,* at 5. Later that day, Wieland and a different officer came to the door to make an offering of McDonald's ice cream coupons for Ms. Perry's children. Wieland apologized for any inconvenience and the other officer "was smug about it." *Id.,* at 6. As for Rosie's appearance, Mr. Phillipson did note that ten to twenty minutes before Wieland arrived, both gates were open temporarily but nobody saw Rosie enter. *Id.,* at 7. However, at the time of shooting Rosie, the gates were <u>closed</u>.

The timing of the four gunshots involved a delay of approximately one minute between the first and second shot, 15-20 seconds between the second and third shot, and five seconds between the third and fourth shot. *Phillipson,* at 5.

## <u>Civilian Witness – *Joyce Darby*</u>

Joyce Darby witnessed the officers confront Rosie at her home. She notes that "the dog is sitting at the top of the, not the top, the middle of the driveway, the police are at the top of the driveway looking down and the dog is sitting about[.]" *Darby Interview,* at 4 (**Exh. K**). Rosie was not barking or showing aggression to the officers, who had a catchpole and guns drawn at the time. Instead, she "had no expression" and was "just sitting there." *Id.,* at 5.

An aerial overview of Rosie's path is shown below. Point A signifies Rosie's residence, Point B the Perry residence, and Point C the Burnett residence. The distance from Point A to Point B is 0.4 miles.



    Neither Arico, Graddon, nor Wieland appeared to have any training in neutralizing canines or animal control training specifically, after having reviewed the training jackets provided through public disclosure. Yet, Graddon had training in Less Lethal Force (Bean Bag) on Mar. 10, 2002 (through DMPD).

| 68 | Course Code -> 150-025-0001-001 | | | |
|---|---|---|---|---|
| | LESS LETHAL FORCE (BEAN BAG) | 03/10/2002 | $ | 0.00 |
| | DES MOINES POLICE DEPARTMENT | 03/10/2002 | | |
| | Attendance/Grade: P    Instructor: D. BELL | Travel Cost: | $ | 0.00 |
| | Training Hrs:    3.00    COURSE SATISFACTORILY COMPLETED | | | |
| | Course Note: 100% ON THE WRITTEN TEST | | | |

Wieland also had Less Lethal Force (Bean Bag) training on Apr. 6, 2004 (through DMPD):

| 21 | Course Code -> 150-025-0001-001 | | | |
|---|---|---|---|---|
| | LESS LETHAL FORCE (BEAN BAG) | 04/06/2004 | $ | 0.00 |
| | DES MOINES POLICE DEPARTMENT | 04/06/2004 | | |
| | Attendance/Grade: P    Instructor: PAUL GUEST | Travel Cost: | $ | 0.00 |
| | Training Hrs:    2.00    COURSE SATISFACTORILY COMPLETED | | | |

Aside from the ineffectual Taser, no officer attempted to use any other means of less-than-lethal force, such as chemical immobilization, net, a baited trap, or some other lure to befriend Rosie rather than repeatedly scare her to the point of fleeing. Nor did they attempt to contact animal control officers in neighboring jurisdictions, since the city's only ACO, Jan Magnuson, was off-duty.

## Post-Mortem

Following her death, boarded veterinary radiologist Robert Kramer of Veterinary Radiologists performed a computerized tomography (CT) scan, and veterinarians at the Washington Animal Diagnostic and Disease Lab at the Washington State University College of Veterinary Medicine performed a gross necropsy.

Dr. Kramer confirmed four apparent gunshot paths. Based on the reports and statements of eyewitnesses placing Rosie in an upright position facing Graddon and Wieland while sitting on her haunches, the only plausible interpretation of the trauma Rosie sustained indicates that the first shot fractured her right, front leg, shattering her humerus, causing her to fall on her side. This shot alone would not have killed her and veterinary treatment could have saved her life.

Aside from questioning the legality of the decision to shoot her in the first place, the court must pay close attention to the method of attempting to euthanize her by gunshot. For if Graddon honestly fired shots two through four "center-mass" with an intent to put her out of her misery, then he embarrassingly failed to show any skill in the process, for not one of the bullets entered center mass (i.e., he missed her heart entirely and the only shrapnel found center-mass was a fragment in her chest that had ricocheted off her scapula). He also missed her head, although he did not even try to hit her skull. That shots two through four came, admittedly, at near point-blank range, while Graddon stood near a downed Rosie, the size of a small person, demonstrates criminal negligence at a minimum (assuming *arguendo* that center-mass euthanasia by gunshot is even humane, authorized, and necessary)

Dr. Kramer's report describes each bullet pathway, but not in any particular order. That said, as discussed above, the first shot had to have struck her right leg:

1. A bullet has entered the right thoracic limb and caused severely comminuted fracture trauma in the distal right humerus, including entrance into the caudal-most aspect of the elbow joint. Most of the fracture shards are present medial to the large bone fragments. Shrapnel are largely present lateral and proximal to the fracture site. Gas foci are present primarily medial to the fracture bed.

*Kramer Report* (**Exh. 11**). Another shot came from above and entered the middle of her cervical spine (i.e., the neck):

2. A path of shrapnel foci delineates a bullet path from the caudodorsal cervical cutaneous surface, coursing cranially and ventrally, and striking the dorsal aspect of the C3 vertebra. No fractures are apparent, and there is a cluster of ricochet fragments to the left of the ventral aspect of this vertebra. There is gas within the vertebral sinuses in the cervical region, contiguous with gas elsewhere within vascular lumina.

*Id.* A third shot entered Rosie's left shoulder blade:

3. A bullet path is noted from an entrance point dorsal to the left scapula through the dorsal aspect of the scapular body with resultant local fracture, and a majority of the shrapnel is localized in the tissues between the medial aspect of the scapular body and the thoracic spinous processes. There is an incomplete, longitudinally oriented fracture line in the spinous process of the T1 vertebra.

*Id.* A fourth shot presumably entered Rosie's right shoulder blade. Dr. Kramer only found a "single small shrapnel fragment" near the cranial portion of her right lung, which had ricocheted off her scapula:

4. A bullet path is noted from an undetermined entrance point presumably dorsal and lateral to the right scapula, and has caused fractures in the ventral aspect of the scapular body with deposition of large shrapnel fragments immediately medial thereto. Numerous additional fragments course ventromedially and slightly cranially and are embedded in the tissues lateral to or ventral to the right side of the thoracic inlet. A single small shrapnel fragment is present in the cranial tip of the right cranial lung lobe medial to the ventral aspect of the right 2nd rib. No other shrapnel is present in the thoracic cavity.

*Id.* The bullets did not strike Rosie in the abdominal or pelvic regions.

When WADDL performed the necropsy, Rosie weighed 54.5 kg., nowhere near the "200 pound" estimate reported by DMPD. While Dr. Kramer's CT scan provides optimal imaging interpretation focused on penetrating projectiles, WADDL confirms that Rosie was otherwise in "good body condition with adequate internal adipose stores" and "normal skeletal muscle mass."

A 54.5 kg, female, spayed, black Newfoundland, canine is presented dead for necropsy on November 15, 2010. The cadaver is in poor post mortem condition with signs of advanced autolysis that include green discoloration in the subcutaneous adipose tissue and intestine, foul odor and friable tissue. The carcass is in good body condition with adequate internal adipose stores (subcutis, mesentery, perirenal and epicardial) and normal skeletal muscle mass. A microchip with identification number '144658726A' is scanned in the subcutaneous tissues in the interscapular space.

29

*WADDL Report* (**Exh. 12).** Grossly normal were Rosie's brain, eyes, skull, esophagus, trachea, heart, thyroid, diaphragm, stomach, duodenum, ileum, jejunum, cecum, colon, liver, kidneys, adrenal glands, spleen, gall bladder, urinary bladder and bone marrow. *Id.*

## King County Prosecuting Attorney's Office

On Dec. 15, 2010, Chief Criminal Deputy Mark R. Larson of the King County Prosecuting Attorney's Office declined to file felony animal cruelty charges against any of the involved officers. However, this declination to file has no bearing on the present citizen criminal complaint for five reasons: (1) CrRLJ 2.1(c) contemplates that the prosecuting authority may choose not to prosecute, and does not erect an adverse decision as a barrier to a citizen's petition (in other words, it has no preclusive effect); (2) Mr. Larson did not consider RCW 16.52.207 or the related municipal crimes under the DMMC; (3) Mr. Larson fails to scrutinize, with any real attention, the targets chosen by Graddon when he fired four times; (4) Mr. Larson erroneously applies the King County Code to this incident, referencing KCC 11.04.250, which has no bearing within the city limits of Des Moines; and (5) any legal assessment of RCW 16.52.205, a felony, is inapposite; and (5) CrRLJ 2.1(c) only pertains to misdemeanors and gross misdemeanors, not felonies. Lastly, for the reasons stated below, Mr. Wright respectfully disagrees with Mr. Larson's superficial examination of the law, policies, and facts, meriting closer analysis as done here.

## LEGAL ANALYSIS

DMMC 9.16.030 makes it a misdemeanor to willfully and without authority in law kill or wound an animal:

> **DMMC 9.16.030 Wounding or trapping of animals.**
> (1) It is unlawful for a person to willfully and without authority in law kill, wound, or trap an animal or bird, or remove or destroy the young of the animal or the egg of the bird, except this section shall not apply to insect, pest, and rodent control.
> (2) A violation of or failure to comply with this section is a misdemeanor.

Without dispute, Graddon and Wieland willfully caused Rosie to become wounded and die. Whether they did so with "authority in law" invites further discussion below.

DMMC 9.16.010 also incorporates by reference RCW 16.52.207. Under Washington State law, animal cruelty in the second degree is codified, in relevant part, as follows:

> (1) **A person is guilty of animal cruelty in the second degree if, under circumstances not amounting to first degree animal cruelty, the person knowingly, recklessly, or with criminal negligence inflicts unnecessary suffering or pain upon an animal.**

30

RCW 16.52.207(2005). Graddon violated subsection by "knowingly, recklessly, or with criminal negligence" inflicting unnecessary suffering or pain upon an animal. "Pain" has been defined as "a state of physical or mental lack of well-being or physical or mental uneasiness that ranges from mild discomfort or dull distress to acute often unbearable agony." *State v. Zawistowski,* 119 Wash.App. 730, 734 (Div. II, 2004) *rev. den'd,* 152 Wn.2d 1010 (2004). "Undue" means excessive or unwanted. *See State v. Paulson,* 131 Wash.App. 579, 586 (2006).

Wieland, in giving the order to repeatedly shoot Rosie, has accomplice criminal liability. Beyond any reasonable doubt, this incident, blast upon blast, caused escalating, unnecessary pain and suffering to Rosie. As to whether they inflicted this pain and suffering lawfully or without necessity, the analysis that follows negates any attempted justification.

"**Criminal negligence**" is a culpability state defined as one who "fails to be aware of a substantial risk that a wrongful act may occur and his failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable man would exercise in the same situation." RCW 9A.08.010(1)(d). As officers putatively trained in use of force, animal control, and euthanasia by gunshot protocols, the risk of causing unnecessary pain and suffering to Rosie was substantial, if not certain, under the circumstances.

"**Knowledge**" is a culpability state defined as one who "is aware of a fact, facts, or circumstances or result described by a statute defining an offense," or "has information which would lead a reasonable person in the same situation to believe that facts exist which facts are described by a statute defining an offense." RCW 9A.08.010(1)(b)(i-ii). Graddon and Wieland had plenty of time to assess the situation and become aware of undisputed facts and circumstances that (a) Rosie presented no imminent threat to anyone when shot; (b) Rosie had not threatened Ms. Perry, her children, or her dog; (c) Rosie was contained within a gated and enclosed chain-link fence with nearly impenetrable blackberry brambles; and (d) assuming *arguendo* Rosie exhibited any alleged "vicious" propensities, she did so at least twenty-five minutes prior to being shot, after provocation and encroachment onto her property, and in a completely different environment; (e) no split-second decision needed to be made in response to a rapidly escalating and evolving situation, such as where a dog rushes an officer, giving him less than a second or two to defend himself; and (f) the officers made the conscious decision to kill Rosie even before she was Tazed the first time. The assertion by Sgt. Bell to the Wrights that the officers shot in "self-defense," and the assertion by Sgt. Wieland to dispatch that Rosie kept charging and would need to be put down were both knowing falsehoods.

RCW 9A.08.010(4) provides that willful misconduct is satisfied if a person acts knowingly with respect to the offense's material elements, barring some plainly evident purpose to impose further requirements. Accordingly, for purposes of DMMC 9.16.030, knowledge proves willfulness. Des Moines adopts the state's principles of liability. DMMC 9.04.050 (incorporating RCW 9A.08.010).

"**Recklessness**" is a culpability state defined as one who "knows or and disregards a substantial risk that a wrongful act may occur and his disregard of such substantial risk is a gross deviation from conduct that a reasonable man would exercise in the same situation." RCW

31

9A.08.010(1)(c). For the reasons stated as to criminal negligence, aside from gross inattentiveness that would justify conviction under RCW 9A.08.010(1)(d), the actions of these men showed tremendous indifference to the sensibilities of Rosie.

## *First Count*: Decision to Shoot the First Time

Graddon and Wieland rely upon the assertion that Rosie presented a threat to themselves and public safety at the time they shot her. This contention defies the evidence and perverts policy. DMMC 8.04.150, titled *Enforcement Powers,* states:

**8.04.150 Enforcement powers.**

(1) City officers and officials are authorized to take such lawful action as may be required to enforce the provisions of this chapter and the laws of the state as they pertain to control of animal behavior and prevention of cruelty to animals.

(2) Enforcement officers and officials shall not enter a building designated for and used for private purposes, unless a proper warrant has first been issued upon a showing that the officer or official has probable cause to believe that an animal is being maintained in the building in violation of this chapter.

(3) Provided, that such officers or officials, while pursuing an animal observed by the officer or official to be in violation of this chapter, may enter upon any public or private property, except any building designated for and used for private purposes for the purpose of abating the animal violation.

(4) No person shall deny, prevent, obstruct, or attempt to deny, prevent, or obstruct an officer or official from pursuing and impounding an animal observed to be in violation of this chapter. [Ord. 512 § 7(1), 1980.]

Nothing within this section provides *carte blanche* to use lethal force. Indeed, DMMC 8.04.150(1) tempers the authorization to use force in the context of taking "such lawful action as may be required." It in no way attempts to set an express constitutional limit on the use of force, nor does it prescribe or encourage the lethal use of force. And while DMMC 8.04.150(3) allows the officers in hot pursuit to enter private property, it does not warrant or compel the use of lethal force as performed in this case. Besides, no city ordinance can override the federal and state constitutional mandates against unreasonable seizures and deprivations of property without due process of law. U.S. Const. Amend. IV, V, XV; Wash. Const. Art. I, § 3, 7. Further, the Supremacy Clause preempts all municipal codes as the law of the land. U.S. Const., Art. VI, Cl. 2.

*DMPD Policy 820* actually helps prove animal cruelty. Policy 820.3, titled *Officer Responsibility,* states:

32

## 820.3    OFFICER RESPONSIBILITY

During hours when the Animal Control Officer is off duty, or if the ACO is otherwise unavailable, the following animal related calls for service will be handled by the appropriate on-duty officer.

Officers dispatched to emergent animal related calls should attempt to take appropriate actions to control and resolve the situation. Due to the hazards of handling animals without proper equipment, responding officers generally should not attempt to capture and pick up any animal. The following are examples of when an officer may consider acting before the arrival of the ACO:

(a)    When there is a threat to the public safety.

(b)    When an animal has bitten a person, officers should take measures to confine the animal and prevent further injury.  A Case Report will be taken and the animal impounded and/or quarantined.

(c)    When the owner/keeper has been arrested and there is a need for placement of the animal.

(d)    When the animal is gravely injured.

In Rosie's case, ACO Magnuson was off-duty. As on-duty officers, Graddon and Wieland, therefore, "generally should not [have] attempt[ed] to capture and pick up" Rosie. Of course, they will point to 820.3(a), claiming that Rosie was a "threat to the public safety." In the hour between Ms. Carlson's call and the officer's arrival, Rosie presented no such threat as there had been no sighting of Rosie in the street or menacingly approaching any person or animal. Upon their arrival and at the time the officers deployed the Taser on Rosie's property, they provoked the purported "threat" she may have presented to them only and contrived the use of force.

In most scenarios, police officers may meet the threat of deadly force with like force, subject to necessity. "Necessity is the second prerequisite for the use of deadly force under Garner. "The necessity inquiry is a factual one: Did a reasonable non-deadly alternative exist for apprehending the suspect?" *Brower v. County of Inyo,* 884 F.2d 1316 (9th Cir.1989), on remand from 109 S.Ct. 1378. Yet police officers cannot justify a contrived use of deadly force. The Ninth Circuit has created a "police liability based on provocation" doctrine:

> We read  *Alexander*, as limited by *Duran* [*Duran v. City of Maywood*, 221 F.3d 1127 (9th Cir. 2000)], to show that where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force. In Alexander, the officers allegedly used excessive force because they committed an independent Fourth Amendment violation by entering the man's house to arrest him without an arrest warrant, for a relatively trivial and non-violent offense, and this violation provoked the man to shoot at the officers. Thus, even though the officers reasonably fired back in self-defense, they could still be held liable for using excessive force, because their reckless and unconstitutional provocation created the need to use force.

33

*Billington v. Smith,* 292 F.3d 1177, 1189 (9th Cir.(Id.)2002).

　　When may law enforcement be said to "provoke" a dog to act in a manner that warrants the use of deadly force? Do not nonhuman animals have the right to lawfully protect themselves from unauthorized, imminent physical harm? Virtually all state and local dangerous dog codes provide a provocation defense where the animal fears an actual assault to herself, her offspring, or her owner. Which standard would apply, though? The "reasonable person," or the impaired "infant person" or "insane person"? Perhaps the "reasonable dog" standard is most on mark? If a police officer entered a home brandishing a weapon broadcasting fearsomeness, would not a dog, properly on the premises and not sicced on the officer, be within its "rights" or "sensibilities as a dog" to defend its property and guardians?  In other words, is not law enforcement responsible for giving some consideration to the fact that dog will "act like a dog" and, thus, respond accordingly with knowledge and safeguards to accommodate its predictable behavior? Precisely such thought-process underlay the Ninth Circuit's decision in *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose,* 402 F.3d 962 (9th Cir.2005).

　　In rejecting qualified immunity, the *Hells Angels* court found that the shooting of dogs belonging to Hells Angels members constituted an unreasonable seizure, unreasonable execution of search warrant, lacking exigent circumstances, the purported necessity of discharging firearms utterly contrived given that law enforcement had a week to prepare non-lethal means of neutralizing dogs other than killing them if they got in the way, and the unlawfulness of the officers' conduct readily apparent to any reasonable officer. Citing *Fuller v. Vines* for the proposition that killing dogs constitutes the clearly established law of a Fourth Amendment seizure, the court proceeded to examine the reasonableness of the killings, noting, a seizure becomes unlawful when it is "more intrusive than necessary." *Florida v. Royer,* 460 U.S. 491, 504 (1983). As "more than just a personal effect," the court classified the intrusion of killing three dogs as "severe." "The emotional attachment to a family's dog is not comparable to a possessory interest in furniture." *Id.,* at 975.

　　As to the contention that the officers' plan to engage the known guard dogs was necessary to preserve stealth, the court held that the officers themselves "compromised their ability to effectuate a quiet entry," as the shotgun blasts woke the residents, not the barking of dogs. Citing various cases holding that reasonableness under the Fourth Amendment depends on whether officials contemplated alternatives before undertaking intrusive activity implicating constitutional rights, the court found that:

> These cases should have alerted any reasonable officer that the Fourth Amendment forbids the killing of a person's dog, *978 or the destruction of a person's property, when that destruction is unnecessary-*i.e.,* when less intrusive, or less destructive, alternatives exist. A reasonable officer should have known that to create a plan to enter the perimeter of a person's property, knowing all the while about the presence of dogs on the property, without considering a method for subduing the dogs besides killing them, would violate the Fourth

Amendment." *Id.,* at 977-78. This was not a case requiring split-second judgments
in tense, uncertain, and rapidly evolving circumstances as purportedly justifying
the grant of immunity. *Graham,* 490 U.S. at 397.

*Id.,* at 977-78. The only less destructive alternative attempted by the officers was the Taser,
which they knew failed after the first time. As discussed above, even before redeploying the
Taser, the officers admitted that it would only scare her half to death. They tried no other
alternative, but rather made the premeditated decision to simply kill her – regardless of whether
she presented an imminent threat.

After sending Rosie fleeing <u>from</u> her property, Graddon Tazed her again from a moving
vehicle, achieving the expected result (expected by a reasonable person, that is) that she would
be frightened once more and dart into traffic and evade capture. In this regard, the officers
created the "threat to the public safety," not Rosie. But as described above, Rosie minded the
sidewalks and did not endanger any animal, person, or vehicle. When she finally came to rest in
Ms. Perry's back yard, by <u>all</u> accounts (including the officers'), Rosie threatened none. Indeed,
she did what any human would when told to stop, drop weapons, and await being taken into
custody – she sat, perfectly still, not baring teeth, not frothing at the mouth, not barking, not
growling, in other words, not putting up any resistance. Yet this is precisely when Wieland
authorized Graddon to shoot and kill Rosie.

Such deadly force clearly violates the constitution. *Tennessee v. Garner,* 471 U.S. 1, 11
(1985)("A police officer may not seize an unarmed, non-dangerous suspect by shooting him
dead."). When using deadly force, the threat posed to the public and officer must be imminent
and not used merely because the suspect is armed:

> Law enforcement officers may not kill suspects who do not pose an immediate
> threat to their safety or to the safety of others simply because they are armed.
> Whenever practicable, a warning must be given so that the suspect may end his
> resistance or terminate his flight. … Other means exist for bringing the offender
> to justice, even if additional time and effort are required.

*Harris v. Roderick*, 126 F.3d 1189, 1201, 1204 (9th Cir.(Id.),1997)(Ruby Ridge case). In the
Ninth Circuit, even if threatened with a weapon, the officer may still have committed a Fourth
Amendment seizure by using deadly force. *Hopkins v. Andaya*, 958 F.2d 881, 887 (9th Cir.
1992)(officer's firing four shots at unarmed, wounded plaintiff coming after him was
unreasonable, where alternative courses available such as subduing with fists, feet, baton, or butt
of gun); *Reed v. Hoy*, 909 F.2d 324, 325-30 (9th Cir. 1989)(plaintiff armed with splitting maul
advanced on officer who, after warnings, shot plaintiff; jury could find that shooting was
unreasonable under Fourth Amendment).

The slaying of Rosie also constitutes excessive and illegal non-deadly force pursuant to
the Supreme Court case of *Graham v. Connor,* 490 U.S. 386, 396 (1989), which judges non-
deadly force by balancing several factors: (1) assessing the gravity of the particular intrusion on
Fourth Amendment interests by evaluating the type and amount of force inflicted; (2) assessing

the importance of the government interest at stake by evaluating the (a) severity of the crime at issue, (b) whether the suspect posed an immediate threat to the safety of the officer or others, and (c) whether the suspect was actively resisting arrest or attempting to evade arrest by flight; and (3) balancing the gravity of the intrusion on the individual against the government's need for that intrusion to determine constitutionality. At the time the officers deployed lethal force, Rosie was not "actively resisting arrest or attempting to evade arrest by flight." She did not then pose "an immediate threat to the safety of the officer or others." Her only "crime," as it were, was to be forcibly ejected from her property by trespassing officers. And, technically, she was not "at large" when the officers arrived.[5]

DMMC 8.04.020(6) defines "at large" as:

**Off the premises** of the owner or keeper and not under control of the owner or keeper or other competent person by leash; except an animal within an automobile or other vehicle of its owner or keeper or other competent person is deemed to be on the owner's or keeper's premises.

Furthermore, in that Ms. Perry did not object to Rosie staying in her fenced backyard for "days," Ms. Perry became Rosie's "keeper." Accordingly, even at Ms. Perry's address, Rosie could not be deemed "at-large."

Instead, she was situated in a completely fenced backyard without objection or concern by the homeowner. The balancing test tips sharply in Rosie's favor under *Graham.*

Thus, DMPD Police 820.3's general proviso that the officers should have waited for any other animal control officer to arrive governs. The first shot, therefore, caused undue suffering and broke the law.

### ***Second, Third, and Fourth Counts*:**
### **Decision to Shoot the Second, Third, and Fourth Time**

*DMPD Policy 820.5,* titled *Injured Animals* also compels a finding of animal cruelty. It states:

---

[5] And remember that the 911 call from Ms. Carlson never alleged any vicious behavior by Rosie.

**820.5   INJURED ANIMALS**

When any injured domesticated animal is brought to the attention of a member of this agency, all reasonable attempts shall be made to contact the owner or keeper. When the owner or keeper cannot be located and the animal is not an immediate danger to the community, it may be taken to a doctor of veterinary medicine as described below (RCW 16.52.085(2)):

(a)   During normal business hours, the animal should be taken to an authorized veterinary care clinic or to an animal shelter if a shelter vet is on duty.

(b)   If after normal business hours, the animal should be taken to the department authorized veterinary emergency clinic.

(c)   The only exception to the above is when the animal is an immediate danger to the community or the owner/ keeper of the animal is identified and takes responsibility for the injured animal.

   1.   When the need to kill a seriously injured or dangerous animal is necessary, the department Use of Force Policy § 304 shall be followed. Destruction of an animal shall be undertaken with reasonable prudence and, whenever possible, in consultation with a licensed veterinarian and the owner/ keeper of the animal (RCW 16.52.210).The decision to dispose of a seriously injured animal will rest with the on-duty Shift Supervisor.

(d)   Injured wildlife should be referred to the Marine Mammal and Fisheries Department or the Washington State Department of Fish and Wildlife as applicable.

(e)   When handling dead or injured animals department employees shall attempt to identify and notify the owner/ keeper of the final disposition of the animal.

(f)   Each incident shall be documented and include, at minimum, the name of the reporting party and veterinary hospital and/or person to whom the animal is released. If the ACO is off-duty, the information will be forwarded for follow-up.

After the first shot by Graddon, he converted Rosie into an "injured domesticated animal." At that moment, all officers present had a duty to undertake "all reasonable attempts" to contact the Wrights. As discussed above, the police failed to find the cell phone numbers and 2009 license for Bentley, the St. Bernard all the officers identified repeatedly at the scene. They also failed to check the residence for the alarm system registration that would have provided cell phone numbers and contacts of relatives.

Continuing on, when the owners cannot be located "and the animal is not an immediate danger to the community," the officer <u>may</u> take her to a veterinarian. Why this did not cross the officers' minds escapes logic and compassion. However, subsection (b) states that "after normal business hours" (which this was on a Sunday), Rosie "should be taken" to a veterinarian. Undisputedly, the officers failed to do this.

To the extent they invoke subsection (c), Graddon and Wieland must prove that at the time she was shot and immobilized, she presented an "immediate danger to the community." Not so, especially when they had her corralled in Ms. Perry's yard with cop cars blocking the exit and the gates closed. Assuming *arguendo* that she did present such a threat (with heavy labored breathing and not moving from her position), subsection (c)(1) appears to circularly permit euthanasia only when "the need to kill a seriously injured or dangerous animal is necessary."

Was Rosie "seriously injured"? We know from the CT scan that likely only one of the four shots caused her death – the one collapsing part of her lung. The first shot just hit her leg and no vital organs. Given that shots two through four were made at close range, it follows that the first shot hit her leg and the remaining "center-mass" shots inflicted the grievous and mortal wounds. Besides, no officer took the time to determine the extent of her injuries by seeking veterinary assistance for a proper diagnostic assessment, including administration of a sedative or paralytic to prevent her from struggling during the examination. The officers took no accounting of the gradient of injury before executing her with three additional gunshots other than to note her lack of movement and heavy breathing. Furthermore, did the "need to kill" override the need to provide veterinary treatment? On information and belief, none of the officers had training as veterinary technicians or veterinarians. Hence, if they were attempting to diagnose or prognose, they were engaging in the unauthorized practice of veterinary medicine, compounding the criminality of their irreversible decision to "put her out of her misery." See RCW 18.92.010 (defining veterinary practice to include diagnosis and prognosis of animal disease, deformity, defect, wound or injury).

Was she "dangerous"? Not as defined under state or even city law. See RCW 16.08.070(2) and DMMC 8.04.020(7). Assuming they had grounds to kill, they needed to follow *Use of Force Policy 304.* They also needed to, "whenever possible," destroy Rosie "in consultation with a licensed veterinarian and the owner/keeper of the animal." Again, without dispute, they never consulted with a veterinarian. They also did not shoot her "with reasonable prudence." Of note is that liability rests by policy with the "on-duty Shift Supervisor" for any "decision to dispose." This was Wieland. *DMPD Policy 304.1.1(c-d)* discusses shooting of "dangerous" animals:

**304.1.1   POLICY**
It is the policy of this department to resort to the use of a firearm, when it reasonably appears to be necessary, and generally:

(c)  To stop a dangerous animal.
   1.   In circumstances where officers encounter an unexpected dangerous animal or are surprised by an animal which reasonably appears to pose an imminent threat to the safety of officers or others, officers are authorized to use deadly force to neutralize such a threat.
   2.   In circumstances in which officers have sufficient advanced notice that a potentially dangerous domestic animal (e.g., dog) may be encountered, such as in the serving of a search warrant, officers should develop reasonable contingency plans for dealing with the animal without the use of deadly force (e.g., fire extinguisher, Taser, OC Spray, animal control officer). Nothing in this policy shall prohibit any officer from resorting to deadly force to control a dangerous animal if circumstances reasonably dictate that a contingency plan has failed or becomes impractical.

(d)  An officer may euthanize an animal that is so badly injured that human compassion requires its removal from further suffering and where other dispositions are impractical.

38

Though problematic in many respects, this policy did not make the killing of Rosie necessary or due. First, it never defines "dangerous animal." But again, under state and local law, she did not meet the definition. Hence, the officers violated policy.

Nonetheless, *Policy 304.1.1(c)(2)* helps Rosie, since this was a situation where they had "sufficient advanced notice that a potentially dangerous domestic animal (e.g., dog) may be encountered" (viz., in Perry's backyard when Rosie was doing nothing but keeping to herself). They then needed to "develop reasonable contingency plans for dealing with the animal without the use of deadly force (e.g., fire extinguisher, Taser, OC Spray, animal control officer)." While they tried the Taser and contacted off-duty Magnuson, they did not seek help from neighboring jurisdictions with on-duty animal control, nor did Magnuson think to contact any number of her animal control colleagues with whom she has worked repeatedly in the context of her connections with and official position in the Washington Animal Control Association.[6] For instance, ACO Magnuson helped found and manage the WACA Animal Control Academy, conducted annually at DMPD. She also served as an officer with WACA. And Pierce County Animal Control Supervisor and current President of WACA, Tim Anderson, was then known and available to her.[7]

Nor did the officers try any other method for capturing Rosie without lethal force, such as specialty impact munitions (e.g., bean bag, on which Graddon and Wieland were both trained), projectile netting, chemical immobilization, or tempting her with treats. Of interest is *DMPD Policy 14.00.00*, allowing for chemical immobilization through tranquilizer darting. They had an easy opportunity to just dart her and when drugged, take her into custody. At the moment they killed her, and minutes prior, she presented no threat to anyone. Hence, their "contingency plan" did not fail or become impractical. It was simply insufficient.

*Policy 304.1.1(d)* is a double-edged sword. On the one hand, it encourages the officer to euthanize where the animal is "so badly injured that human compassion requires" but only where "other dispositions are impractical." On the other hand, how could Graddon and Wieland have determined that she was "so badly injured"? Did they know where Graddon shot her, precisely, and the extent of damage? Obviously, that it took him three more shots proves that she was not "so badly injured" by the first shot alone. And even Graddon states on video that she did not whimper the first two shots – proving his belief that she was not "severely injured" after each impact. Further, they still never tried "other dispositions," like veterinary care or sedation with a dart or pole. And if the officers let "human compassion" guide them, then their attempt to euthanize failed and, as explained below, showed at least criminal negligence (the method to euthanize is a head shot, not a shot to center-mass).

Any officer trained in euthanasia by gunshot knows that "center-mass" shots would not have put Rosie out of her misery in any expeditious fashion. The proper method for euthanasia

---

[6] On information and belief, Magnuson has served as the Washington Animal Control Academy Coordinator for nearly a decade.
[7] According to the WACA Wiki, she is presently the WACA Vice President. Mr. Anderson is WACA President. Waca.wikidot.com/contact (accessed Feb. 11, 2011).

by gunshot is to the head. The *Euthanasia Training Manual* published by Rebecca H. Rhoades, DVM on behalf of the Humane Society of the United States confirms that for cattle, deer, horses, sheep, goat, and pigs, the correct shot location for euthanasia by gunshot is into the brain. Correct placement is essential to avoid undue suffering.



*Id.,* at page 123 (ISBN 0-9658942-6-6 (2002). UC Davis endorses the same protocol in the context of sheep and goats:[8]

---

[8] *See Emergency Euthanasia of Sheep and Goats, UC Davis Veterinary Medicine Extension* (www.vetmed.ucdavis.edu/vetext/INF-AN/INF-AN_EMERGEUTH-SHEEPGOAT.HTML, accessed Feb. 11, 2011).



The method of gunshot to the head was utilized to euthanize a retired Alachua County Sheriff's Office police dog named Kozar. When the public questioned whether this method constituted cruelty, Sheriff Sadie Darnell stated that the shooting of Kozar in the head by a .22 caliber gun "is an accepted method under the humane society." Of course, the Alachua County Humane Society noted their recommendation for chemical euthanasia, performed by a licensed veterinarian whenever possible.[9]

The American Veterinary Medical Association also counsels euthanasia by gunshot by penetrating the brain and rejects gunshot to the heart or neck:

**GUNSHOT**

A properly placed gunshot can cause immediate insensibility and humane death. In some circumstances, a gunshot may be the only practical method of euthanasia. Shooting should only be performed by highly skilled personnel trained in the use of firearms and only in jurisdictions that allow for legal firearm use. Personnel, public, and nearby animal safety should be considered. The procedure should be performed outdoors and away from public access.

For use of a gunshot to the head as a method of euthanasia in captive animals, the firearm should be aimed so that the projectile enters the brain, causing instant loss of consciousness.[51,112-114] This must take into account differences in brain position and skull conformation between species, as well as the energy requirement for skull bone and sinus penetration.[109,115] Accurate targeting for a gunshot to the head in various species has been described.[114,116-119] For wildlife and other freely roaming animals, the preferred target area should be the head. The appropriate firearm should be selected for the situation, with the goal being penetration and destruction of brain tissue without emergence from the contralateral side of the head.[120] A gunshot to the heart or neck does not

---

[9] *Law Enforcement Canine's Death Raises Questions Over Proper Euthanasia,* Feb. 5, 2008 (WCJB-TV)(www.wcjb.com/news/1833/law-enforcement-canines-death-raises-questions-over-proper-euthanasia (accessed Feb. 11, 2011)).

immediately render animals unconscious and thus is not considered to meet the panel's definition of euthanasia.[121]

*AVMA Guidelines on Euthanasia*, Jun. 2007, at 13-14.

Hence, the decision to shoot Rosie, repeatedly, nowhere near her brain (or even the heart), signifies dispositive proof of causing death by unnecessary suffering. All officers present knew or should have known that this method violated all euthanasia by gunshot protocols.

## Considerations for Filing a Citizen Complaint

To file a criminal citizen complaint, the court must consider probable cause and may consider elements (1) through (7) under CrRLJ 2.1(c). Those issues are addressed *seriatim*:

**(1) Whether an unsuccessful prosecution will subject the State to costs or damage claims under RCW 9A.16.110, or other civil proceedings.**

Civil liability will only attach if the prosecution commences in bad faith and without probable cause. The evidence plainly supports second-degree cruelty and unlawfully wounding/killing. RCW 9A.16.110 (Defending against violent crime – Reimbursement) does not apply here. Any civil suit would likely be dismissed as frivolous. A finding of probable cause negates a claim for malicious prosecution as a matter of law. *Jacques v. Sharp,* 83 Wash.App. 532 (1996); *Hanson v. City of Snohomish,* 121 Wn.2d 552 (1993); *Peasley v. Puget Sound Tug & Barge Co.,* 13 Wn.2d 485 (1942).

**(2) Whether the complainant has adequate recourse under laws governing small claims suits, anti-harassment petitions or other civil actions.**

Civil litigation will not provide the required sanction of conviction, imprisonment, and/or fine. Nor will civil suit compensate for the undue pain and suffering endured by Rosie.

**(3) Whether a criminal investigation is pending.**

No. Rather, it has completed.

**(4) Whether other criminal charges could be disrupted by allowing the citizen complaint to be filed.**

No other criminal charges are pending.

**(5) The availability of witnesses at trial.**

All witnesses are available for trial.

**(6) The criminal record of the complainant, potential defendant and potential witnesses, and whether any have been convicted of crimes of dishonesty as defined by ER 609.**

On information and belief, neither the complainant nor potential defendants have been so convicted. The conviction status of other witnesses is unknown.

**(7) Prosecution standards under RCW 9.94A.440 (now RCW 9.94A.411).**

Prosecution is both technically sufficient and serves an important public purpose. RCW 9.94A.411 articulates reasons to decline to prosecute, which are negated in turn:

(a) it is not contrary to legislative intent (animal cruelty laws must be abided by those hired to prevent it);

(b) RCW 16.52.207 is a 17-year-old statute, with amendments as recent as 2007, and certainly not antiquated;

(c) the violation is <u>not</u> *de minimis* (Rosie was tortured before dying, and the evidence strongly supports the interpretation that the officers delighted in the slaying – recall the "Nice!" exclamation coupled with high-fiving and pats on the back, unprofessional chuckling over the inability to dispose of Rosie without a city truck retrieving her remains from the Perry property; and premeditated determination to kill Rosie);

(d) the purported defendants are not confined on other charges;

(e) there is no pending conviction for another charge;

(f) the cost of not prosecuting is highly disproportionate to the efforts undertaken to obtain and preserve evidence, as well as the monumental reaction by the public (holding a vigil for Rosie), who demand accountability and vindication;

(g) the only motivation of the complainant is to punish needless animal suffering;

(h) no immunity issues arise here;

(i) the victim, Rosie, if she had a human spokesperson or guardian ad litem (and she does through Mr. Wright) would assuredly want to avoid cruel treatment and torture, as all sentient beings (except the masochistic) would; this motivation is necessarily implied from our cruelty laws, which permit prosecution of those who legally "own" the animal victim, as well as defend those animals who have no owners at all.

RCW 9.94A.411 also speaks to standards favoring prosecution. For property crimes, they will be filed "if the admissible evidence is of such convincing force as to make it probable that a reasonable and objective fact-finder would convict after hearing all the admissible evidence and the most plausible defense that could be raised." The evidence provided herein amply convinces

43

under this standard. The *Affidavit of Complaining Witness*, as required by CrRLJ 2.1(c), is attached.

**A final point to consider**: Rosie's death was not the first involving an arguable excessive use of force by DMPD. For instance, on Oct. 10, 2006, a Tuesday, Ofc. S. O'Flaherty shot a dog named Kong, which he claimed "continued to close in on me," making him feel "fearful for [his] own and the safety of the citizens behind [him]." *O'Flaherty Report,* at 4 (Case 06-3775). There is no evidence he tried to reach animal control, deploy a Taser, or use a catchpole. See the video below to consider if he used reasonable force (Kong is just walking up to the officer barking) and then hear Kong's owner crying off-camera:



Whether or not Ofc. O'Flaherty followed appropriate protocol is beyond the scope of this criminal petition, but note that because Kong "appeared to (sic) suffering due to the seriousness of the gunshot wounds," he "euthanized him with another shot **to the head**." *O'Flaherty Report,* at 4 (emphasis added)(**Exh. N**). Not once did Graddon or Wieland even attempt to euthanize by gunshot to Rosie's head.

Respectfully,

ANIMAL LAW OFFICES


Adam P. Karp, Esq.
Encl.: As stated

44





# ANIMAL LAW OFFICES
## OF ADAM P. KARP, JD, MS

114 W. Magnolia Street, Suite 425
Bellingham, Washington 98225

**Bellingham:** (360) 738-RARF (7273)
**Outside Bellingham:** (888) 430-0001
**Fax**: (360) 392-FYDO (3936)
**E-Fax**: (866) 652-3832
**Email**: adam@animal-lawyer.com
**Web**: www.animal-lawyer.com

**By First-Class Mail**

Thursday, February 17, 2011

Jennefer Johnson, Administrator
Des Moines Municipal Court
21630 11ᵗʰ Ave. S., Ste. C
Des Moines, WA 98198-6317
(206) 878-4597
jhenson@desmoineswa.gov

**RE:** *City of Des Moines ex rel. Charles H. Wright v. Michael Graddon & Steve Weiland*
**_Supplement_: Petition for Citizen Criminal Prosecution (CrRLJ 2.1(c))**
**Hearing Date: Feb. 28, 2011 at 9 a.m.**

Dear Judge Alicea-Galvan,

Please consider the attached supplemental submission for consideration on Feb. 28, 2011:

1. ***Declaration of Eugene Nucci* (faxed signature appended):** Of note is Mr. Nucci's interaction with, presumably, Sgt. Wieland, saying, without basis, that there was a "vicious dog in the neighborhood." Further, Mr. Nucci lives directly next door to Ms. Perry and watched as Rosie slowly entered Ms. Perry's backyard and went into the blackberry bushes from which she never emerged, showing no aggression at any time.

2. ***Alarm Registration Application (Apr. 30, 2010):*** Proving that on Nov. 7, 2010, DMPD had access to current information linked to the Wrights' residential address, including cell and work phone numbers not, on information and belief, ever tried by Ofc. Graddon or Sgt. Wieland, including two emergency contacts with phone numbers, neither of whom DMPD bothered to try. This form is redacted to protect the Wrights' privacy.

Respectfully,

ANIMAL LAW OFFICES

Adam P. Karp, Esq.
Encl.: As stated
CC: Graddon/Wieland, City Attorney



IN THE DISTRICT COURT OF SNOHOMISH COUNTY
STATE OF WASHINGTON

FILED
SEP 19 2011
SNO. CO. DISTRICT COURT

IN RE THE CITZEN COMPLAINT
OF CHARLES H. WRIGHT,
            Petitioner

)
)
)
)
)
)
)

DECISION OF THE COURT

HAVING REVIEWED THE FILE HEREIN AND CONSIDERED THE ARGUMENTS

PRESENTED, THE COURT HEREBY ENTERS THE FOLLOWING DECISION:

1. The Petitioner Charles Wright complied with CrRLJ 2.1(c).

2. This Court has the authority to rule on the Mr. Wright's Citizen Complaint Petition.

3. This Court rejects all of the City's arguments and contentions that the citizen complaint
   process set forth in CrRLJ(c) is unconstitutional.  Specifically, this Court rejects the
   notion that the citizen complaint process threatens the "independence or integrity or
   invades the prerogatives" of the prosecuting attorney's charging decisions.  Under CrRLJ
   2.1(c), a district court has the authority to *evaluate* whether a citizen complaint petition
   contains facts sufficient for probable cause.  Then the court is to consider factors (1) – (7)
   to determine whether the filing of charges is justified.  In so evaluating, the court
   considers the prosecution standards under RCW 9.94A.440, whether a criminal
   investigation is pending, and whether other criminal charges could be disrupted.  Further,
   at a hearing, the court allows the county prosecuting attorney to present evidence.  This
   cannot be considered an expansion of the district court's authority, and thus, the authority
   and limitations inherent in CrRLJ 2.1(c) cannot be said to result in the court wearing two
   hats at the same time as argued by the City.

In Re the Citizen's Complaint
Of Charles H. Wright – Page **1**

This is a difficult case, and this Court has thought long and hard about the facts, the issues, and the law that counsels provided.  After a careful review, this Court is not satisfied that probable cause exists, both under City of Des Moines Municipal Code and Revised Code of Washington.

IT IS HEREBY ORDERED that Charles H. Wright's Petition be DENIED.

DATED this 19th day of September, 2011

Judge Tam T. Bui

In Re the Citizen's Complaint
Of Charles H. Wright – Page **2**



1
2
3
4
5
6
7
8
    **IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
9
    **IN AND FOR THE COUNTY OF SNOHOMISH**
10

| | |
|---|---|
| IN RE: CITIZEN COMPLAINT OF CHARLES H. WRIGHT: | No. 11-2-08932-9 (Consolidated with 11-2-09434-9) |
| CHARLES H. WRIGHT, | **ORDER ON REVIEW** |
|                     Petitioner, | |
|   vs. | |
| SNOHOMISH COUNTY DISTRICT COURT, SNOHOMISH COUNTY DISTRICT COURT JUDGE TAM BUI, | |
|                Respondents. | |

11
12
13
14
15
16
17
18
19
20
      THIS MATTER came before the Court on (1) a Notice of Appeal to Superior
21
Court; (2) Petition for Writ of Review; (3) Notice of Cross-Appeal and (4) a Cross-
22
Petition for a Writ of Review where Charles H. Wright and the City of Des Moines
23
sought review of various aspects of a September 19, 2011 *Decision of the Court* rendered
24
by the Snohomish County District Court in an unstyled proceeding, *In re Citizen*
25
*Complaint of Charles H. Wright.* By stipulated order entered on November 3, 2011 all
26
proceedings relating to the September 19, 2011 Decision were consolidated under the
27
above-captioned case.
28
29

ORDER ON REVIEW
PAGE 1 OF 3



**CITY OF LAKEWOOD**
Legal Department
6000 Main Street S.W.
Lakewood, Washington 98499
(253) 589-2489  FAX (253) 589-3774

Between the parties, the following issues are before the Court for determination:

1. The one-year statute of limitations expired on November 7, 2011 without any criminal charges having been filed. Is this case moot?

2. This matter was originally filed in Des Moines Municipal Court, and ultimately transferred to Snohomish County District Court. Did the Snohomish County District Court have the authority to determine this matter when (a) no statute or court rule authorizes transfer of cases from a municipal court to a district court; (b) violations of municipal law were alleged; and (c) all alleged criminal acts occurred within King County? (Cross-Appeal Assignment of Error No. 1).

3. CrRLJ 2.1(c) requires procedural requirements to be met, including an affirmation before a judge and advance notice to the prosecuting authority before filing the required declaration. Mr. Wright's *Declaration* lacks both. Did Mr. Wright comply with CrRLJ 2.1(c)? If not, is this non-compliance fatal? (Cross-Appeal Assignment of Error No. 2).

4. The decision whether to file a criminal charge is reserved to the prosecutor; the Washington Supreme Court has explicitly noted that the decision to file and pursue criminal charges is wholly within a prosecutor's discretion and is not a judicial function. Against this backdrop, does CrRLJ 2.1(c) violate notions of separation of powers, and is therefore unconstitutional? Alternatively, does the continued pursuit of this matter constitute a separation of powers violation? (Cross-Appeal Assignment of Error No. 3).

5. The District Court concluded that probable cause was lacking to commence the criminal prosecutions at issue. Did the District Court properly conclude that probable cause was lacking? (Mr. Wright's Assignment of Error No. 1).

The Court rules and determines as follows:

1. The applicable one year statute of limitations as paced and equitable tolling does not apply. The case is therefore moot. *

2. Sno. Co. Dist. C. had jurisdiction to entertain this matter

3. CRLJ 2.1(c) is akin to a show cause procedure

*under chapters 3.66 and 3.50 RCW.*

*and beyond the other issues stated herein, the Court need not and does not resolve any other issues.*

City of Lakewood

**CITY OF LAKEWOOD**
Legal Department
6000 Main Street S.W.
Lakewood, Washington 98499
(253) 589-2489  FAX (253) 589-3774

1 ~~Facts to a "showcase" property and that the~~

2 ~~filing of the Declaration of Company Witness of Supporting~~

3 ~~Materials does not constitute the filing of a separate~~

4 ~~CeRLJ 7.1(a).~~ complaint under

10

11 Accordingly, It Is ORDERED:

12 1. The Petition for Writ of Review (Case No. 11-2-08932-9) and the RALJ

13 appeal (Case No. 11-2-09434-9) are hereby dismissed as moot.

14 2. The Decision of the Court, entered on September 21, 2011 by the

15 Snohomish County District Court is hereby affirmed.

16 SO ORDERED this 9th day of March, 2012.

17

18 _____

19 Judge

Presented by:

20

21 By: _____

22 Matthew S. ~~Kaser~~, WSBA 32239

23 Special Prosecutor, City of Des Moines

24

**Approved for Entry; Copy Received;**

25 **Notice of Presentment Waived:**

26 ANIMAL LAW OFFICES.

27

28 _____

29 Adam P. Karp, WSB No. 28622

Attorney for Complainant Wright

ORDER ON REVIEW
PAGE 3 OF 3

*City of Lakewood*

**CITY OF LAKEWOOD**
Legal Department
6000 Main Street S.W.
Lakewood, Washington 98499
(253) 589-2489  FAX (253) 589-3774



**IN THE DISTRICT COURT OF SNOHOMISH COUNTY**
**STATE OF WASHINGTON**

| | |
|---|---|
| CITY OF DES MOINES *ex rel.* CHARLES H. WRIGHT and STATE OF WASHINGTON *ex rel.* CHARLES H. WRIGHT;<br><br>    Plaintiff,<br><br>  vs.<br><br>STEVEN WIELAND and MICHAEL GRADDON,<br><br>    Defendants. | **Case No.:**<br><br>**PLAINTIFF'S RESPONSE TO CITY OF DES MOINES'S MOTION TO DISMISS** |

  Plaintiff Charles H. Wright, through attorney Adam P. Karp, responds to the City of Des Moines's *Motion to Dismiss* dated Feb. 28, 2011.

  **A. <u>Complainant Has Complied with CrRLJ 2.1(c).</u>**

  **First**, this objection is moot as Mr. Wright submitted an amended affidavit including this attestation.

  **Second**, the City argues that the affidavit must be submitted prior to the court even considering whether to file a criminal complaint. However, CrRLJ 2.1(c) only demands that the complainant "appear before a judge." Nothing more is required. The court is permitted, but not

**PLAINTIFF'S RESPONSE TO CITY'S**
**MOTION TO DISMISS** - 1

ANIMAL LAW OFFICES OF
**ADAM P. KARP, ESQ.**
114 W. Magnolia St., Ste. 425 ● Bellingham, WA 98225
(360) 738-7273 ● Facsimile: (360) 392-3936
adam@animal-lawyer.com

they executed her. Indeed, Ofc. Shields notes, upon arriving at the Perry residence, "The dog watched us and did not move."

### 4. *Aggressive behavior.*

Next, the City contends no witness contradicts Rosie's "aggressive behavior." *MTD,* 14:16. Such argument seriously misleads the court, since any "specific accounts" of aggression dissipate after they Tasered Rosie on her own property and sent her fleeing. <u>After being Tasered the first time, not one officer even hints at aggressive behavior, general or specific in nature</u>. But, as a reminder, and contradicting the City's provably false statement, Joyce Darby saw Rosie while on the Wrights' property. Sgt. Mohr even interviewed her (and whose name was given to him by Mr. Karp). Ms. Darby states that Rosie was not barking or showing aggression, but "had no expression" and was "just sitting there." **Exh. K to Feb. 11, 2011 Package.** After being rousted from her home, all civilian witnesses (Bryan Burnett, Lora Perry, Kennet Phillipson, and Eugene Nucci) confirm that Rosie showed no aggression, was not barking, charging, snarling, or foaming at the mouth at any time.

### 5. *Rosie "at-large" & DMMC 8.04.020(6), 8.04.210(2), and 8.04.260(4)[12].*

Then the City disingenuously claims, "most significantly of all," that Rosie was at large. First, DMMC 8.04.020(6) deems an animal "at large" only when "off the premises of the owner[.]" As explained above and the City must concede, from the time the officers arrived through the moment they Tasered her, she was not "off the premises." Hence, she only became "at-large" in direct response to the assaultive actions of the defendants. But for their wrongful interference, Rosie would never have been "at-large." Further, once Rosie found refuge on Ms.

---

[12] **Exh. A** includes the entire Title 8 DMMC.

**PLAINTIFF'S RESPONSE TO CITY'S MOTION TO DISMISS** - 16

ANIMAL LAW OFFICES OF
ADAM P. KARP, ESQ.
114 W. Magnolia St., Ste. 425 • Bellingham, WA 98225
(360) 738-7273 • Facsimile: (360) 392-3936
adam@animal-lawyer.com

Perry's property, she lost the contrived status as "at-large" for the reason that Ms. Perry became Rosie's "keeper" and permitted Rosie to remain. *See Perry Statement*, **at 7 (Exh. I).** Thus, when Tasered the first time and shot four times, Rosie was <u>not at-large.</u> This eliminates the City's conclusion that the officers acted "as authorized in law," citing DMMC 8.04.210(2), which defines as an abatable nuisance "[a] domesticated animal running at large."

> **i.** **Lethal abatement procedure did not apply to "at-large status" as Rosie was not "subject to removal."**

First, the City ignores the prefatory statements of DMMC 8.04.260, titled *Abatement of nuisances – Procedure – Appeal.* It begins:

> The following procedure shall apply to the **abatement of animals subject to removal,** to animals not redeemable because subject to cruelty as provided in DMMC 8.04.230, and to kennels, pet shops, and shelters in violation of DMMC 8.04.040 through 8.04.120:

DMMC 8.04.260 (emphasis added). Note that it only applies to "abatement of animals subject to removal." DMMC 8.04.250, titled *Animal declared a public nuisance – Abatement,* provides context for the phrase "subject to removal" to mean excommunication or banishment from the city:

> An animal that has been the **subject of three convictions of a violation of this chapter in a period of 365 days or an animal that bites or attacks a person or persons without provocation twice within a five-year period is a public nuisance and shall not be kept within the city. The chief of police shall follow the procedures set out in DMMC 8.04.260 in order to abate such animal**. After the completion of such abatement procedures, an animal subject to removal from the city as provided in this section that is found within the city shall be impounded and treated as an unredeemed animal with no right of redemption by its owner or keeper. [Ord. 1027 § 1, 1993: Ord. 512 § 7(6), 1980.]

DMMC 8.04.250 (emphasis added). Clearly, Rosie was not an animal "subject to removal from the city" for the reason that she was never the subject of three convictions of a violation within

**PLAINTIFF'S RESPONSE TO CITY'S
MOTION TO DISMISS** - 17

ANIMAL LAW OFFICES OF
ADAM P. KARP, ESQ.
114 W. Magnolia St., Ste. 425 • Bellingham, WA 98225
(360) 738-7273 • Facsimile: (360) 392-3936
adam@animal-lawyer.com

a one year period, did not bite or attack a person without provocation twice in a five-year period. Note that DMMC 8.04.250 references the procedure of DMMC 8.04.260 as the means of abatement. Thus, the City's disturbing attempt to authorize the slaying of Rosie for allegedly being at-large pursuant to DMMC 8.04.260(4) takes dramatic liberties with the plain reading of the code, which would not authorize such *ultra vires* activity. The court should dismiss this argument outright.

            **ii.**    **Lethal abatement secondary to impound by "reasonable means."**

Even if the court rejects the above dispositive arguments, and humors the City by applying DMMC 8.04.260(4), note that abatement must occur by "reasonable means," ordering impoundment if safely achievable and then only if the dog "reasonably appears to constitute an imminent or continuing danger to the public." The Code permits "slay[ing]" only after reasonable efforts to impound fail. As noted above, Rosie was not "at-large," and was not "subject to removal," so this ordinance simply does not apply. Next, she remained on her property and did not present any danger to the public at the time they Tasered her. In no way could the officers' own provocative behavior transform Rosie's behavior into one characterized as dangerous or imminent, much less continuing, and no callers reported or witnessed Rosie threatening people or animals. To be clear, Rosie never bit, attacked, chased, or hurt any person or animal without provocation.

On the issue of "reasonable means" of impoundment, as noted early in in-car dashcam 545, the officers did not know how to deploy the catchpole and asked what they would do even if they ensnared her. Not once did they seek assistance in using the catchpole, ask for a

**PLAINTIFF'S RESPONSE TO CITY'S MOTION TO DISMISS** - 18

Animal Law Offices of
Adam P. Karp, Esq.
114 W. Magnolia St., Ste. 425 • Bellingham, WA 98225
(360) 738-7273 • Facsimile: (360) 392-3936
adam@animal-lawyer.com

properly sized catchpole from dispatch or neighboring jurisdiction, enlist the aid of animal control from King County or other municipalities, or take any steps to answer the question of what to do with her once captured (viz., impoundment). Hence, the "attempts to contain her" by Tasering were ill-conceived and not reasonably calculated to do anything other than startle Rosie and send her running. Even if the court finds that Rosie presented an "imminent or continuing danger to the public" while on the Wrights' property, the officers did not slay her <u>there</u>. Instead, half an hour later, when they found her in Ms. Perry's fenced and densely vegetated backyard, where she was – by all accounts – not moving, sitting quietly, not threatening anyone, none of the officers even attempted to impound her. Instead, they reached for the assault rifle and resorted to lethal force. The officers did not act "reasonably," did not reasonably perceive any imminent or continuing danger to the public, failed to attempt to impound her through means reasonably calculated to achieve that end, and slew her without any legal justification. This ordinance does nothing to exonerate the officers.

### iii. DMMC 8.04.260(4) cannot preempt or conflict with RCW 16.52.207.

For another reason, however, DMMC 8.04.260(4) does not provide a "complete defense." That it conditionally permits "slay[ing] such animal" does not mean officers can slay cruelly. RCW 16.52.207 does criminalize the mere killing an animal, but instead only those slayings effectuated by methods resulting in undue suffering, as occurred here. Thus, even if permitted to kill Rosie (which the Wrights strongly challenge), the City fails to address whatsoever the means by which the defendants "slew" her (i.e., <u>four</u> shots, the first accompanied by the congratulatory backslap and proclamation "Nice!!!" as captured on in-car

**PLAINTIFF'S RESPONSE TO CITY'S MOTION TO DISMISS** - 19

dashcam 521 (which DMPD Sgt. Mohr wrongly claimed never existed ("There was no video footage for car 521 assigned to Officer Shields."))) Further, the City completely ignores the discussion at pages 32-42 of the Feb. 11, 2011 submission of Mr. Karp.

### iv. No authorization to "slay" by Chief of Police.

Lastly, DMMC 8.04.210 only permits slaying when permitted by the "chief of police." The City wrongly argues that DMMC 2.08.020 confers upon "the officers at issue" the right to slay an animal absent consultation with any supervising officer or the Chief of Police. This misstates the code. DMMC 2.08.020 provides:

> The chief of police is appointed by the city manager upon the basis of qualifications and experience for such office. The chief of police is excluded from the provisions of civil service contained in chapter 41.12 RCW, and may be removed from office in accordance with the city personnel manual. Subordinates to the chief of police who qualify as classified employees under chapter 41.12 RCW are appointed and removed pursuant to the provisions of chapter 41.12 RCW and the "Rules and Regulations" of the Des Moines Civil Service Commission. The chief of police so appointed shall qualify before entering upon his or her duties by furnishing a fidelity bond at the expense of the city in a sum to be set by the city manager and upon filing his or her oath to support the governments of the United States, the state, and the city and to the faithful performance of his or her duties. The powers and duties of the chief of police and the subordinates of the chief of police are those granted under the laws of the state, the ordinances of the city, and as determined by the city manager by written executive order. [Ord. 1135 § 2(2)(part), 1995; Ord. 982 § 1(A), 1992. Formerly 2.05.020.]

Nothing in this section automatically extends the powers of the Chief of Police to street or commanding officers. Rather, it states that "subordinates of the chief of police" only have those "powers and duties" as "granted under the laws of the state, the ordinances of the city, and as determined by the city manager by written executive order." No provision of the RCW or DMMC granted Graddon and Weiland the right to slay Rosie without authorization by the Chief

**PLAINTIFF'S RESPONSE TO CITY'S MOTION TO DISMISS** - 20

ANIMAL LAW OFFICES OF
**ADAM P. KARP, ESQ.**
114 W. Magnolia St., Ste. 425 • Bellingham, WA 98225
(360) 738-7273 • Facsimile: (360) 392-3936
adam@animal-lawyer.com

of Police as clearly set forth in DMMC 8.04.260(4). Nor has the City produced evidence of an executive order providing that Graddon and Weiland could disregard the straightforward language of DMMC 8.04.260(4). Lastly, there is no evidence that Sgt. Weiland (not the Chief of Police) consulted with Chief O'Leary prior to ordering Graddon to kill Rosie. DMMC 2.08.020 does not allow patrol officers to make such a decision without police chief authorization. Ostensibly, the entire reason the City council added the phrase "chief of police shall have authority to slay such animal," was to <u>constrain</u> all subordinates and <u>prevent</u> them from doing precisely what took place on Nov. 7, 2010. The City's strained reading not only fails by the language of the ordinance, but would render the use of the phrase "chief of police" superfluous and convert the ordinance into one that would allow life-and-death decisions to be made without any consultation with a supervising officer, much less the Chief of Police.

### 6. *Failure to cooperate with investigation.*

The City then complains about Mr. Wright's failure to assist in the investigation. As noted above, Mr. Karp provided contact information for one witness not known to the City (Joyce Darby) and encouraged Mr. Phillipson to submit to interview by Sgt. Mohr. Mr. Karp did not know of Eugene Nucci until late January 2011 and only obtained his statement in February 2011. Lastly, days prior to Nov. 16, 2011, Mr. Karp emailed and left a voicemail for the City Attorney and the Chief of Police explaining his intent to send Rosie to WSU/CVM for a necropsy, asking if the City wanted to independently examine her prior to her cremation or burial. On Nov. 16, 2011, Interim Police Chief O'Leary left Mr. Karp a voicemail (which can be produced on demand) acknowledging Mr. Karp's message, claiming his appreciation for the notification and offer for examination, but stating at that point he did not believe any additional good would

**PLAINTIFF'S RESPONSE TO CITY'S MOTION TO DISMISS** - 21



# KEATING, BUCKLIN & McCORMACK, INC., P.S.

ATTORNEYS AT LAW

JOHN L. McCORMACK
MARK R. BUCKLIN
RANDAL W. EBBERSON
STEVEN L. THORSRUD
MICHAEL C. WALTER
ANDREW G. COOLEY
STEWART A. ESTES
JAYNE L. FREEMAN
STEPHANIE E. CROLL

800 FIFTH AVENUE, SUITE 4141
SEATTLE, WASHINGTON 98104-3175
PHONE: (206) 623-8861
FAX: (206) 223-9423
E-MAIL: kbm@kbmlawyers.com

RICHARD B. JOLLEY
BRENDA L. BANNON
MARY ANN MCCONAUGHY
SHANNON M. RAGONESI
KIMBERLY J. WALDBAUM
JEREMY W. CULUMBER
ADAM L. ROSENBERG
AMANDA G. BUTLER
BRIAN C. AUGENTHALER

ROBERT C. KEATING (1915-2001)

January 16, 2013

Adam P. Karp
Animal Law Offices
114 W. Magnolia St., Ste. 425
Bellingham, WA 98225-4354

Re:  **CONFIDENTIAL SETTLEMENT NEGOTIATIONS**
     **City of Des Moines adv. Charles and Deidre Wright**

Dear Adam:

Enclosed with this letter you will find a Rule 68 Offer of Judgment from Defendants to Plaintiffs. This Offer of Judgment is being extended at this early stage of litigation as it is a reasonable and economical way to resolve this case before either side incurs expensive costs and attorney fees from litigation. This is an excellent opportunity for Mr. and Mrs. Wright to conclude this case before they have to spend a lot of money on this lawsuit. I trust that you will fulfill your professional responsibilities by sharing this letter and Offer with them, and fully explaining to them all of the benefits of accepting this offer, and the risks if they do not.

No one knows better than you the difficulty in trying to obtain an award of damages greater than fair market value for the death of a pet. The law simply does not allow for the type and amount of damages the Wrights would like to receive for the loss of their pet. Although they are bringing claims of intentional torts and seeking damages for alleged malicious actions by the police, a court has already determined there is no evidence to support an allegation of maliciousness against the officers. In addition, the Wrights' contributing decisions, actions and omissions as pet owners make it unlikely that a jury will place all of the blame on the police for what happened in this situation. As a result, the Wrights are not likely to obtain a jury award in an amount greater than the $51,000 plus reasonable attorney fees and costs being offered to them today.

If Mr. and Mrs. Wright decline this Offer of Judgment, they face a substantial risk of having to pay a large amount of costs and attorney fees out of their own pockets. If they take a chance with a trial and get an award from a jury that is less than the Offer, **they will have to pay all of their own costs and attorney fees that they incur from today until the end of the lawsuit. They will also have to pay all of the Defendants' costs from today until the end of the lawsuit.** As the Wrights have brought a claim under 42 U.S.C. § 1983, which allows recovery of attorney fees as "costs," the Wrights would also be responsible for paying the

Adam P. Karp
January 16, 2013
Page 2

Defendants' reasonable attorney fees as part of the costs they would have to pay at the conclusion of this case. If this case goes all the way through a jury trial, a conservative estimate of costs would be $20,000 to $30,000; and a conservative estimate of attorney fees would be $140,000. These amounts can easily increase depending on the amount of pre-trial discovery, motion practice, and experts that are needed to litigate this case.

Please let me know Mr. and Mrs. Wrights' response to this Offer of Judgment. It will be deemed withdrawn unless written notice of acceptance is received within fourteen days after you receive it.

Thank you.

Sincerely,

Shannon M. Ragonesi

SMR:jh
Enclosure
cc:    Reed Hardesty
K:\SMR\Des Moines adv. Wright - 1002-109\CORRESPONDENCE\l-011613-karp.doc